1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                    SOUTHERN DIVISION

4

5

6    WALLACE DWAYNE PETERSON, JR.,
          Plaintiff,
7

8    VERSUS          CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

9

10   PEARL RIVER COUNTY,
     MISSISSIPPI; DAVID ALLISON,
11   Individually; and JOHN AND
     JANE DOES 1-10, Individually,
12        Defendants.

13

14

15

16              DEPOSITION OF SHANE EDGAR

17

18        Taken at the Pearl River County Sheriff's

19        Department, 171 Savannah Millard Road,

20        Poplarville, Mississippi, on Friday,

21        October 22, 2021, beginning at 9:09 a.m.

22

23

24

25


EXHIBIT
1

```
 1    APPEARANCES:

 2
          G. MORGAN HOLDER, ESQUIRE
 3
          CHRISTOPHER E. SMITH, ESQUIRE
 4
          Smith & Holder, PLLC
 5
          1720 22nd Avenue
 6
          Gulfport, Mississippi  39501
 7
          morgan@smitholder.com
 8
          chris@smithholder.com
 9
              ATTORNEYS FOR PLAINTIFF
10
11        LANCE W. MARTIN, ESQUIRE

12        Allen, Allen, Breeland & Allen, PLLC

13        214 Justice Street

14        Brookhaven, Mississippi  39601

15        lmartin@aabalegal.com

16            ATTORNEY FOR DEFENDANTS

17

18   ALSO PRESENT: Wallace D. Peterson, Jr.

19

20

21   REPORTED BY:

22        NATALIE R. SEYMOUR, CSR #1637
          Schroeder-Lanoux Reporting & Legal Video, Inc.
23        220 Glen Eagles Drive
          Ocean Springs, Mississippi  39564
24        (228)875-2864
          Natalie@SchroederLanoux.com
25
```

1                          TABLE OF CONTENTS

2

3     Examination by:                                  Page:

4       Mr. Holder                                        5

5       Mr. Martin                                       44

6       Mr. Holder                                       62

7

      Exhibits:
8
        Exhibit 1, Notice of Deposition                   5
9
        Exhibit 2, Copy of photographs
10          (CLT - (PETERSON) 000036 - 000061)           18

11      Exhibit 3, Pearl River County,
          Mississippi's Responses to Plaintiff's
12        First Set of Interrogatories                   23

13      Exhibit 4, PRC Sheriff's Department,
          Narcotics Investigative Report                 23
14
      Certificate of Reporter                            68
15

16

17

18

19

20

21

22

23

24

25

```
 1                      STIPULATION
 2         It is hereby stipulated and agreed by and
 3    between the parties hereto, through their
 4    respective attorneys of record, that this
 5    deposition may be taken at the time and place
 6    hereinbefore set forth, by Natalie R. Seymour,
 7    Court Reporter and Notary Public, pursuant to the
 8    Federal Rules of Civil Procedure, as amended;
 9         That the formality of READING AND SIGNING is
10    specifically WAIVED;
11         That all objections, except as to the form of
12    the questions and the responsiveness of the
13    answers, are reserved until such time as this
14    deposition, or any part thereof, may be used or is
15    sought to be used in evidence.
16                         - - -
17
18
19
20
21
22
23
24
25
```

```
1                    (Exhibit 1 was marked.)
2                         SHANE EDGAR,
3               having been first duly sworn, was
4               examined and testified as follows:
5                            - - -
6                         EXAMINATION
7   BY MR. HOLDER:
8        Q.    How would you like me to refer to you,
9   Officer Edgar, Shane?  Does it matter?
10       A.    Doesn't matter to me, man.
11            MR. HOLDER:  Let the record reflect this
12       is the deposition of Shane Edgar.
13  BY MR. HOLDER:
14       Q.    What's your title?
15       A.    My rank is captain.  My title is patrol
16  commander.
17       Q.    Okay.  Captain, patrol commander, Pearl
18  River County Sheriff's Department?
19       A.    Yep.
20            MR. HOLDER:  This is taken pursuant to
21       notice.  Reserve all objections, Lance, save
22       to the form of the question?
23            MR. MARTIN:  Yes.
24  BY MR. HOLDER:
25       Q.    All right.  State your full name for the
```

1   record, please.

2        A.   Shane Michael Edgar.

3        Q.   And what city do you reside in, Shane?

4        A.   Carriere.

5        Q.   And are you from Pearl River County?

6        A.   I moved here in 2000, in between my

7   sophomore and junior year.

8        Q.   Okay.  How old are you right now?

9        A.   Thirty-eight.

10       Q.   And did you graduate high school?

11       A.   I did.

12       Q.   Where did you go to high school?

13       A.   Pearl River Central.

14       Q.   Okay.  And did you go to any college?

15       A.   Sure did.

16       Q.   And where did you go to college?

17       A.   I got my associate's through PRCC, and I

18  got my bachelor's from Southwestern Kansas.

19       Q.   And what is that bachelor's degree in?

20       A.   Criminal justice.

21       Q.   And how long have you been in law

22  enforcement?

23       A.   Since 2005.

24       Q.   And where did you begin your law

25  enforcement career?

1      A.    I began here.  And I've been here the
2  whole time.
3      Q.    And what type of training did you
4  receive prior to or as a condition of your
5  employment with Pearl River County?
6      A.    I've been through the basic law
7  enforcement academy.  Man, if you want a whole
8  list, we're going to be here a minute.  I've been
9  through interview interrogation tactics.  I've
10  been through SFST.  I've been through basic SWAT.
11  I've been through high-risk warrant operations.
12  I've been through, gosh, patrol's response to
13  narcotics.  I've been through K9 certification,
14  which is basic K9 certification.  I've been
15  through -- I'm trying to think.  It's hard to come
16  off the cuff with all the classes, but --
17      Q.    So needless to say, you've undergone and
18  completed a lot of training?
19      A.    Yes, sir, I have.
20      Q.    Okay.  And are you required to, you
21  know, do a certain amount of training hours every
22  year or anything like that?
23      A.    No, sir.  That is not a State
24  requirement.
25      Q.    Got you.  And when you began with Pearl

1    River County Sheriff's Department, what capacity

2    were you employed?  Were you a deputy?

3         A.    I started in the jail.

4         Q.    Okay.  And just go through -- let's just

5    say since 2015.  Let's start in 2015.  Do you

6    recall what job was then?

7         A.    2015, I would have been a patrol

8    supervisor as a sergeant.  And then about

9    three -- going on three years ago now I was

10   promoted to captain as a patrol commander.

11        Q.    So at the time of the incident that's

12   the basis of Mr. Peterson's complaint, you were

13   already a patrol commander?

14        A.    I believe so.

15        Q.    Did you review any materials before your

16   deposition today?

17        A.    No, sir.

18        Q.    Did you speak to anybody in preparation

19   for your deposition today?

20        A.    I spoke to Lance, and I spoke to Ryan

21   Stachura.  Ryan Stachura has been coordinating

22   dates and times for us to come here, so he's the

23   one that's been telling us what's coming up.

