```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

 3                    SOUTHERN DIVISION

 4

 5

 6   WALLACE DWAYNE PETERSON, JR.,
          Plaintiff,
 7

 8   VERSUS           CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

 9

10   PEARL RIVER COUNTY,
     MISSISSIPPI; DAVID ALLISON,
11   Individually; and JOHN AND
     JANE DOES 1-10, Individually,
12        Defendants.

13

14

15

16             DEPOSITION OF ROB WILLIAMS

17

18        Taken at the Pearl River County Sheriff's

19        Department, 171 Savannah Millard Road,

20        Poplarville, Mississippi, on Friday,

21        October 22, 2021, beginning at 10:30 a.m.

22

23

24

25
```

EXHIBIT
2

```
1    APPEARANCES:

2
          G. MORGAN HOLDER, ESQUIRE
3
          CHRISTOPHER E. SMITH, ESQUIRE
4
          Smith & Holder, PLLC
5
          1720 22nd Avenue
6
          Gulfport, Mississippi  39501
7
          morgan@smitholder.com
8
          chris@smithholder.com
9
                ATTORNEYS FOR PLAINTIFF
10

11        LANCE W. MARTIN, ESQUIRE

12        Allen, Allen, Breeland & Allen, PLLC

13        214 Justice Street

14        Brookhaven, Mississippi  39601

15        lmartin@aabalegal.com

16              ATTORNEY FOR DEFENDANTS

17

18   ALSO PRESENT: Wallace D. Peterson, Jr.

19

20

21   REPORTED BY:

22        NATALIE R. SEYMOUR, CSR #1637
          Schroeder-Lanoux Reporting & Legal Video, Inc.
23        220 Glen Eagles Drive
          Ocean Springs, Mississippi  39564
24        (228)875-2864
          Natalie@SchroederLanoux.com
25
```

```
1                    TABLE OF CONTENTS

2

3   Examination by:                          Page:

4      Mr. Holder                               5

5      Mr. Martin                              32

6      Mr. Holder                              45

7
    Exhibits:
8
       Exhibit 5, CAD report                   29
9
       Exhibit 6, Notice of Deposition         52
10
    Certificate of Reporter                    53
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATION

 2        It is hereby stipulated and agreed by and

 3   between the parties hereto, through their

 4   respective attorneys of record, that this

 5   deposition may be taken at the time and place

 6   hereinbefore set forth, by Natalie R. Seymour,

 7   Court Reporter and Notary Public, pursuant to the

 8   Federal Rules of Civil Procedure, as amended;

 9        That the formality of READING AND SIGNING is

10   specifically WAIVED;

11        That all objections, except as to the form of

12   the questions and the responsiveness of the

13   answers, are reserved until such time as this

14   deposition, or any part thereof, may be used or is

15   sought to be used in evidence.

16                      - - -

17

18

19

20

21

22

23

24

25
```

```
 1                    ROB WILLIAMS,
 2           having been first duly sworn, was
 3           examined and testified as follows:
 4                       - - -
 5                    EXAMINATION
 6    BY MR. HOLDER:
 7        Q.   Rob, my name's Morgan Holder.  Chris and
 8    I represent Wallace Peterson in this case, which
 9    I'm sure you're probably intimately familiar with
10    by now.
11        A.   Yes.
12        Q.   State your full name for the record,
13    please.
14        A.   Robert B. Williams.
15        Q.   And where are you employed?
16        A.   Pearl River County Sheriff's Department.
17        Q.   What is your job title?
18        A.   Job title is operations commander,
19    major.
20        Q.   Okay.  And how long have you been
21    employed with the Pearl River County Sheriff's
22    Department?  Longer than you care to remember?
23        A.   November 2005, I believe, is my official
24    date.
25        Q.   Okay.  So you were employed there in
```

```
 1   August 2019; is that correct?
 2        A.   That's correct.
 3        Q.   And are you familiar with the events
 4   giving rise to the lawsuit in this case, the
 5   search warrant execution at Mr. Peterson's
 6   residence?
 7        A.   Yes, I am.
 8        Q.   Did you review anything before your
 9   deposition today?
10        A.   I have not reviewed anything.
11        Q.   Okay.  Have you gone over anything with
12   anybody in preparation for the deposition?
13        A.   Other than when we met with Lance --
14        Q.   And you don't need to give me any of the
15   specifics of that.  That's privileged.
16             In 2019, what were your job
17   responsibilities?
18        A.   2019, I was the logistics captain, and I
19   was responsible for the entire fleet, the
20   inventory for the department and doing training.
21        Q.   Okay.  And at some point in time did you
22   become familiar with an investigation into
23   Mr. Peterson?
24        A.   They called me as kind of an extra body.
25   I wasn't involved in the investigation.  They just
```

1    said, hey, we're fixing to go do a search warrant;

2    we need X amount of people or whatever.  So I just

3    went and helped them execute the warrant.

4         Q.   Do you remember when you were first

5    called?

6         A.   I do not.

7         Q.   Do you know if it was the day of the

8    execution of the warrant?

9         A.   I knew they had it coming up, and then

10   they just called me the day of.  I think they were

11   just kind of waiting for whatever to fall into

12   place to serve it.

13        Q.   Do you recall if you attended any type

14   of operations meeting to execute the warrant or

15   anything like that?

16        A.   That, I don't.

17        Q.   You don't recall, or you did not?

18        A.   I don't recall.  I know they had a

19   meeting.  I want to say that day, when they called

20   me, I was stuck and tied up.  And by the time I

21   got there, I went and met them wherever we met to

22   go to the staging area prior to going to his

23   · house.

24        Q.   Where was the staging area?

25        A.   I don't even remember.  Usually it's at

1    the narc trailer.  Other times -- as far out as

2    that is, it could have been an abandoned store,

3    something like that.  We'll stop several miles

4    from the house for everybody just to meet there.

5        Q.    So when y'all arrived at Mr. Peterson's

6    residence, everybody arrived at the same time?

7        A.    Basically, yes.

8        Q.    Okay.  Did you ride by yourself?

9        A.    I did.

10       Q.    Do you recall who Sheriff Allison rode

11   with?

12       A.    I do not.  I don't know who he rode

13   with.

14       Q.    Do you recall who Officer Stachura rode

15   with?

16       A.    I do not.

17       Q.    Do you recall who Officer Edgar rode

18   with?