24        Q.    Okay.  And we've kind of scheduled these

25   things to where, you know, we're trying to do a

```
 1    lot of depositions in a short amount of time.  So

 2    I'm going to skip over a lot of the background

 3    stuff that we'd normally get into.

 4              Do you recall the events of August 23rd,

 5    2019, at Mr. Peterson's residence?

 6        A.    Yes, sir.

 7        Q.    Okay.  Let me ask you this:  Did you

 8    know who Wallace Peterson was before then?

 9        A.    I had heard the name, but I didn't know

10    him directly.

11        Q.    Okay.  When did you become involved in

12    this investigation?

13        A.    The morning of.

14        Q.    The morning of the 23rd?

15        A.    If that's the day it occurred, yes.

16        Q.    Okay.  Was there an operations plan in

17    place for the execution of this warrant?

18        A.    Yes, sir.

19        Q.    And who put that plan together?

20        A.    Ryan Stachura.

21        Q.    And when did y'all go over that plan?

22        A.    The morning of.

23        Q.    The morning of the 23rd?

24        A.    (Witness nodded affirmatively.)

25        Q.    And who all was present for the
```

```
 1   operations plan?
 2        A.   Oh, geez.  Pretty much everyone that
 3   went there other than personnel that were -- I
 4   think they had a couple of people that were in the
 5   area, but I don't -- I mean, if you need a by-name
 6   roster, that's going to be -- I can tell you who I
 7   remember.
 8        Q.   Was Van there?
 9        A.   I don't remember directly.
10        Q.   Was Sheriff Allison there?
11        A.   I believe so.
12        Q.   Was Rob there?
13        A.   Yes.
14        Q.   Was Officer Quave there?
15        A.   See, I don't remember who was in the
16   area.  That's where I'm -- and there would have
17   been two other narcotics officers.  So I know Ryan
18   was there, but I can't remember who else would
19   have been on scene as far as narcotics officers
20   are concerned.  I remember they had some that were
21   in the area in case the individual got mobile we
22   could make a traffic stop on them.
23        Q.   Where did this ops plan meeting take
24   place?
25        A.   Narcotics office.
```

```
1        Q.    And where is that?

2        A.    It's on grounds here.

3        Q.    And do you recall what time it was?

4        A.    No.

5        Q.    If I told you that y'all arrived at

6   Mr. Peterson's house shortly after 8:00 in the

7   morning --

8        A.    Then it would have been before that in

9   the morning.  I mean, it was an hour or two before

10  we arrived.

11       Q.    And before that -- well, let me ask you

12  this:  How did you know to be there that morning?

13       A.    I was contacted and advised that we had

14  a search warrant to conduct, and I believe I would

15  have been contacted by Ryan Stachura.

16       Q.    And the first time you were contacted

17  about it was that morning?

18       A.    Uh-huh.

19       Q.    So you had no idea about this

20  investigation until that morning?

21       A.    I might have received a call the day

22  before.

23       Q.    Okay.  Do you know who that call would

24  have been from?

25       A.    See, we're talking a while back.  Our
```

1    information flow a lot of times comes from text

2    message or calls.  It would have either been from

3    Ryan or Daniel Quave would have been probably the

4    one that would have put it out.

5         Q.   And when these text messages and calls

6    come in, are they coming through personal cell

7    phones or work cell phones?

8         A.   Work.

9         Q.   And are those messages and calls

10   archived, the records of those?

11        A.   I don't know.

12        Q.   How many, we'll call it, search

13   warrants -- residential search warrants in

14   narcotics cases had you executed prior to the one

15   in Mr. Peterson's case?

16        A.   Ballpark?

17        Q.   Just rough estimate.

18        A.   I'd say probably over 100.

19        Q.   Okay.  And in each one of those, is it

20   customary or is it procedure to have an operations

21   plan where you meet to discuss how you're going to

22   execute those things?

23        A.   If time allows, yes.

24        Q.   Outside of extenuating circumstances?

25        A.   Yes.

```
 1        Q.    And in this case, what was the general
 2   operations plan that Officer Stachura put in
 3   place?
 4        A.    That we were going to meet up here, that
 5   we had some personnel that were already in the
 6   area.  They described the residence, and then the
 7   plan was put together on the flow that was going
 8   to go out there as far as the general order of
 9   personnel.  We identified personnel that were
10   going to be on perimeter, personnel that were
11   going to be on entry.  Then we went through
12   the -- the intent was to secure the residence and
13   execute the search warrant.
14        Q.    Okay.  And this order of personnel, who
15   was going to be involved in the entry of this
16   residence?
17        A.    Obviously myself, Shane Tucker, Tyler
18   Tate.
19        Q.    Tyler Tate, is that what you said?
20        A.    Yes.  Daniel Quave.  Did I mention Shane
21   Tucker?
22        Q.    You did.
23        A.    And Rob Williams.  I believe that was
24   going to be it.
25        Q.    Who's Tyler Tate?
```

```
1        A.    He's a sergeant on patrol.

2        Q.    Is he still employed here?

3        A.    He is.

4        Q.    And he was present that morning?

5        A.    He was.

6        Q.    All right.  When y'all left the

7    narcotics office to begin going to Mr. Peterson's

8    house, were y'all all in separate vehicles, or

9    were some people riding together; do you recall?

10       A.    Yeah, there were some people -- most of

11   the time we try to limit the amount of vehicles we

12   take, but some people were by themselves.  Some

13   people had multiple people.

14       Q.    Was there a K9 unit out there?

15       A.    Yes.

16       Q.    And do you know whose unit that might

17   have been?

18       A.    I want to say David Bean.  I'm trying to

19   remember if he came with us or if he came later

20   for search capabilities.

21       Q.    And during this operations meeting, what

22   did Mr. Stachura explain about the underlying

23   facts and circumstances about the case or the

24   investigation?

25       A.    From my recollection, he -- we talked
```

1   about that there was evidence of drug sales.  And

2   it was a narcotics search warrant, so we were

3   going in.  That's about what I remember about it.

4        Q.   Did you see the warrant?

5        A.   He had a packet of paper with him,

6   but --

7        Q.   So you're running point on this; right?

8   You're going in first?

9        A.   Yes.

10       Q.   Normally would it be incumbent on the

11  person running point or someone close by to have a

12  copy of the warrant to give to the resident?

13       A.   No.

14       Q.   So y'all don't give copies of search

15  warrants?

16       A.   We're not going to have something in our

17  hands that's going to keep our hands full when

18  we're trying to execute a search warrant.  That

19  would be an officer safety issue.  So that's

20  why we -- it's brought with us, but that's not

21  going to be the person that's on point.  It's

22  normally the people -- it's normally someone

23  that's coming in directly --

24       Q.   And during the operations plan, did

25  Officer Stachura indicate any reason for there to

1   be concern about, you know, any history of

2   violence or danger?

3        A.   I remember the conversation was had

4   about there are suspected weapons in the household

5   and -- but I don't remember a whole bunch past

6   that point.

7        Q.   I'm assuming anytime you execute a

8   warrant at a residence, you're going to suspect

9   there might be a weapon in the house somewhere;

10  right?

11       A.   I suspect everyone has a weapon at all

12  times.

13       Q.   You didn't have any specific

14  intelligence that Mr. Peterson was a danger, I

15  guess is what I'm getting at?

16       A.   I don't remember if he put anything out

17  about that or not.

18       Q.   Okay.  Now, when y'all arrived at his

19  residence, kind of walk me through exactly how

20  everything went down from you getting out of the

21  car, walking to the front door.  Who were you

22  with?

23       A.   When we pulled up, I exited my vehicle.

24  As we were coming around, I was on point as we

25  were coming up to the front door.  It's a

```
 1    single-wide mobile home.  As I was approaching the
 2    front door, we had someone there with breaching
 3    capabilities.  And the door was unlocked, if I
 4    remember correctly.  So we made it to the door,
 5    and upon getting to the door, we knocked, grabbed
 6    the door handle and entry.
 7         Q.   All right.  And so y'all get to the
 8    door.  You knock, notice the door's open and walk
 9    in.  Is that, generally speaking, how it went
10    down?
11         A.   Generally speaking, that's correct.
12         Q.   And when you walked in, Mr. Peterson was
13    asleep on the couch?
14         A.   He was laying on the couch, correct.
15         Q.   Now, you walked in first?
16         A.   That's correct.
17         Q.   Was anybody standing directly behind you
18    or to the side of you?
19         A.   Yes.
20         Q.   Who was that?
21         A.   I believe Shane Tucker was directly
22    behind me.
23              MR. HOLDER:  Lance, the CLT Bates Stamps
24         36 through 61, all the photos, I'm just going
25         to introduce these in globo as Exhibit 2.
```

```
1              MR. MARTIN:  No objection.

2                      -  -  -

3              (Exhibit 2 was marked.)

4    BY MR. HOLDER:

5         Q.   And how many of y'all were around the

6    door at this point in time?

7         A.   I couldn't give an accurate count on

8    that, sir.

9         Q.   Let me ask you this:  Pursuant to the

10   operations plan, where would Sheriff Allison and

11   Ryan Stachura have been at that point in time?

12   Were they guarding the perimeter?

13        A.   They were in the rear of the stack of

14   vehicles.  So upon our arrival, when we made

15   entry, they were -- to my knowledge, everything

16   was secure and done by the time I first saw Ryan

17   come into the house.  And when we -- I don't know

18   where they were, but they were not in the stack

19   with us, if that makes sense.  They were in the

20   vehicle stack, but they were not in the stack

21   going in the door.

22        Q.   Do you know if they were inside their

23   vehicles or outside their vehicles at that point

24   in time?

25        A.   At that time, I don't know.
```

1       Q.    But do you recall from the operations

2    plan where they were supposed to be at that point

3    in time?