19       A.    I do not.

20       Q.    Okay.  Do you recall what the various

21   responsibilities were for the officers there that

22   day?

23       A.    Well, usually your narcotics officers,

24   once they put everything out, they call us.

25              I've been part of the SWAT team since

1    2009, and they call us on any kind of high-risk

2    warrants or execution.  And from that point, we

3    get out there, and it's usually established

4    whoever's going to be the ram guy or the first guy

5    that goes into the door to make entry for

6    everybody else to go in.

7            I want to say that day I was probably

8    maybe the fourth person in the door.  I know there

9    were several people ahead of me.

10        Q.   Okay.  So you were part of the entry

11    team, then?

12        A.   Yes, I was part of the entry team.

13        Q.   And why was this particular warrant

14    considered high risk?

15        A.   Unknown, I guess through their

16    investigation, of how many people could possibly

17    be there due to their surveillance and what

18    they've done as far as their investigation was

19    concerned.

20            We hit some houses that may have --

21    we've gone there before and done surveillance for

22    a week, and there's 20 people at the house all

23    week long.  And then you anticipate for 20 people,

24    and then when you get there, there's one or two.

25    So you just never know who's going to be at the

```
 1    residence and how many people you'll need.
 2         Q.   As part of the entry team, do you recall
 3    Officer Edgar entering first?
 4         A.   I remember, when I got there, we
 5    all -- everybody pulled into the yard.  I got out.
 6    I don't remember who went in first at all.  I'm
 7    assuming it would have been him; because when I
 8    got to the door, I can remember coming in the door
 9    and looking to my left and seeing Captain Edgar
10    had already taken him to the ground.
11              When I looked that way, seeing there was
12    no threat that way, we just spun off.  What we do,
13    you're constantly looking for work, is a quote
14    that we use, so you're not standing idly by.  At
15    that point I went to the right and went down the
16    hallway to maybe a kid's bedroom or something, and
17    I cleared that way.
18         Q.   Okay.  And were y'all's firearms drawn?
19         A.   Yes.
20         Q.   And what kind of firearm did you have on
21    you that day?
22         A.   On that day, I'm pretty sure it was just
23    my pistol.
24         Q.   Do you know what kind of firearm Officer
25    Edgar or Officer Tate or Officer Tucker had?
```

```
 1        A.    I don't know what they had.  I do not.
 2              Typically when we go on something small
 3    like this, one or two guys will carry a long gun
 4    just to have that extra fire power, but the
 5    majority of us carry pistols for the simple fact
 6    that if we have to go hands-on and apprehend
 7    somebody, there's more retention in your holster
 8    pistol.
 9        Q.    When you say "small," is there -- I
10    mean, it's high risk, but it's small?
11        A.    I was saying as far as, like, a
12    single-wide trailer, because if you put 12 people
13    in that, it gets cluttered quick.
14        Q.    I understand.  But one or two guys even
15    in these "small, high-risk-type operations" would
16    be carrying some type of long gun, rifle or
17    shotgun?
18        A.    Usually somebody will be carrying a
19    rifle.  We usually don't carry shotguns.  If we
20    have a shotgun, it's usually for door thudders,
21    which is kind of like a distractionary device.  We
22    don't use the old flash-bangs anymore because
23    there's too much risk for fire.  We use little,
24    small shotgun shells about this big
25    (demonstrating), and it's just really loud.
```

```
1    There's no potential for fire or anything else.
2    It's just safer.
3         Q.    To the best of your recollection, you
4    were the first one in there after Officer Edgar,
5    Tucker and maybe Officer Tate?
6         A.    Yes, that's what I'm trying to remember.
7    I know for sure I remember seeing Shane Edgar.  I
8    remember seeing the chief over here and maybe
9    somebody else.  But it's so fast.  As soon as I
10   saw that threat was down and there's nothing I
11   could push that way to, I just immediately turned
12   right and started working back the other way.
13        Q.    Who are you referring to when you say
14   "the chief"?
15        A.    Shane Tucker.  I'm sorry.
16        Q.    And when you went to the right, is that
17   towards the bedroom?
18        A.    I believe it was -- all the way at the
19   end, I believe there was, like, maybe a child's
20   room to where I ended up back all the way to the
21   right of the trailer, which would have been the
22   south side of the trailer.
23        Q.    And at that point in time, you realized
24   there was nobody else in there?
25        A.    There was nobody in there.  Once we all
```

1   cleared, we stopped.

2          We do an initial search for upright

3   bodies out in the open.  So we cleared through

4   there.  After we complete a primary search, we

5   fall back to what's called a secondary.  Then we

6   start looking under the beds.  We start looking in

7   the closets.  In some cases, we've found people

8   hiding under the clothes on the floor in the

9   bedroom.

10          So really wherever a body will fit, you

11   go back through every little cabinet looking.  And

12   then once you get the all-clear, everybody's done

13   and secured at that time.

14      Q.   And did you leave the trailer at that

15   point, or did you remain in there?

16      A.   No, I remained in the trailer.  We went

17   from there -- once we cleared our side, I walked

18   back through and went to the other side and made

19   sure it was clear.  Everybody had back-cleared the

20   other side of the trailer, which I believe would

21   have been the master bedroom and the bathroom on

22   the other end.

23      Q.   And when you went back to the other

24   side, was Mr. Peterson still inside handcuffed, or

25   was he --

1     A.    I want to say when I walked back through
2   there, he was still there when I passed by him.
3   And it wasn't long after that, I believe, they got
4   him up.
5     Q.    Was there any discussion going on or
6   dialogue between Mr. Peterson --
7     A.    If there was, I didn't comprehend it or
8   understand it.  I didn't pay attention to it.
9     Q.    Did you hear anything before you walked
10  in the trailer?
11    A.    No.
12    Q.    You didn't hear Mr. Peterson make any
13  threats or anything like that?
14    A.    I did not.
15    Q.    Do you know if Officer Edgar knocked on
16  the door or whether he just went straight in?
17    A.    I do not know.  I don't know.
18    Q.    I know it's difficult to remember and
19  kind of --
20    A.    Especially that far back.
21    Q.    -- estimate, but if you had to estimate,
22  from the time that Officer Edgar went in and the
23  time that you came in, how many seconds do you
24  think that might have been?
25    A.    I remember parking and running

```
 1    from -- where I was parked was further back.

 2    Maybe 10, 15 seconds by the time I got out of my

 3    vehicle, got up to the door, got in.

 4              But there was other units.  They pulled

 5    in before us.  We're in a big, long train of cars.

 6    And usually whoever's responsible for breaching

 7    the door is the first car in because they've got

 8    to get set up, get that big, heavy ram out or

 9    whatever they've got to carry equipment-wise to

10    get to the door.  So they're usually the first

11    ones.

12              So as far as seconds, if I had to guess,

13    maybe 15 by the time I got parked and got to the

14    door.

15        Q.   Okay.  Were they carrying one of those

16    big rams that day?

17        A.   I don't remember.

18        Q.   So in that 15 seconds or so by the time

19    Edgar went in and you went in, by the time you got

20    in there, Mr. Peterson was already handcuffed and

21    laying on the ground; is that correct?

22        A.   I don't know if he was handcuffed, but

23    he was on the ground.  He was on the ground.

24        Q.   Okay.  And who was dealing with

25    Mr. Peterson at that point?
```