4       A.    They were following up the rear.

5       Q.    Okay.  When you say "following up the

6    rear," was that a single-file line or kind of

7    wrapped around the house there?

8       A.    So his driveway, if I remember

9    correctly, is toward the left side of his house.

10   When we pulled in -- and we do these often enough

11   that it's not necessarily a plan of you're going

12   to park here, you're going to park here, you're

13   going to park here all the time.  Due to driveways

14   being different, people pulling up, we start

15   parking.

16          So, no, I can't tell you where the

17   sheriff was parked.  I can't tell you if the

18   sheriff was sitting in his car.  He rode with

19   Ryan, I do remember that, but --

20      Q.    The sheriff and Ryan rode together?

21      A.    Correct.

22      Q.    What you're saying is when y'all went in

23   the front door, they weren't in the vicinity of

24   y'all?  They were somewhere outside, basically?

25      A.    That's correct.

1      Q.    Okay.  And when you breached the front

2    door, all right, tell me what happens at that

3    point.

4      A.    Upon breaching the front door, I was

5    announcing myself as sheriff's department.  I said

6    it multiple times as I was coming into the door

7    and through the door.  I started in.  I noticed

8    that there was a white male laying on the couch,

9    which we later identified as Wally Peterson.

10           As I came in, he sat up, looked at me.

11   We made eye contact.  I was making verbal

12   commands, show me his hands and to get on the

13   ground.  He looked at me.  He then -- I saw him

14   look to the right.  As I was approaching, I was

15   beginning to holster my sidearm as I was going to

16   take him into custody, at which point he grabbed a

17   wine bottle.  And when he grabbed the wine bottle

18   with his right hand, he picked it up, spun it

19   around as if to be used as a weapon.  The wine

20   bottle was on a little table beside the couch.

21      Q.    Like a coffee table?

22      A.    Yes.

23      Q.    Was this on the coffee table between the

24   front door and the couch?

25      A.    It was kind of toward the right of him.

1    So when he sat up, he reached to his right.  And

2    he was laying with his head to the left when I

3    came in the door.

4         Q.   And when you came through the door, did

5    you have your firearm drawn?

6         A.   I did.

7         Q.   And what kind of gun was what?

8         A.   That would have been a GLOCK 34.

9         Q.   Can you explain what that looks like?

10        A.   It is a black pistol, semi-auto.

11        Q.   Was anybody carrying a rifle or a

12   shotgun-type weapon?

13        A.   It wouldn't surprise me, but I don't --

14        Q.   Do you know where Tyler Tate was during

15   the entry?  Was he with you in your little group

16   right there?

17        A.   Uh-huh.

18        Q.   So he was involved in the entry with

19   y'all?

20        A.   But he was further back in the stack,

21   yes.

22        Q.   Let me ask you this:  About how long did

23   it take from the time you walked in the door until

24   the time you got Mr. Peterson handcuffed?

25        A.   It was a pretty short amount of time.

```
 1        Q.    We talking, like, five seconds, ten
 2    seconds?
 3        A.    Before I made contact with him, or
 4    before he was in custody?
 5        Q.    Once you got inside the residence.
 6        A.    I understand.  I'm asking before I made
 7    contact, or before he was in custody?
 8        Q.    From the time you walked in his front
 9    door until the time he was in handcuffs.
10        A.    I would say probably 10, 15 seconds.
11    Well, actually, that might be a little short.
12              It's hard to judge time on that.  I know
13    that when I came in, it would have probably taken
14    me five seconds to get across the room and make
15    contact with him.  And then whenever he was placed
16    on the ground, he was trying to pull his hands
17    underneath him, and it took me a couple of seconds
18    to get his hands back around his back.
19              So, you know, 20 seconds or so,
20    somewhere in that ballpark.
21        Q.    Did you notice that he was bleeding?
22        A.    Once we got him up, yes.
23        Q.    And do you know how he was cut?
24        A.    I do not.
25        Q.    And when you say you took him to the
```

1   ground, explain to me exactly how that happened.

2        A.    When I came in, as I said, he was laying

3   there.  He had grabbed the wine bottle.  I grabbed

4   his other arm and pulled him off the couch to take

5   him to the ground so that he, one, couldn't

6   utilize a weapon; two, so that he would be -- I

7   could get him in handcuffs.  So it would have been

8   basically a left arm, straight arm bar takedown.

9        Q.    And who would have been in the position

10  to observe everything that happened up to that

11  point?

12       A.    Shane Tucker.

13       Q.    Just you and Shane Tucker?

14       A.    I don't want to say just Shane Tucker,

15  but I think with him being behind me -- directly

16  behind me, he would have had the best view.

17            MR. HOLDER:  Okay.  We're going to mark

18       the interrogatory responses from the County,

19       Lance, as Exhibit 3 and the investigative

20       report as Exhibit 4.

21                     - - -

22            (Exhibits 3 and 4 were marked.)

23  BY MR. HOLDER:

24       Q.    Did anybody else participate in the

25  takedown and putting Mr. Peterson in handcuffs, or

1   was it only you?

2        A.   I got him in the handcuffs.  Tyler Tate,

3   I believe, was the one that assisted with the pat

4   down.  So once I got the hands secured, he did the

5   pat down and checked for weapons.

6        Q.   And was he immediately transferred

7   outside?

8        A.   It was pretty quick.

9        Q.   Okay.  And do you recall what he was

10  wearing?

11       A.   No, sir.

12       Q.   If I told you he was just in his

13  underwear and shoes, would you agree with that?

14       A.   I couldn't agree or disagree.  Like I

15  said, I absolutely don't remember what he was

16  wearing.

17       Q.   Did you stay inside after he was taken

18  outside?

19       A.   We took him outside.  He was handed off.

20       Q.   Do you recall who you handed him off to?

21       A.   Ryan Stachura was out there, and we took

22  him out there.  We were still in the process of

23  doing our secondary sweep, which is our

24  standard --

25       Q.   Making sure there's nobody in there with

1    guns or something?

2        A.    Making sure, yeah, there's not someone

3    hiding under a couch, hiding in a closet,

4    something like that.

5        Q.    And the same people that were involved

6    in the entry were involved in the secondary sweep?

7        A.    That is correct.

8        Q.    All right.  And then at some point in

9    time did Sheriff Allison and Ryan Stachura enter

10   the residence, as well?

11       A.    Oh, I'm sure.

12       Q.    At some point in time, did everybody

13   enter the residence; do you know?

14       A.    I can't tell you where everyone went.

15       Q.    Okay.  Were you in there when the search

16   of the residence was taking place?

17       A.    Part of it, yes.

18       Q.    Okay.  And when did you leave?

19       A.    I was in and out of the residence a time

20   or two, just walked out to -- once we secured

21   everything, did our secondary sweep, I mean, stuff

22   like walking out to my vehicle, taking my vest

23   off, putting my vest in the car and stepping back

24   in.

25              The primary individuals doing the search

1    is normally narcotics.  We will assist, but they

2    had narcotics officers in there searching, but we

3    spent time -- I spent time inside and out.

4        Q.    Do you know Jeffrey Horner?

5        A.    Yes.

6        Q.    Was he there?

7        A.    I believe so.

8        Q.    Nathan Davis?

9        A.    Yes.

10       Q.    Also there?

11       A.    Yes, he was.

12       Q.    Any of those two involved in the initial

13   entry?

14       A.    I believe both of them were on

15   perimeter.

16       Q.    Terrence Tucker?

17       A.    That would be Shane Tucker.

18       Q.    And what about Van Giadrosich?  Was he

19   involved in the entry or perimeter or some other

20   responsibility?