1         A.    Shane Edgar.

2         Q.    Alone?

3         A.    Shane Edgar, from what I can remember,

4    was putting -- he was dealing with him, had hands

5    on.  And I want to say Chief Shane Tucker, which I

6    keep calling "chief," was the one standing and

7    providing cover for him and also keeping whatever

8    threat was past him, just holding that until they

9    could get him in custody and everybody could push

10   through and clear the rest of the house.

11        Q.    Okay.  And did you notice Mr. Peterson

12   bleeding?

13        A.    I did.  I did.  I didn't notice it

14   until -- when we came out of the house after

15   searching a while later, I believe he had got out

16   of the vehicle or something and was standing by

17   one of the cars, and I remember seeing it.

18        Q.    Do you know what vehicle he was in?

19        A.    I don't.  I want to say it would have to

20   be a marked unit.  Yeah, it would have had to have

21   been something that's got a transport cage in it,

22   but I don't remember which one it was for sure.

23        Q.    Who had the K9 unit out there?

24        A.    That, I don't know.  I can't recall.

25        Q.    Do you know if the dog was ever

1  utilized?

2      A.   I don't remember seeing the dog, I

3  don't, unless it came in to search the house after

4  the fact.

5      Q.   And you --

6      A.   It wasn't used during the entry, I know

7  that much.

8      Q.   And you don't know whether it was

9  utilized outside, either?

10     A.   That, I don't know.

11     Q.   Did anybody ever interview you after

12 everything to get your perspective on how things

13 transpired?

14     A.   No.

15     Q.   Did you ever write a report of any kind?

16     A.   I never did, no.

17     Q.   Did you ever talk to Officer Stachura

18 about it?

19     A.   While we were there searching, if we

20 were -- through the searching process, we talked

21 to him.  If we came across something and we

22 figured it may have evidentiary purpose or

23 something that may be used as evidence, then we

24 got him, brought it in there, showed him what we

25 found.  And it was up to him if he was taking it

```
1    or not.  If we find it, we just let them come in
2    and photograph everything.
3              As far as after the fact, once that was
4    over, no, I haven't talked to him since about
5    anything as far as related to the case.
6         Q.   Do you know where Sheriff Allison and
7    Ryan Stachura were when you made entry into the
8    trailer?
9         A.   I do not.  They definitely weren't in
10   the trailer with us, I know that.
11             I'm pretty sure Daniel Quave was behind
12   me.  And I don't know who came in after the rest
13   of us.
14        Q.   Now, at that point in time, did you have
15   a body camera?
16        A.   I did not.
17        Q.   No?
18        A.   Well, I have one.  I don't know.  As
19   part of me being responsible for the inventory,
20   that's also equipment, too.  So I don't know if I
21   had a body camera issued to me or not.  We had so
22   many break that I would issue mine down for other
23   officers to use.  Yeah, I did not have one on for
24   sure when we made entry.
25        Q.   Do you know if anybody there had a body
```

```
 1    camera?
 2         A.    I do not.  If anybody did have it, it
 3    would be one of our -- the patrol officers that
 4    was actually on duty.  If they were out there with
 5    us, they would have theirs on.  It was in policy.
 6         Q.    And who were those officers?
 7         A.    That, I don't know.  I would have to go
 8    look.
 9         Q.    Would that be Officer Quave, maybe?
10         A.    No.  No.  Because you've got Joe Quave
11    and Daniel Quave.
12         Q.    Daniel Quave.
13         A.    No.  Daniel was behind me.  He was
14    behind me.  Daniel, back then, was actually in
15    narcotics.  So, no, he would not have had one on.
16         Q.    What about Van Giadrosich?
17         A.    Van would not have one on.  He was a
18    narcotics investigator.
19         Q.    What about Nathan Davis?
20         A.    Nathan is part of our SWAT team, but he
21    is also a patrol deputy.  So I don't know if he
22    was -- which capacity he was functioning in, if he
23    had his full kit on when he went in there or if he
24    still had his patrol vest on with his camera.
25         Q.    What about Jeffrey Horner?
```

1      A.     Jeffrey Horner, back then, I doubt he

2    would because he was probably -- back then he was

3    an investigator, if I'm thinking right.  He would

4    have been in CID.

5      Q.     And you mentioned the policies and

6    procedures on that.  What do the policies and

7    procedures say about them wearing a body camera?

8      A.     As far as the patrol deputies

9    themselves, whenever they have contact with the

10   public or they get out with a call, they're to

11   turn their body cameras on.  The investigators,

12   narcotics officers, SWAT team members, they're not

13   required to wear one.

14     Q.     Do you know the rationale behind that

15   policy, about why some people are required to turn

16   them on and some aren't?

17     A.     Well, narcotics, all day long they can't

18   walk around in an undercover capacity wearing a

19   camera because it's just going to --

20     Q.     Let me rephrase that question.

21   Specifically referencing the execution of a search

22   warrant, do you know of any reason why it wouldn't

23   be good policy to have them on then?