21       A.    Honestly, I don't know.  I don't know

22   where he was.  I remember seeing him that day, but

23   I don't even remember what he was doing.

24       Q.    Now, when you say -- Mr. Peterson was

25   placed in custody; is that right?

```
 1        A.    Correct.

 2        Q.    Was he under arrest?

 3        A.    At that point, yes.

 4        Q.    And what was he under arrest for?

 5        A.    For my aspect of it, it would have

 6   been -- at the very minimum, I would have charged

 7   him with resisting arrest; but he was handed over

 8   to Ryan Stachura at that point.

 9        Q.    But what would he be resisting arrest

10   for?  This was a search warrant; right?

11        A.    Uh-huh.

12        Q.    Okay.  What was he resisting arrest for?

13   He wasn't charged with anything at that point in

14   time, was he?

15        A.    Because he was being disorderly when I

16   told him to show me his hands and he grabbed for a

17   weapon.

18        Q.    Okay.  But that's not resisting arrest

19   because he's not under arrest at that point in

20   time; right?

21        A.    When I'm placing him under arrest for

22   disorderly conduct, yes, it would be.

23        Q.    You said once you placed him under

24   arrest, he was no longer resisting.  So I'm just

25   trying to figure out what he was being placed in
```

1    custody or arrested for.  I understand that y'all

2    have to secure the premises when you're executing

3    the search warrant.  I keep hearing that he was

4    placed in custody, and I keep trying to figure out

5    what he was under arrest for.

6        A.    Well, when you grab a weapon whenever

7    you're being told not to, then I'm going to place

8    you in custody.

9        Q.    Let me ask you this:  Who was involved

10   in taking all of these photographs; do you know?

11       A.    I believe that would have been Ryan

12   Stachura.

13       Q.    Okay.  You didn't take any of these?

14       A.    No, sir.

15       Q.    I'm going to hand you what's marked as

16   Exhibit 2 and just have you go through these and

17   tell me if you recognize a lot of that stuff.  The

18   first picture, that's Mr. Peterson; right?

19       A.    Uh-huh.

20             THE COURT REPORTER:  Is that "yes"?

21             THE WITNESS:  Yes.  I'm sorry.

22             Some of these are familiar.  Some of

23        them, like I said, I don't -- I didn't take

24        all the pictures, so obviously some of the

25        stuff that he took pictures of I necessarily

```
 1          didn't see.
 2     BY MR. HOLDER:
 3          Q.    All right.  Do you see these -- on the
 4     second and third -- the two pages after the
 5     picture of Mr. Peterson up front, do you see these
 6     Cool Blue wine bottles?  Do you recall those being
 7     in the top of the kitchen cabinet?
 8          A.    No, I don't.
 9          Q.    Okay.  Do you recall what the wine
10     bottle looked like that he allegedly picked up?
11          A.    It was dark in color, but I don't
12     remember much else from it.
13          Q.    Do you remember if it was empty?
14          A.    I don't.
15          Q.    Can you show me in these pictures a
16     picture of it?
17          A.    No, I cannot.  At least I didn't see it
18     unless it's one of those that are sitting there,
19     but I don't --
20          Q.    I mean, would you agree that it would be
21     important to take a picture of the "perceived
22     weapon" that he was threatening y'all with?
23          A.    Probably, yes.
24          Q.    Was there any body cameras being worn?
25          A.    I wasn't wearing one.
```

```
 1        Q.    Does the County have body cameras?

 2        A.    They do.

 3        Q.    I mean, does everybody have them?

 4        A.    Especially during that time, a lot of

 5   people didn't because we were in the process -- I

 6   say "a lot."  Some people didn't have them because

 7   we were rotating through ordering some.  We had

 8   some that were broken.  And they are expensive

 9   items, so there are times that we're short on body

10   cams; which I go without one quite a bit because I

11   hand mine off to patrol officers who do patrol

12   activities every day.

13        Q.    Do you know out of the seven or eight,

14   nine officers that were there, whether all of

15   theirs were broken?

16        A.    I would imagine not.

17        Q.    Is there any reason, to the best of your

18   knowledge, why nobody was wearing theirs or had

19   them activated?

20        A.    It's not required for us to wear them on

21   SWAT operations.

22        Q.    Why is that?

23        A.    Well, one of the reasons is the nature

24   of what we're doing.  We go over fences, and they

25   get tore up and broke, and they're expensive; but
```

1    it's not a requirement.

2         Q.    What about when executing a search

3    warrant when you know you're likely to be in

4    contact with a member of the public or a suspect

5    or something like that?  Are y'all required to

6    wear them then?

7         A.    (Witness nodded negatively.)

8         Q.    Are y'all ever required to wear them?

9         A.    Patrol is required to wear them.  It's

10   primarily a patrol tool.

11        Q.    Were there any patrol officers out

12   there?

13        A.    There were.  But they were not acting in

14   a patrol capacity, the ones that went in on the

15   entry.

16        Q.    What patrol officers were out there?

17        A.    Nate Davis, I believe David Bean, Tyler

18   Tate, myself.  That's all I can think of off the

19   top of my head.

20        Q.    Who was Nate Davis?

21        A.    Corporal Davis.

22        Q.    I'm going to hand you what's been marked

23   as Exhibit 3.  This is the County's responses to

24   interrogatories.  I'll ask you to turn to the

25   response to Question 21.  I think it's the last

```
 1   response in there.
 2            It's Response Number 24, I'm sorry, on
 3   Page 21.  And do you see the last paragraph
 4   beginning with "without waiving any objections"?
 5   Do you see where I'm at on Page 21?
 6        A.   Yes, sir.
 7        Q.   Okay.  And it says that you participated
 8   in answering these interrogatories.  Do you see
 9   that?
10        A.   Uh-huh.
11        Q.   And do you recall doing that?
12        A.   All right.  What do you mean by
13   "interrogatories"?
14        Q.   These are written questions that are
15   propounded by a party to another party in
16   discovery.
17        A.   Yes, sir.
18        Q.   And they're required to be signed under
19   oath.  In this case, I believe it was Officer
20   Stachura that signed, but it says that you and
21   Officer Stachura and Sheriff Allison all
22   participated in answering them.
23            Do you recall having discussions about,
24   you know, any of these questions?
25        A.   I'd have to go through the questions,
```

1    but I've had conversation about it, yes.

2        Q.    And were y'all all having these

3    conversations together, or was it something that,

4    you know, was -- I'm not asking the context of any

5    discussions between you and Lance, but do you

6    recall whether or not this was, like, a meeting

7    y'all had together, or was it individually or

8    what?

9        A.    I know that I have spoken with the

10   sheriff and Ryan at the same time about this.   I

11   don't remember exactly when this came about.

12       Q.    All right.   Let me get to this.   After

13   everything happened, okay -- I mean, obviously

14   just generally speaking, if you're running point

15   in an operation, are you required to do a report

16   if there's any use of force or anything like that?

17       A.    No, sir.

18       Q.    Is it, generally speaking, just the lead

19   investigator, lead officer that's required to

20   write the report?

21       A.    (Witness nodded affirmatively.)

22       Q.    So subsequent to this, who did you speak

23   with about this incident that day?