24     A.     No.

25     Q.     Because it would certainly eliminate the

```
 1    he said/she said, wouldn't it?

 2          A.    A hundred percent, yep.

 3          Q.    Did you ever talk to Officer Edgar while

 4    you were there?  And I don't mean before.  I mean

 5    after everything happened.

 6          A.    I'm sure I did.  Through searching and

 7    everything else I had contact with him, there's no

 8    doubt.

 9          Q.    Did anybody ever indicate to you why

10    Mr. Peterson might have been bleeding?

11          A.    No, they did not.

12          Q.    Okay.  Were you there when they brought

13    Mr. Peterson back inside?

14          A.    I was.

15          Q.    Okay.  And what was the purpose of that?

16          A.    They brought him back inside to open the

17    safe.

18          Q.    And did he do that?

19          A.    He did.  If I'm not mistaken, they

20    uncuffed him from behind and cuffed him in the

21    front, and he opened the safe.  I think they

22    brought him back -- he didn't want to give us the

23    combination to the safe, but he did agree to come

24    in and open the safe, if my memory's correct.

25          Q.    And was there any cash in there, if you
```

```
 1   recall?
 2        A.   No, there was not.
 3        Q.   Did you ever see any cash anywhere in
 4   the house?
 5        A.   I did.  And it was 40 or $60, and it was
 6   in the master bathroom, and it was on the counter.
 7        Q.   Do you recall what Wallace was wearing?
 8        A.   No, I do not.
 9        Q.   Do you know if he was just in his
10   underwear?
11        A.   I think he was.  Underwear, shorts or
12   something.
13        Q.   Do you know if they let him change into
14   any pants or anything before he went back outside?
15        A.   That, I do not know.
16        Q.   All right.  So briefly rehashing the
17   entry, you were approximately the fourth person
18   in?
19        A.   I believe so, yes.
20        Q.   And as the fourth person in, the
21   events -- the majority of the events leading rise
22   to this complaint, basically, this lawsuit, had
23   already taken place?
24        A.   Yes.
25        Q.   And so you weren't able to observe them?
```

```
1        A.    I did not.
2        Q.    And could anybody else other than the
3   people that went in before you have possibly
4   observed them?
5        A.    I do not believe so.  The only people
6   would have been Chief Shane Tucker for sure who
7   was with Shane Edgar; and if Tyler was the third
8   one in the door, then he could have, too, for
9   sure.
10       Q.    Okay.  Now, when you were in training in
11  law enforcement, they trained you about the
12  importance of writing accurate reports?
13       A.    Absolutely.
14       Q.    Because if you don't do that, it didn't
15  happen kind of thing?
16       A.    Didn't happen.
17       Q.    And words have meaning; right?
18       A.    Yes.
19       Q.    So if I write or you write,
20  hypothetically -- and I'm sure you have written
21  this in a report before -- that an officer struck
22  somebody, what does that mean to you?
23       A.    It means they struck them.
24       Q.    It doesn't mean they grabbed them; it
25  means they struck them?
```

```
 1        A.    If I was to read it, that's what I would
 2   assume.
 3        Q.    Okay.  And, again, they train you on the
 4   importance of these reports; correct?
 5        A.    That is correct.
 6        Q.    Did anybody there that you recall
 7   mention anything about a wine bottle?
 8        A.    After the fact, I remember hearing them
 9   talk about a wine bottle, but vaguely.
10        Q.    There were several wine bottles there?
11        A.    Yeah.  I mean, just vaguely talking
12   about it.  I just don't remember all the
13   conversation from back that far to give you
14   anything accurate.
15        Q.    I understand.  Now, do you have a pretty
16   good recollection of kind of the, we'll call it,
17   schematics of the inside of the trailer?
18        A.    Yes.  The only thing that's sketchy in
19   my mind -- I was sitting there thinking -- when I
20   went in and took a right, I don't remember if
21   there was another bedroom or a laundry room or
22   something on that end, a bathroom.
23              I'm trying to put another room here, but
24   I can't picture it clearly.  I just remember going
25   all the way down, and I do remember, like, the
```

 1   kid's toys in the last room.  And I do remember

 2   coming back through the living room area into a

 3   kitchen, that opened into a bedroom, that opened

 4   into a master bedroom on the north side.

 5        Q.   So when you walked in -- I want to kind

 6   of focus on the living room area -- do you recall

 7   there being a coffee table between the sofa and

 8   the door?

 9        A.   I remember there being a coffee --

10   something and a coffee table and the door, yes.

11        Q.   And where was Mr. Peterson laying in

12   relation to that if you're looking from the front

13   door towards the back of the trailer?

14        A.   He was laying -- when I came in, Shane

15   Tucker was standing here.  Shane was on -- Shane

16   Edgar had him down, but I don't know where the

17   coffee table was in relation, not accurately.

18        Q.   Okay.  But was he laying to your left if

19   you were looking straight to the front door?

20        A.   When I came through, he was this way,

21   yes.

22        Q.   Okay.  Did you see any other type of

23   furniture in there other than that coffee table

24   and the couch?

25        A.   Not that sticks out of place.  I guess

1    just regular household furniture.

2         Q.   Did you see any objects on the ground

3    that you recall?

4         A.   I don't.

5         Q.   At this point in time, when you came --

6              You said you observed Mr. Peterson

7    bleeding, but you didn't observe it until after he

8    had been taken outside?

9         A.   After.  Because when he got out of the

10   car -- I don't know.  We wear these heavy kits.

11             So most of the time, once we go through

12   there, we clear -- we secondary clear the house.

13   At that point, when the scene's safe, we go out

14   and take off 45 pounds with the vest and

15   everything else and go get a flashlight.

16             At that point -- I'm trying to think

17   when I noticed him bleeding.  I don't know if it

18   was somewhere in passing or maybe later when he

19   came back in or if he was standing out by the car.

20   We were there a while, so we were in and out a few

21   times doing different stuff, gathering and getting

22   bags for somebody.

23        Q.   Do you recall where he was bleeding

24   from?