24       A.    Well, I spoke to Ryan Stachura about the

25   incident.   I mean, on scene multiple people spoke

```
 1   to each other.  Everyone that was on scene spoke
 2   to each other at one point or another about the
 3   situation, I'm sure.
 4        Q.   And your testimony is that you just
 5   basically grabbed Wallace and took him to the
 6   ground or led him to the ground by his hand and
 7   cuffed him; right?
 8        A.   There was a little bit of a struggle
 9   where he was trying to keep his hands behind
10   him -- I mean, underneath him, like he was trying
11   to pull his hands forward, but that's -- in a
12   nutshell, yes.
13        Q.   Did you ever strike him?
14        A.   No, sir.
15        Q.   Okay.  And you spoke to Ryan.  And when
16   you spoke to Ryan -- obviously Ryan is doing the
17   report -- was this at the scene, or was this in a
18   briefing later on here or what?
19        A.   I know I spoke to him at the scene.
20        Q.   Okay.  Because Ryan couldn't see all of
21   this going on; right?
22        A.   Correct.
23        Q.   But Shane Tucker could; is that correct?
24        A.   That's correct.
25        Q.   All right.  I'm going to hand you what's
```

```
 1    been marked as Exhibit 4.  This is the Narcotics

 2    Investigative Report.  And I'm going to ask you to

 3    read the -- you can just take your time and read

 4    Paragraph 27.  Would you agree that it says there

 5    that Wallace was struck by a SWAT deputy?

 6         A.   Yes, sir.

 7         Q.   And do you have any idea where that

 8    information could have come from?

 9         A.   It might have been a description on the

10    takedown.  Because I did grab him -- I did grab

11    him pretty hard to take him to the ground because

12    he had a weapon.

13         Q.   He uses the word "struck" and then uses

14    the word "placed" on the ground to be handcuffed.

15              So did you ever tell Ryan that you

16    struck him?

17         A.   No, sir.  I don't remember that I said

18    that, no.

19         Q.   Did you see Wallace after he was taken

20    outside?

21         A.   Yes, sir.

22         Q.   And where was he when he was outside?

23         A.   I saw him in a patrol car, standing

24    beside it another time.

25         Q.   Did you ever see him in the back of a K9
```

```
 1   unit?
 2        A.    It might have been the K9 unit.
 3        Q.    Could you see that he was still bleeding
 4   when you saw him?
 5        A.    By the time I got back out, it looked
 6   like it had quit bleeding.
 7        Q.    Do you know if anybody ever offered him
 8   any medical treatment or anything?
 9        A.    That would have been done when I was
10   inside.
11        Q.    So you don't know whether anybody did or
12   not?
13        A.    I don't recollect.  I don't remember.
14        Q.    And if you don't know, you don't know.
15        A.    Yeah, that's what I'm saying, I don't.
16        Q.    I'm not trying to trick you here.
17        A.    No.  No, I know.  Like I said, I --
18        Q.    Let me ask you this:  At this point in
19   time, you and Officer Stachura, y'all worked
20   together; right?
21        A.    Uh-huh.
22        Q.    Did y'all handle a lot of cases
23   together?
24        A.    Uh-huh.
25        Q.    You know, discuss a lot of cases
```

1    together that y'all might not have been working

2    directly on together?

3         A.   We've discussed cases, yes.

4         Q.   And up until the morning of this

5    incident, you know, this is the first time you

6    really kind of knew who Wallace Peterson was,

7    basically?

8         A.   Like I said, I knew the name, but I

9    didn't know him directly.

10        Q.   If there had been a methamphetamine

11   investigation ongoing for three years, would that

12   have been kind of very rare for you not to know

13   about it?

14        A.   It would be very rare for me to know

15   about it.

16        Q.   Okay.  Even if it's, you know, somebody

17   that you work with all the time?

18        A.   That's not how narcotics investigations

19   work.  If they're working something, then

20   oftentimes it's a need-to-know situation.  If

21   there's no reason for me to need to know, then he

22   wouldn't have told me about it regardless of how

23   long he worked it.

24        Q.   He wouldn't ask you maybe, hey, do you

25   know Wallace Peterson, ever heard of any, you

1  know, rumors of him dealing meth or anything like

2  that?

3       A.   He might have, but I don't remember him

4  doing that.

5       Q.   How many narcotics investigations have

6  you been involved in?

7       A.   Direct or indirect or both?

8       Q.   Both.

9       A.   Hundreds.

10      Q.   Okay.  I mean, usually over the course

11 of three years, would you agree that, you know,

12 you're going to try to set up some type of

13 controlled-buy situation?

14      A.   Yeah, normally.

15      Q.   Now, do you recall there being some type

16 of whiskey or moonshine, whatever the hell you

17 want to call it, in these mason jars in there?

18 Whether you saw it or not, did you know it was

19 there?

20      A.   Yes.

21      Q.   Okay.  Do you recall ever seeing anybody

22 pouring that stuff out?

23      A.   No, sir, I don't recall that.

24      Q.   Did anybody there have a camera with

25 them that you know of?

1        A.    Obviously someone took pictures, which

2    Ryan did.

3        Q.    Well, that was probably a bad question.

4    A video camera?

5        A.    That, I don't know.

6        Q.    Okay.  Do you recall if Officer Quave

7    had a video camera with him?

8        A.    I don't remember if anyone did.

9        Q.    Okay.  And the reason I'm asking you is

10   because in the investigative report, there's a

11   snippet where it was being videoed as he was

12   pouring out this whiskey.  And there was never any

13   video produced, so I didn't know if you had seen

14   this happen or not.

15       A.    (Witness nodded negatively.)

16       Q.    No?

17       A.    If I did, I don't remember it.  But the

18   amount of illegal alcohol I've poured out in my

19   career or had people to pour out, that's not

20   something that would stick out, honestly.

21       Q.    See, where we're from, illegal and

22   alcohol usually don't go together.

23       A.    Where are you from?

24       Q.    Harrison County.  You know, as long as

25   you're 21, it's pretty much all legal.

```
1          A.    Right.

2          Q.    I know it's different here.

3                Anyway, so you didn't see Officer Quave

4    filming Ryan or anyone else pouring this stuff

5    out?

6          A.    I don't remember.

7          Q.    I'm assuming if that happened, that

8    would have happened outside?

9          A.    It could have been inside or outside.

10         Q.    Okay.  Is it uncommon for somebody to

11   use their Smartphone to film something like that?

12         A.    No.

13         Q.    Would Officer Quave have had a body

14   camera?

15         A.    I don't know.  Possibly.

16         Q.    During the ops plan, did Ryan ever

17   discuss with you that he was seeking a no-knock

18   warrant?

19         A.    I don't remember.

20         Q.    Was it your understanding whether this

21   was or was not a no-knock warrant?

22         A.    I don't remember if he -- I don't

23   remember that.  I know it would have been in the

24   brief, but --

25         Q.    Now I'm going to ask a couple of
```

```
 1    personal questions here.  Don't think anything of
 2    it.  I've got to ask.
 3              Were you taking any prescription
 4    medication at this point in time?
 5        A.    Nope.
 6        Q.    Suffering from any depression, anxiety
 7    or anything like that?
 8        A.    No.
 9        Q.    Under any doctor's care?
10        A.    No.
11        Q.    Any counseling or therapy or anything
12    like that, mental health treatment?
13        A.    No.
14        Q.    And it's your understanding that you
15    interviewed with Officer Stachura at some point
16    after the incident; right?
17        A.    Yes.
18        Q.    And did he ever follow up with you on
19    that, or was it just that day kind of thing; do
20    you recall?
21        A.    All I remember is that day.
22        Q.    And it was at the scene; it wasn't here?
23        A.    Yes.
24        Q.    Okay.
25        A.    And like I said, I don't
```

```
 1    remember -- that's just one of those -- if he
 2    spoke to me, like, later on about it.
 3         Q.   Do you remember if anybody was present
 4    when you talked to him?
 5         A.   No.  No, I don't remember.
 6              MR. HOLDER:  Let's go off the record for
 7         just, like, two minutes.
 8                   (Off the record.)
 9    BY MR. HOLDER:
10         Q.   All right, Officer Edgar.  I know we've
11    kind of gone over this in detail, but I just want
12    to make sure that I've got this right.
13              Insofar as who saw Wallace being taken
14    to the ground, to the best of your understanding,
15    the only people that could see it necessarily were
16    you and Shane Tucker and possibly Tyler Tate?
17         A.   Yes.
18         Q.   And do you recall who rode to and from
19    the scene together?  I know you know that Stachura
20    and Allison rode together.  Do you recall who you
21    rode with?
22         A.   No.
23         Q.   Do you recall who anybody else might
24    have ridden with or together with?
25         A.   No.
```