25        A.   I do not.  I know it was his face.

```
1          Q.   Was it a pretty good amount of blood?
2          A.   When I saw him, it was not.  It was
3     enough I could tell he was bleeding.
4          Q.   Was it dried up at that point, or was it
5     still wet?
6          A.   No, I think it was dry.  It was starting
7     to dry.
8          Q.   Was there any blood on the floor of the
9     house; do you recall?
10         A.   That, I do not recall.
11         Q.   Okay.  Do you know if anybody outside
12    offered medical treatment of any kind?
13         A.   That, I do not.
14         Q.   Would that be something pursuant to
15    policy or custom that y'all would do?
16         A.   If they need medical attention,
17    absolutely.  If they need medical attention, we
18    get an ambulance out there.
19         Q.   And who would generally be the person to
20    make that decision?
21         A.   It could be anybody.  Because
22    everybody's ultimately responsible for somebody's
23    safety.
24         Q.   If the sheriff was there, would he be
25    the person that was ultimately responsible in this
```

```
 1   case?
 2        A.    He's responsible for everything.  But
 3   the operations -- if the injury like this, what I
 4   saw, was just a little, small scratch or busted
 5   nose or something, then no.  If he would have
 6   requested an ambulance or something, we would have
 7   gotten one for sure, but something like that would
 8   normally have been just treated on scene.
 9        Q.    And how would y'all normally treat it on
10   scene?
11        A.    Just with whatever first aid we could
12   render to them.
13              We've got a couple of guys -- I don't
14   know if they were there or not, but most of the
15   time on these operations, we also have two SWAT
16   medics that are with us.
17        Q.    Do you know who that would have been in
18   this case?
19        A.    The two we have now are Justin Miller
20   and Jonathan Head.  I don't know if they were
21   there.
22        Q.    Do you recall seeing David Bean there?
23        A.    I do not.
24        Q.    When you respond to these things, do you
25   call in to dispatch and let them know?
```

1        A.    Yes.  Yes.

2              MR. HOLDER:  I have a dispatch report.

3        Let me go ahead and mark this.  I guess this

4        will be 5.

5                         - - -

6              (Exhibit 5 was marked.)

7              THE WITNESS:  David Bean's one of our

8        K9s.  There very well may have been a K9 that

9        ran through the house.

10   BY MR. HOLDER:

11       Q.    So David Bean is a K9 officer?

12       A.    He is a K9 officer, yeah.

13             I'd have to go back and look.  I don't

14   know when he became a K9 officer, but he may have

15   had the dog at that time.  I don't know.  I'd have

16   to go back and look and see when he got certified

17   and had his dog.  He is one of our K9s now.

18       Q.    I'm going to hand you Exhibit 5, Rob.

19   This is the CAD report.

20       A.    Okay.

21       Q.    Just look at everybody that was reported

22   to have called in and just go down one by one.  I

23   believe the first person on there is Joe Garcia.

24       A.    Joe Garcia.

25       Q.    And he was not there; correct?

1       A.    I don't remember him being there or not
2    being there.
3       Q.    Do you see your name on there?
4       A.    I do not.
5       Q.    Do you see Shane Edgar's name on there?
6       A.    I do not.
7             And something like this -- and we do it
8    all the time -- you have this many people going
9    out there, it's a safety risk even with us through
10   dispatch to let them know some of these places
11   we're going.  So just a few minutes out we'll just
12   get on the radio and say, hey, SWAT team,
13   narcotics officers, CID patrol.  And you may have
14   assisting agents with Picayune.  We'll tell
15   dispatch a blanket like that, hey, we got a lot of
16   folks, we're getting out at this residence, we're
17   doing a search warrant.
18            And the reason we do that is because in
19   the past, not only our agency years ago, but other
20   agencies have leaked out information that's almost
21   led to officers getting hurt.  So that's why some
22   of this stuff is kept until the last minute and
23   given to dispatch.
24            If they call it like this, automatically
25   the girls back then would have thought, Joe

1    Garcia, Daniel Quave, Van and Ryan.  If they say,

2    all narcs are out there, they're going to put

3    everybody's name on the sheet.  And that's how

4    that probably got to where it is if Joe wasn't

5    there.

6         Q.    But Ryan and Van --

7         A.    Ryan was there for sure, I know.  I

8    remember seeing him.

9         Q.    Tyler Tate was there, as well?  He's not

10   on that sheet, but I'm just asking whether he was

11   present.

12        A.    I'm pretty sure Tyler was there.

13              That's what I was trying to figure out

14   in my head.  I remember for sure seeing Shane

15   Edgar and then Shane Tucker, and I was always

16   missing that -- my peripheral vision, I

17   still -- my mind's telling me somebody was

18   standing there.  It had to be Tyler.

19        Q.    What is Tyler's -- what's his job title?

20        A.    He is a sergeant on patrol.

21        Q.    Let me ask you this, Rob.  Did you know

22   Wallace Peterson before that day?

23        A.    I knew of -- I knew of him.

24        Q.    And when you say you "knew of him" --

25        A.    I've been in Poplarville since 1985.

1     There's not too many folks you -- I've never known
2     him personally, but I knew of him.
3          Q.    Were you aware that there was an
4     investigation?
5          A.    I was aware of the investigation, yes.
6     I knew they had that going on.
7          Q.    And how were you aware of that?
8          A.    Just through -- I don't know -- one of
9     the guys, either Ryan or one of the narcs, talking
10    to me about the upcoming search warrant and just
11    being kind of prepared to go with them to help.
12          MR. HOLDER:  That's all I have.
13                      - - -
14                   EXAMINATION
15    BY MR. MARTIN:
16          Q.    All right, Rob.  Earlier you said that
17    you were -- whenever you enter a residence
18    executing a warrant, you're constantly looking for
19    work?
20          A.    In our world, you're constantly looking
21    for work.  So what that means is you get a bunch
22    of guys -- you get 12 of us coming in and Shane
23    goes and takes him into custody, it's hard not
24    to -- everybody to go over there and want to help
25    and make sure that's done.  But if you've got

1    enough people there containing that situation,

2    you've got a whole entire residence you still have

3    to clear.

4           So when I looked that way and saw all of

5    those guys and that situation was under control, I

6    immediately went this way to make sure that was

7    clear.  And I'm assuming as soon as they had him

8    in custody, then the rest of those guys, Shane

9    Tucker, Tyler or whoever else that came behind

10   them, pushed through the other part of the house.

11          Constantly look for work, that's what

12   that means, don't stand around idly because that's

13   how you get hurt.  You need to go in there, make

14   sure the residence is clear, do a secondary and

15   back-clear it.

16       Q.   And to your recollection, which member

17   were you in the stack?

18       A.   To the best of my knowledge, I believe I

19   was number four.

20       Q.   Okay.  And when you stepped up and you

21   saw that Shane had Mr. Peterson in custody, did

22   you notice anything about Shane and Mr. Peterson

23   that would warrant your involvement with them?

24       A.   No.

25       Q.   And when you noticed Shane and

1   Mr. Peterson, did you stand there and watch their

2   actions, their interactions with each other?

3        A.    No.   When I looked, Shane had him on the

4   floor and was in the process of taking him into

5   custody.

6             Unless you do it, it's hard to explain.

7   All of that was processed in a half a second, and

8   then I was going right.   The whole trailer was

9   probably cleared in under 20 seconds.