1      Q.    Okay.  Do you recall what kind of
2   firearms that Officer Tucker and Officer Tate were
3   carrying that day?
4      A.    No.
5      Q.    Do you recall if they were drawn as
6   y'all walked in, their firearms?
7      A.    Oh, they would have been.  I mean, I
8   can't -- yeah, I would go ahead and say yes.
9      Q.    Would any of them have had a taser drawn
10   rather than a firearm?
11      A.    No.
12      Q.    Okay.  Again, it's your testimony you
13   don't know how the injuries to Mr. Peterson's face
14   occurred, but you did observe blood after he was
15   handcuffed?
16      A.    Uh-huh.  Yes, sir.
17            Sorry.  Stenographers get on to me.  I
18   have a tendency of nodding my head and uh-huhs.
19      Q.    It's human nature.  We all do it.  I
20   didn't even pick up on that one.
21      A.    I caught it myself, actually.  I knew it
22   was coming.
23            MR. HOLDER:  That's all I have for now,
24      Lance.
25            (Discussion off the record.)

```
 1                        -  -  -
 2                     EXAMINATION
 3   BY MR. MARTIN:
 4       Q.    All right.  I'm just going to step
 5   through this.  You know, Morgan asked some really
 6   good questions.  I'm going to do my best to kind
 7   of clarify and get a better understanding of
 8   everything that went on.
 9            Earlier you mentioned that yourself,
10   Shane Tucker, Daniel Quave, Rob Williams and Tyler
11   Tate were grouped together entering Mr. Peterson's
12   home; is that correct?
13       A.    Yes, sir.
14       Q.    What do you call that, that grouping?
15       A.    A stack.
16       Q.    Okay.  And are there any procedures or
17   protocols that that stack is to follow when
18   executing a warrant?
19       A.    Yes.  We go through a lot of training
20   for it, especially with the SWAT team.  And
21   traditionally when you go in, someone goes left,
22   someone goes right, someone takes contact.  And
23   when I say "takes contact," it's not always get
24   shot, but someone -- you know, someone is going
25   hands-on or dealing with something.  In this
```

1    situation, since I was dealing with that

2    situation, then whoever's behind me, we would have

3    tried to keep pushing in to secure the rest of the

4    house.

5         Q.   Okay.  When they push to secure, is that

6    an immediate moment or is there a delay?

7         A.   It's as immediate as possible.

8         Q.   Okay.

9         A.   Because a door -- we call a door a fatal

10   funnel.  So we try and get through the door as

11   quick as possible, and then we start pushing into

12   the rest of the house.  Because the sooner we can

13   get it secured, the sooner that we are making it

14   safe for everybody involved.

15        Q.   Okay.  And what was the time span

16   earlier that you mentioned that it took you to

17   enter the door?

18        A.   Enter the door?

19        Q.   Yeah.

20        A.   Oh, it would have been seconds.

21        Q.   Okay.  And then to get to Mr. Peterson?

22        A.   I'm really guessing about 10 seconds or

23   better, somewhere in that ballpark.

24        Q.   Okay.  I don't want this to seem funny,

25   but it will be a little.  Do you have eyes in the

1   back of your head?

2      A.   I do not.

3      Q.   So can you state with 100 percent

4   accuracy what people behind you were doing?

5      A.   Oh, absolutely not.

6      Q.   Okay.  When you enter into a residence

7   where there are possibly unknown parties inside,

8   do you treat that casually?

9      A.   Oh, absolutely not.

10     Q.   How would you treat a situation like

11  that?

12     A.   As dynamic as possible.

13     Q.   And what do you mean by that?

14     A.   That the quicker we can get in there and

15  get control of everything, the less opportunity

16  that people have to go for and act on weapons, run

17  or try and plan an attack on us or anything like

18  that.

19     Q.   Would you describe that as a possibly

20  high-stress situation?

21     A.   Yes, sir.

22     Q.   Why?

23     A.   Well, because anytime that you go into a

24  house, there's a possibility of someone

25  that -- you're going in the house because you

```
 1    suspect illegal activity.  So when you go in

 2    there, there's a possibility that you're going to

 3    end up having someone that fights, someone with a

 4    weapon, without a weapon, someone to run, you

 5    know, so on and so forth.  But we train for that

 6    for a reason, to keep the stress to a minimum.

 7         Q.    Tell me about your training.  You've

 8    listed some extensive training.  We've heard the

 9    word "SWAT" several times today.

10              Where did your SWAT training take place?

11         A.    We had a company, ALS, that came out

12    of -- I believe they're out of Arkansas.  They

13    came down, and the training was conducted in Pearl

14    River County.  So they brought a team down to

15    conduct our training.

16         Q.    And how long did that take, that

17    training?

18         A.    That was a five-day training course, 24

19    hours a day for five days.

20         Q.    Okay.  Did you receive any kind of

21    certificate for completing that?

22         A.    Yes, sir.

23         Q.    And when was that?

24         A.    Oh, I'm getting old.  Eleven, twelve

25    years.
```

```
 1        Q.   Okay.  And would you say that you have
 2   used the techniques and tactics that you learned
 3   in that SWAT training throughout the past 11, 12
 4   years?
 5        A.   Yes, sir.  Now, things do change over
 6   time, obviously.
 7        Q.   Sure.
 8        A.   But, yes, the basic SWAT training that
 9   we received we still conduct.
10        Q.   And I know that you said you've been
11   involved in hundreds of investigations.  If you
12   can ballpark how many times a year you use your
13   SWAT training.
14        A.   Okay.  Can I ask for some clarification
15   on that?
16        Q.   Sure.
17        A.   Because I use my SWAT -- the training I
18   received in SWAT, every time that I have to clear
19   a house, every time that I go in approaching a
20   house, especially a high-risk-type house, I use
21   that training, I would say, close to, you know, a
22   weekly, biweekly basis at a minimum.
23        Q.   And that's sufficient.  That kind of got
24   where I was going.
25             During this training, do they train you
```

1    to have your weapons drawn when you enter a home?

2         A.    Oh, absolutely.

3         Q.    Why?

4         A.    Because you're potentially going to be

5    assessing a threat as soon as you go through.

6         Q.    Okay.  When it comes down to assessing

7    threats, have you ever done any specific training

8    with threat assessment?

9         A.    On a, like, operational level or on an

10   operator level as in --

11        Q.    Either/or.

12        A.    Yes, both.

13        Q.    You enter into a place and you see a

14   person.  Let's say they're unarmed, armed, level

15   of armament.  Have you ever seen any training on

16   how to assess those things?

17        A.    Oh, absolutely.

18        Q.    Tell me about that.

19        A.    Specifically for that, we do SWAT

20   training monthly.  We do eight hours of SWAT

21   training.  So we do a lot of shoot-house-type

22   stuff.  We use sim guns for sim gun training.

23   Sometimes with the sim gun training we use targets

24   that are shoot, no-shoot targets.  And it's a

25   literal picture of somebody that you can come in

```
 1   and there will be one picture they're holding a
 2   weapon, another picture they're holding a baby,
 3   another picture they're holding a badge, so on and
 4   so forth.  We do those quite often.
 5            I've been through high-risk warrant
 6   operation training that they go through the
 7   operational level risk assessment.  I also bring a
 8   lot of my risk assessment training from the
 9   military, as well, because we do training in the
10   military to do the same thing, both operator level
11   and operations level, so yeah.
12            Does that answer your question?
13       Q.   It does.  And about how long do you have
14   to make these decisions?
15       A.   Oh, a split second.
16       Q.   Okay.  Are there ever any times when the
17   threat that you assess requires the use of force?
18       A.   Absolutely.
19       Q.   And have you ever received any excessive
20   force training?
21       A.   I have.
22       Q.   All right.  Would you tell me a little
23   bit about your excessive force training?
24       A.   All the way back when I went to the
25   academy, there's classes I've gone through with
```

1    that.  Specifically that, when I went through

2    first-line supervisor leadership -- it's been a

3    few years back -- they went into excessive force

4    training.  We do excessive force training within

5    the department, because we do interdepartmental

6    training pretty regularly, as well.  That's one of

7    the things that we go through, also.

8         Q.   Are there any kind of guidelines that

9    you can apply to your assessment that lets you

10   know how much force you should use for a

11   particular situation?

12        A.   Yes, sir.

13        Q.   What is that?

14        A.   They call it the ladder of force

15   continuum, or the ladder of force.  Basically if

16   they step up a level, you step up a level to where

17   you can take someone into -- does that make sense,

18   or do you need more?