10       Q.    To your knowledge, did anyone work the

11  right side of the trailer with you?

12       A.    I believe Daniel Quave did.   I think he

13  was behind me.

14       Q.    Okay.   And as y'all were working

15  together, are y'all calling things out?

16       A.    Yes.   Everybody's talking.   Everybody's

17  communicating.

18       Q.    What are some things that you'll

19  normally hear?

20       A.    Just, room cleared, small room.   As

21  you're doing it, you're identifying any threat.

22  You don't want to -- you turn into -- there's guys

23  with sometimes long guns, and there may be a stack

24  of eight guys behind you.   If you roll into a room

25  that's only got a washer and a dryer in it and

```
 1    it's big enough for two people, you better start
 2    saying "small room."  Because if not, there's
 3    going to be eight of you in that small room
 4    because they're coming right behind you.  The
 5    dynamics flow fast.
 6         Q.   Okay.  In these fast-flowing dynamics,
 7    when you looked at Captain Edgar with
 8    Mr. Peterson, did you see Captain Edgar strike
 9    Mr. Peterson?
10         A.   I did not.
11         Q.   Earlier you said that whenever you
12    cleared your end of the trailer, you came through
13    and you -- and I'll quote you -- you passed by
14    after the search.  Where did you pass by to?  What
15    did you mean by that?  You're coming out of the
16    right side of the trailer?
17         A.   I'm coming out of the right side, and I
18    passed by where he was still on the floor at that
19    time, and I went to the other side.
20              I've been a team leader on a SWAT team
21    for years, and that's my responsibility, is what
22    my guys are doing from one end of that trailer to
23    the other.  So as soon as we got our half done, I
24    followed up to make sure they didn't need our help
25    on the other side of the trailer.
```

```
 1        Q.    Did they need your help on the other
 2   side?
 3        A.    They did not.  By the time I got there,
 4   everything was cleared, and everything was
 5   back-cleared.
 6        Q.    Okay.  Was the sheriff in front of you
 7   in the stack?
 8        A.    No, sir.
 9        Q.    Do you know where the sheriff was when
10   you were in the stack?
11        A.    I do not.
12        Q.    When you passed through the living room
13   to the other side of the trailer, was the sheriff
14   standing there?
15        A.    No, sir.  Typically, on most of these
16   calls we go to like this, the sheriff will not
17   come in until we've back-cleared the house and
18   everything's safe.  Then he'll come in.
19        Q.    Why would there have been no body cam
20   requirements?  Can you just clarify that a little
21   more, please?
22        A.    There's just never been a -- as far as
23   the SWAT team or which -- which division?
24        Q.    For the SWAT team executing this warrant
25   on this day.
```

1      A.    There's just never -- never been in

2    policy.

3             When we adopted it years ago, we had

4    enough money to get patrol and investigators back

5    then body cameras.  I love mine.  I use it all the

6    time as a narcotics agent.  I didn't wear it, but

7    it was good for on-scene interviews.

8      Q.    Sure.

9      A.    I love them, you know.  If you had one

10   on, we wouldn't be sitting here now.

11     Q.    Right.  But earlier you stated, to your

12   knowledge, you don't recall anyone having one on

13   this day?

14     A.    I do not.

15            And if anybody was there that -- like,

16   that came to transport, now, that officer would

17   have a body camera on if they were part of the

18   execution.

19     Q.    Earlier you said you made some

20   observations about Mr. Peterson bleeding.

21     A.    Yes.

22     Q.    What were those observations, again?

23     A.    I just remember -- whether he was

24   passing coming in and out or if he was standing

25   outside by the vehicle, I just remember seeing a

1   little blood on him.

2       Q.   Okay.  Have you ever seen similar

3   instances where other people have had blood on

4   their face like Mr. Peterson did that day?

5       A.   Yes.

6       Q.   And what's your general assessment of

7   that amount of blood?

8       A.   Very, very mild.  It's just a -- I've

9   seen us bleed worse than that.

10      Q.   Was there any blood gushing from

11  Mr. Peterson's face?

12      A.   Not that I saw.

13      Q.   I know you established that you think

14  that David Bean and a K9 might have been there,

15  but earlier you said you could not be 100 percent

16  certain.

17      A.   I'm not 100 percent sure.  If they had a

18  K9 there, it was not used during the execution of

19  the warrant.  It would have been used as

20  a -- maybe a secondary search for narcotics.  Once

21  everything was all under control, they may have

22  just walked the dog through to see if it hit on

23  anything.

24      Q.   Okay.  I want to talk to you some about

25  the call sheets.

1       A.    Yes.

2       Q.    Explain to me how an officer's number is

3   logged onto the CAD.   Like, how does that happen?

4       A.    That goes out if -- I'm Pearl River 3.

5   So if I go, Pearl River 3 Central, I'm going to be

6   out at this address dealing with this situation,

7   at that time they put in Pearl River 3, Rob

8   Williams, is out at this address.

9           Something this big, with so many people

10  going, they'll say, narcotics -- they may say,

11  narcotics, CID and the SWAT team's out with us.

12  And right then, depending on which dispatcher you

13  get -- we've got several new girls.   I called down

14  there the other day, and they almost wouldn't talk

15  to me because they didn't know who I was.   So I've

16  got to get somebody who's been there before -- or

17  been there longer.

18          If they don't know -- it depends on

19  who's receiving this information and who's CADing.

20  Because if you say "narcotics," they may just put

21  narcotics is on scene or CID's on scene.   And they

22  may just put up the one officer's number there,

23  and then it's up to this officer later to put who

24  was there.   Because if you've got 24 people, you

25  can't each one at a time go, I'm on scene, I'm on

1    scene for something that big.

2         Q.   So there's someone manually entering

3    that on the back end?

4         A.   Yes.  There's somebody at dispatch that

5    manually enters that after you call it in on the

6    radio.

7         Q.   Sometimes I get confused with what "CAD"

8    stands for.  I believe it's Computer Assisted

9    Dispatch.  Sometimes I think it's Computer

10   Automated Dispatch.

11            To your knowledge, is there anything

12   that the sheriff's department has here that when

13   you click your walkie, it automatically logs you

14   into the CAD?

15        A.   No, it does not.

16            Now, when you key up your radio, it does

17   show them which radio is keyed up, but it doesn't

18   log you into the CAD system that I'm aware of.