19        Q.   No.  I think I've got it.  Keep going.

20   You're good.

21        A.   So if you go into a situation and

22   someone's being non-combative but they're not

23   listening, then you can step up and go soft-handed

24   to put them in the handcuffs.  If someone is being

25   combative, then you can -- so basically if

```
 1    someone's trying to swing on you, then you
 2    transition over to a secondary weapon.  If someone
 3    grabs a weapon that would potentially be lethal,
 4    then that authorizes use of lethal force or
 5    whatever level that you need to.
 6         Q.   Okay.  Was lethal force used here?
 7         A.   No.
 8         Q.   In your assessment of Mr. Wallace
 9    holding a -- or allegedly holding -- by your
10    testimony holding a wine bottle, what did what you
11    saw -- how did that factor into your assessment of
12    how to deal with Mr. Peterson?
13         A.   Oh, he was obviously holding that in an
14    aggressive manner as if he was going to use it as
15    a weapon, something that I've seen.  Beer bottles
16    and wine bottles are a pretty serious weapon.
17         Q.   Okay.  And what did you do in response
18    to that threat?
19         A.   Since I was as close as I was, I went
20    ahead and took him -- I grabbed ahold of him and
21    did a straight arm-bar taking him to the ground
22    and then got ahold of the other hand.  And in the
23    process of doing that, he let go of the bottle.
24         Q.   Okay.  What is a straight arm-bar?
25         A.   Basically where you grab them right
```

1   around the wrist, and then you place them on the
2   ground grabbing them about their triceps area.
3   And it's a control tactic to put them on the
4   ground.
5          Q.   And which hand or arm of Mr. Peterson's
6   do you recall grabbing?
7          A.   Left.
8          Q.   Which hand did you grab Mr. Peterson's
9   left arm with?
10         A.   Well, I would have grabbed with my left
11  to take him down and pushed with my right.
12         Q.   So you grabbed his left hand with your
13  left hand.  You placed your right hand on his left
14  shoulder?
15         A.   Yes, sir.
16         Q.   And then take him to the ground.  Okay.
17  Which direction would you have pushed Mr. Peterson
18  as you were doing that?
19         A.   I guess toward the left of my body.
20         Q.   Okay.  And was that one continuous
21  movement?
22         A.   He was struggling a little bit, but it
23  was pretty continuous.
24         Q.   Can you put a time stamp ballpark on
25  that?

1        A.    I know why y'all ask, but it's hard for

2    me to.   It's hard to time that.

3        Q.    Sure.

4        A.    I'd say a matter of seconds.

5        Q.    Right.   And once you and Mr. Peterson

6    reached the ground, what was your body position at

7    that point in time?

8        A.    I was over the top of him, had his left

9    hand pulled back.   He was still struggling, trying

10   to get both of his hands forward, but I was able

11   to get his right hand and get it pulled up out

12   from underneath his body.

13       Q.    Okay.   And once you pulled his hands

14   back, what did you do?

15       A.    I was able to place him into handcuffs.

16       Q.    Okay.   After placing him in handcuffs,

17   what was your next action?

18       A.    Next action was I confirmed looking

19   around that we had people pushed in both

20   directions, cleared the rest of the house and that

21   the immediate area was secured.   Officer Tate --

22   or Deputy Tate -- I guess Sergeant Tate --

23   sorry -- Sergeant Tate performed a pat down to

24   ensure he didn't have any weapons.   And then after

25   this, we looked at getting him picked up and

1    brought out of the house.

2         Q.    When the pat down took place, was he

3    standing?  Was Mr. Peterson standing, or was he

4    still on the ground?

5         A.    Still on the ground, I believe.

6         Q.    Okay.  And while you were arm barring

7    and handcuffing Mr. Peterson, do you recall

8    Sheriff Allison being in the trailer?

9         A.    I do not.

10         Q.    When Tate was patting Mr. Peterson down,

11    do you recall whether or not the sheriff was in

12    the trailer?

13         A.    No, sir.  The first time I remember

14    seeing the sheriff, once we had Mr. Peterson in

15    custody, was when we walked outside, and he was

16    standing outside the residence.

17         Q.    When you say you saw him standing

18    outside, where did you see him?

19         A.    Over toward the vehicles, which would

20    have been, I guess, toward the north end of the

21    trailer, where the vehicles were, coming up that

22    direction.

23         Q.    Estimated amount of feet, five, ten,

24    fifteen, twenty?

25         A.    From the door?

1       Q.      Yeah.

2       A.      Thirty to fifty.

3       Q.      Okay.  Did you hit Mr. Peterson with

4   your firearm?

5       A.      I did not.

6       Q.      Okay.  Earlier you said that you knocked

7   and announced, you entered the residence and you

8   holstered your weapon.

9       A.      As I was approaching and I was getting

10  on top of him, then I holstered to go hands-on.

11      Q.      Why would you holster your weapon?

12      A.      Because at that point I felt that I

13  could get control of him and take him to the

14  ground and it would be safer to do that without

15  having my sidearm out.

16      Q.      Have you ever managed a person in

17  effectuating an arrest with your sidearm in-hand?

18  Does that make sense?

19      A.      Yes, I get what you're saying.  I'm just

20  trying to figure out how -- yes, I've had a

21  sidearm in my hand when I've grabbed ahold of

22  people before.  But if we're saying to effectuate

23  the arrest and we're placing handcuffs on them,

24  then I would say no.

25      Q.      And why not?

1      A.    Because you need two hands to be able to
2   keep control of them and operate handcuffs; which
3   I handcuff with my right hand, which I also hold
4   my sidearm with.  So it would be hard for me to do
5   both.
6      Q.    Right.  To your knowledge and
7   experience, did Mr. Peterson's situation require
8   that you continue to hold your firearm?
9      A.    No.  At which point that I grabbed ahold
10   of him, I transitioned over and felt that I could
11   control the situation and get the bottle without.
12   So I felt at that point that it was a matter of
13   getting him to the ground, not a matter of
14   utilizing my firearm.
15      Q.    When you trained in the service academy,
16   which academy did you go to?
17      A.    SRPSI, Southern Regional Public Safety
18   Institute.
19      Q.    Where is that located?
20      A.    It is at Camp Shelby, Mississippi.
21      Q.    How long did that last?
22      A.    Ten weeks back then, I believe.
23      Q.    If you were to place the situation we're
24   looking at here where Mr. Peterson grabbed a wine
25   bottle -- if you put that on the force continuum,

```
 1    what level of force would the force continuum
 2    allow you to use in stopping that threat?
 3         A.    Deadly force.  If someone has a weapon
 4    that they could used to cause death, then you
 5    could react with deadly force.
 6         Q.    Okay.  But, again, you didn't have to
 7    use -- you didn't use deadly force here?
 8         A.    No, sir.
 9         Q.    Earlier Mr. Holder showed you a
10    photo -- or a stack of photos, and the first one
11    is Mr. Peterson.  Do you still have those photos
12    near you?
13         A.    Yes, sir, I have the photos in front of
14    me.
15         Q.    Okay.  And that first photo that you
16    identified, that's Mr. Peterson; correct?
17         A.    Yes, sir.
18         Q.    All right.  And would you just describe,
19    the best that you can tell -- this is a black and
20    white photo -- where you see blood on
21    Mr. Peterson's face?
22         A.    Appears to be his right nostril and by
23    the side of his lip.
24         Q.    Have you ever seen someone struck in the
25    face multiple times with firearms before?
```

```
1        A.    I have.
2        Q.    To the best of your recollection, what
3   would that person's face look like?
4              MR. HOLDER:  Object to the form.
5   BY MR. MARTIN:
6        Q.    You can answer.
7        A.    I can still answer?
8        Q.    Yes, sir.
9        A.    Normally when I've seen people struck
10   with a firearm, you see lacerations, not just
11   blood protruding.  Because as they're hit in the
12   face, especially if it's several times, you're
13   going to wind up catching one of the bony parts,
14   getting lacerations, and it would be substantial
15   damage.
16        Q.    And why would that substantial damage
17   occur in your experience?
18        A.    Because you're using a blunt object to
19   hit someone in the face.
20        Q.    And what are firearms/service weapons
21   typically made out of?
22        A.    Metal and hard plastic, polymer.
23        Q.    Based on your experience, if you knew
24   nothing about this case and you looked at
25   Mr. Peterson's photo, as an investigator, would
```

1   you suspect that he had been beaten multiple times

2   in the face with a firearm?