19        Q.   Okay.  Can names sometimes be missed?

20        A.   Well, obviously by that, for sure.

21   Because I was there, and I'm not on it.

22        Q.   Do you remember radioing in that day?

23        A.   More than likely, I did not.  Because

24   whoever's operation it is, whoever's warrant is,

25   that's usually their responsibility.  They run

```
 1    their own show as far as going out there and
 2    communicating with dispatch.
 3         Q.   Do you remember who was running the show
 4    this day?
 5         A.   If I had to guess, I would say -- I'm
 6    just guessing -- Ryan Stachura.  I don't know who
 7    would have called in.
 8         Q.   And why would you guess that Ryan was
 9    calling the shots?
10         A.   Because I think it was his operation,
11    from what I remember.
12         Q.   And you say that the girls back then
13    had a -- they would hear, you know, "narcotics"
14    and just start entering everyone?  Is that what
15    you said?
16         A.   They would.
17              For example, like with Joe -- there's
18    two of them back there now.  So if they say that
19    narcotics is on scene, they automatically know
20    that it's going to be Joe and Ryan.  Some of the
21    experienced dispatchers will.  Some of the younger
22    ones may not do that.  It just all depends on how
23    many 911 calls they're on when they put in
24    information like that, too, with what's going on
25    with the terminals.
```

1      Q.   I got you.  When all of this was
2  happening, at any point in time did you hear
3  Mr. Peterson ask for assistance when Captain Edgar
4  was arresting him?
5      A.   I did not.
6      Q.   To your recollection, when was the first
7  time you saw the sheriff?
8      A.   After everything was completely done,
9  after the residence was completely secure.
10      Q.   And about how long did that take?
11      A.   Twenty to thirty seconds and the whole
12  thing was over.
13      Q.   Okay.  And where did you see the
14  sheriff?
15      A.   I first saw him when I walked outside,
16  after it was over.
17      Q.   And when you walked outside, do you
18  remember where he might have been standing?
19      A.   Coming out of the door, he was back to
20  the north of the trailer, I believe, up toward
21  where the driveway -- the north side of the
22  driveway was.
23      Q.   Okay.  I just saw you use your hands
24  some, and that kind of made me think of something
25  from earlier.  In your testimony earlier, you were

1    talking about making entry and noticing Shane.

2    And I'm looking at you, and I saw you point with

3    your left hand, and you said, he was this way.

4         A.   Yes.

5         Q.   Which way was Shane from you when you --

6         A.   When I went in, he was to the left.

7         Q.   Okay.  And about how far to the left was

8    he from you?

9         A.   Maybe me to you, or maybe closer.

10             When I went in, I initially started

11   rolling that way, and I saw that, and I turned

12   around and went the other way.

13        Q.   You saw what?

14        A.   Saw Shane had him on the ground already.

15        Q.   Okay.  Did you see any officers clearing

16   to the left?

17        A.   I did not.  At that point, they

18   were -- from what I remember, Shane had hands on

19   him.  He was on the ground.  Shane Tucker was over

20   watch for him with lethal force and looking

21   straight ahead.

22        Q.   What do you mean "Shane Tucker was over

23   watch"?  What does that mean?

24        A.   At that point in time, while Shane had

25   put his firearm up to go hands-on, now Shane

```
 1   Tucker's responsibility at this point is to watch
 2   him and also watch any threat that may come out of
 3   the bedroom.  So at that point, he's standing
 4   there watching for any other threat that may come
 5   to them until they can get him in custody and then
 6   push forward.
 7        Q.   Okay.  And what position -- I saw you,
 8   you know, move your body some.  What position did
 9   you see Tucker holding or maintaining?
10        A.   He had his back to me, looking toward
11   the -- they were here, so he had his back to me,
12   and he was still looking north toward the master
13   bedroom.
14        Q.   Okay.  So would Tucker have been between
15   you and Mr. Peterson?
16        A.   Yes.
17        Q.   Okay.  And was Officer Tucker standing,
18   kneeling?
19        A.   He was standing.
20        Q.   Okay.  And you say he was over watch of
21   Captain Edgar as he was handcuffing?
22        A.   Yes.  That would have been his position
23   at that time, basically keep watch to make sure no
24   other threats came out and to make sure you didn't
25   need lethal force on the threat that you're still
```

1   dealing with.

2        Q.    In your quick assessment there, was

3   lethal force necessary at that point in time you

4   observed?

5        A.    At that point in time I observed, no,

6   absolutely not.

7        Q.    And why is that?

8        A.    Because he already had him in custody,

9   pretty much.  Shane already had him controlled at

10  that point.

11             MR. MARTIN:  All right.  No questions at

12       this time.

13                      - - -

14                 FURTHER EXAMINATION

15  BY MR. HOLDER:

16       Q.    Briefly, I'm looking at this CAD report

17  again.  According to that report, which we

18  obviously know is littered with errors and

19  omissions --

20       A.    Yes.

21       Q.    -- Officer Bean transported Wallace to

22  the jail.

23       A.    Okay.

24       Q.    That is a K9 unit; correct?

25       A.    That is.

```
1          Q.    Would there be some type of video inside
2     that patrol vehicle?
3          A.    No, there is not.
4          Q.    At any point in time or --
5          A.    No, not at all.
6                Back then, that would have been one of
7     our Tahoes.  At one time they all had the
8     WatchGuard System in them, but as time went -- the
9     system's, like, 5- or $8,000.  They're expensive.
10    And we got them off a grant years ago.  Once they
11    slowly died, we just didn't have the money to
12    replace the cameras.  Most of those were actually
13    in the vehicle and pointed out.  They didn't point
14    in the vehicle.
15         Q.    That leads me to my next question.
16    Would there have been any vehicles there with dash
17    cam footage pointing out?
18         A.    Not to my knowledge, I don't think there
19    was any there.
20         Q.    Were they equipped with those, or were
21    they just not turned on?
22         A.    No.  No.  No.
23                Years ago the majority of us had them on
24    patrol, but they eventually just died due to
25    being, you know, old and outdated, and we finally
```

 1    removed them all.  The system became outdated, how

 2    you download them and everything else.

 3         Q.    Let me ask you this:  These CAD

 4    calls -- we'll just call them calls or

 5    check-ins -- how long are those retained; do you

 6    know?

 7         A.    That stuff right there should be

 8    forever.