3        A.   No, sir.

4        Q.   Why not?

5        A.   Because it looks more like he hit his

6   face one time, as if being taken to the ground,

7   and it caught his mouth and nose.

8        Q.   Okay.  Have you dealt on scene with bad

9   injuries before?

10        A.   Yes, sir.

11        Q.   What would you classify as a bad injury?

12        A.   A bad injury is going to need stitches.

13   It's going to be something that's going to leave a

14   substantial scar or have some sort of

15   life-altering, long-term situation.

16        Q.   Based on this photo and your

17   recollection from that day, was Mr. Peterson

18   suffering from a serious injury?

19             MR. HOLDER:  Object to form.

20        A.   No, sir.

21   BY MR. MARTIN:

22        Q.   Did you feel that Mr. Peterson needed an

23   ambulance called?

24        A.   No, sir.

25        Q.   Why not?

1      A.    Because the bleeding stopped shortly

2   after, so it didn't appear that it was something

3   that was substantial, and it was -- it appeared to

4   be minor injuries.  I mean, there wasn't -- and

5   there wasn't nothing in that situation that would

6   have constituted a serious injury whenever he was

7   taken into custody.

8      Q.    Okay.  Once Mr. Peterson was in custody

9   and you were observing him, did you want any

10  additional harm to come to Mr. Peterson?

11     A.    No, sir.

12     Q.    Okay.  I want to talk quickly again

13  about the sheriff.  We've established that he was

14  not inside whenever you were inside with

15  Mr. Peterson.

16           Do you recall having any interactions

17  with the sheriff once you finished handcuffing

18  Mr. Peterson?

19     A.    Oh, I'm sure we talked probably more

20  than once while we were out there.

21     Q.    Did you talk with the sheriff in the

22  living room when Mr. Peterson was with you?

23     A.    Oh, no, sir.

24     Q.    And why not?

25     A.    Because we got him up -- we were still

1    in the process of doing our secondary sweep.  And

2    once we got him handcuffed and got him up, I

3    walked him outside.

4         Q.   And I don't need to get into specifics

5    of our past conversations, but Mr. Holder asked

6    you some questions earlier about the interrogatory

7    responses.  Do you remember having a phone

8    conversation with me about these events?

9         A.   Yes, sir.

10        Q.   Okay.  And we've mentioned the sheriff.

11   Where was Investigator Stachura?  Where was Ryan,

12   to your knowledge, when you were effectuating the

13   arrest?

14        A.   I believe he was outside.

15        Q.   Okay.  So you say you believe.  You

16   can't be certain where Ryan was?

17        A.   I don't know when he came up to the

18   trailer.

19             MR. MARTIN:  I think that's it,

20        gentlemen, for me.

21                       - - -

22                  FURTHER EXAMINATION

23   BY MR. HOLDER:

24        Q.   This couch, would you agree it's

25   probably eight feet from the front door?

1      A.    Yes.

2      Q.    It's pretty close?  Couple of steps,

3    whatever?

4      A.    Yes.

5      Q.    And there's a coffee table in between?

6      A.    Yes.

7      Q.    So when you walk in, Mr. Peterson was

8    asleep on the couch and gets up.  At that point in

9    time, is it your goal to make sure that he's

10   secured for everybody's safety?

11     A.    Yes, sir.

12     Q.    Prior to any allegations of you hitting

13   him or him picking up a wine bottle, your goal is

14   to make sure that, you know, everybody's safe and

15   secure; right?

16     A.    Correct.

17     Q.    Okay.  And so this whole entire

18   operation, from the time you walked in that front

19   door until the time he got up off that couch, had

20   to have just lasted a matter of seconds; correct?

21     A.    Yes, sir.

22     Q.    And you walked in with your firearm

23   drawn; is that right?

24     A.    Yes, sir.

25     Q.    So when did you holster your firearm?

```
 1          A.   As I was coming through, coming across,
 2    I holstered it as I was coming up on him.  I
 3    grabbed his arm.  I holstered it at the same time,
 4    transitioned and took him down.
 5          Q.   And one of the reasons you have your
 6    firearm drawn when you come in is because you
 7    don't know who's there; right?
 8          A.   Correct.
 9          Q.   And when you're going to secure
10    Mr. Peterson, you still don't know who's there;
11    correct?
12          A.   That is correct.
13          Q.   So what would be the point in holstering
14    your firearm if you still don't know who's there?
15          A.   Because at the point that I'm taking him
16    into custody, I have people that are behind me
17    that I trust to do their job to cover my six.
18          Q.   But they were still behind you when you
19    were going in to begin with; right?
20          A.   Uh-huh.
21          Q.   Okay.  So nothing changed really; right?
22          A.   Well, yes, it did change.
23          Q.   Well, they didn't have time to secure
24    the entire house at that point in time; correct?
25          A.   It doesn't matter.  It still did change
```

1   at the point that I was taking him into custody.

2       Q.   Okay.  What changed then insofar as

3   whether you knew if there was anybody else in the

4   house?

5       A.   Because I was dealing with him.  I

6   didn't know if there was anyone else in the house;

7   but at that point, that turns into their

8   responsibility to take people into custody.

9       Q.   Okay.  And it's your testimony that you

10  walk in, and Officer Tucker and Officer Tate are

11  walking in.  Y'all's firearms are drawn, and

12  Mr. Peterson, at some point in time when you

13  approach him, he gets up and he sees y'all; right?

14      A.   Yes.

15      Q.   And he's bringing a wine bottle to a gun

16  fight, basically, at this point in time?

17      A.   If you want to put it like that.

18      Q.   Now, you said Sheriff Allison was

19  standing outside, correct, during this point in

20  time?

21      A.   Yes, sir.

22      Q.   To the best of your knowledge, how often

23  does he participate in the execution of search

24  warrants?

25      A.   Pretty often.

1      Q.    Have you ever participated with him

2   before?

3      A.    Yes, sir.

4      Q.    Okay.  And does he ever run point with

5   you on any of those, or is he always outside?

6      A.    No, sir.  He's normally outside.

7      Q.    Okay.  Now, you said, you know, your

8   experience is if you're struck in the face with a

9   firearm, there's going to be substantial injuries

10  and damage; is that correct?

11     A.    That is my experience, yes.

12     Q.    There would be bad injuries.  Would you

13  consider nerve damage to be a bad injury?

14     A.    Yes, sir.

15     Q.    And you're not a doctor, are you?  I'm

16  not trying to be a smartass.

17     A.    Nuh-uh.

18           THE COURT REPORTER:  Was that "yes" or

19     "no"?

20           THE WITNESS:  I'm sorry.  No, I am not a

21     doctor.

22  BY MR. HOLDER:

23     Q.    You don't have any extensive medical

24  training, do you?

25     A.    I have medical training, but not

1    extensive.

2         Q.   And what type of medical training?  Are

3    you talking about CPR?

4         A.   CPR, First Aid, LifeSaver.

5         Q.   But you're not qualified to be giving

6    diagnoses or anything like that to somebody's

7    injuries; is that correct?

8         A.   That is correct.

9              MR. HOLDER:  That's all I've got.

10                       - - -

11         (Deposition concluded at 10:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              CERTIFICATE OF COURT REPORTER

 2        I, NATALIE R. SEYMOUR, Court Reporter and

 3   Notary Public, in and for the County of Harrison,

 4   State of Mississippi, hereby certify that the

 5   foregoing pages, and including this page, contain a

 6   true and correct transcript of the testimony of the

 7   witness, as taken by me at the time and place

 8   heretofore stated, and later reduced to typewritten

 9   form by computer-aided transcription under my

10   supervision, to the best of my skill and ability.

11        I further certify that I placed the witness

12   under oath to truthfully answer all questions in

13   this matter under the authority vested in me by the

14   State of Mississippi.

15        I further certify that I am not in the employ

16   of, or related to, any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the proceedings.

19        Witness my signature and seal, this the 8th

20   day of November, 2021.

21

22

23        _____
          Natalie R. Seymour, CSR #1637
24        My Commission Expires 6/12/2022.

25
```