 9              I can -- when we get through, remind me

10    and I'll go check with Ms. Rebecca.  I think we

11    had a catastrophic failure when we got hit by

12    lightning; because I went to go back and pull

13    something else up, and I want to say we've

14    lost -- you can actually go back and listen to the

15    voice recordings forever.  And the last time we

16    got hit by lightning, we lost several years of it

17    because it knocked the entire server out, but I

18    don't know which year.  I can go check with her to

19    see if that's still available for them to pull

20    from.

21         Q.    But outside of some act of God or other

22    accident, the actual recordings themselves are

23    stored in a cloud forever?

24         A.    Yes.

25         Q.    Backed up?

1      A.   Yes, they're stored forever.   The stuff

2  we have now is stored forever.   And the other

3  stuff was supposed to be stored forever, too,

4  until it got compromised and hit by lightning.

5      Q.   Let me ask you this:   Is there a code

6  that was used to dispatch anytime any type of use

7  of force is used?

8      A.   No, I don't understand what you're

9  asking.

10      Q.   Well, if you have to use force, are you

11  not required to call into dispatch and give, you

12  know, basically the appropriate code for that just

13  to indicate -- for instance, you know, just like

14  when you arrive or when you leave, you know, or

15  when you Mirandize somebody?

16      A.   No, not for that.   That would be

17  documented in the report.

18      Q.   Okay.   What about when you Mirandize

19  somebody?   Would that be something that would be

20  documented via some electronic means?

21      A.   Some of them do it.   Some of them don't.

22  It's just -- me, personally, that's why I like the

23  body camera, because I can turn it on, and I'd

24  have audio, video, Miranda.   I'd have my statement

25  and everything else, and here it is in a pile for

```
 1    you.
 2          Q.    Me too.   I believe you testified you
 3    never heard Mr. Peterson ask for any assistance
 4    when Lance was questioning you; is that correct?
 5          A.    I did not.
 6          Q.    Did you ever hear that he was under
 7    arrest?
 8          A.    I did not.
 9          Q.    Did you ever hear anybody Mirandize him?
10          A.    I did not.
11          Q.    When you say he was in custody, was it
12    your understanding that he was under arrest?
13          A.    Oh, yeah.   I was assuming so, yes.
14          Q.    Did you know what for?
15          A.    I did not.
16          Q.    Okay.   Was it your understanding that it
17    was just a search warrant and not an arrest
18    warrant at that point in time?
19          A.    I knew we had a search warrant.   I
20    wasn't aware if they had an arrest warrant or
21    anything else.
22          Q.    What type of weapon was Officer Tucker
23    holding?
24          A.    I don't remember.   I can't recall.   With
25    him with his back to me, I don't -- I don't
```

1    remember what he was carrying.

2         Q.   Do you recall if he was holding it with

3    two hands, or do you recall how he was positioned?

4         A.   I vaguely remember just seeing the back

5    of him and then Shane on the floor.

6         Q.   And you testified at that point in time

7    Shane had already holstered his weapon?

8         A.   Yes.  Oh, yes.  Yeah, you holster your

9    weapon.

10             That's another reason we keep people

11   with pistols and not long guns, shotguns and

12   rifles, because they're in the way if you have to

13   go put handcuffs on somebody.  We had an incident

14   before where I had my long gun, and I had a fight

15   over it with a guy.  When I went to handcuff him,

16   he got ahold of it.

17        Q.   That's kind of what I'm getting at.  You

18   testified earlier that even with this one, a high

19   risk on a smaller-type scale, that y'all would

20   still have one or two people with long guns.

21        A.   We would.

22        Q.   So would it be fair to say that Officer

23   Tucker likely had a long gun in his hands?

24             MR. MARTIN:  Object to form.

25        A.   That would be something he'd have to

```
1    answer.  I don't know.
2    BY MR. HOLDER:
3         Q.   Well, would anybody outside that's not
4    doing the entry have been carrying a long gun?
5         A.   I doubt it.
6         Q.   So it would have been the SWAT team
7    coming in?
8         A.   It would have been the guys coming in.
9         Q.   You weren't carrying one?
10        A.   I wasn't carrying one.
11        Q.   And Shane Edgar wasn't carrying one?
12        A.   I don't know what they were carrying.
13        Q.   Okay.  He holstered his weapon.  He
14   didn't holster his rifle; right?
15        A.   Yeah, if he holstered his weapon, I'm
16   assuming he was just carrying his pistol, also.
17        Q.   Okay.  And so there was just two others,
18   Officer Tucker and Tyler Tate; right?
19        A.   Yes.
20        Q.   And to the best of your knowledge, you
21   believe that at least one of them was carrying a
22   long gun?
23        A.   One of them probably did have a long
24   gun.  If I had to make an assumption, it was
25   probably Tyler Tate.
```

```
 1        Q.    That's the first time I've heard his
 2   name most of the day.
 3        A.    What's that?
 4        Q.    Tyler Tate.
 5        A.    But all of our stuff we have is -- we've
 6   got straps, and it's hung high up on you.  So if
 7   they have any -- usually the shotguns are not
 8   slung.  They're just -- like I said, they're
 9   really distractionary devices only.
10        Q.    Does Tyler still work here?
11        A.    He does.
12        Q.    Is he working today; do you know?
13        A.    That, I don't know.  I don't know.
14   They're so shorthanded.  I don't know if he's
15   working nights or days.
16             MR. HOLDER:  That's all I've got.
17        Appreciate it, Rob.
18                      - - -
19             (Exhibit 6 was marked.)
20                      - - -
21        (Deposition concluded at 11:31 a.m.)
22
23
24
25
```

1              CERTIFICATE OF COURT REPORTER

2         I, NATALIE R. SEYMOUR, Court Reporter and

3    Notary Public, in and for the County of Harrison,

4    State of Mississippi, hereby certify that the

5    foregoing pages, and including this page, contain a

6    true and correct transcript of the testimony of the

7    witness, as taken by me at the time and place

8    heretofore stated, and later reduced to typewritten

9    form by computer-aided transcription under my

10   supervision, to the best of my skill and ability.

11        I further certify that I placed the witness

12   under oath to truthfully answer all questions in

13   this matter under the authority vested in me by the

14   State of Mississippi.

15        I further certify that I am not in the employ

16   of, or related to, any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the proceedings.

19        Witness my signature and seal, this the 8th

20   day of November, 2021.

21

22                    _____

23                    _____

24                    Natalie R. Seymour, CSR #1637
                       My commission expires 6/12/2022.

25