1                IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                     SOUTHERN DIVISION

4

5

6    WALLACE DWAYNE PETERSON, JR.,
          Plaintiff,

7

8    VERSUS            CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

9

10   PEARL RIVER COUNTY,
     MISSISSIPPI; DAVID ALLISON,
11   Individually; and JOHN AND
     JANE DOES 1-10, Individually,
12        Defendants.

13

14

15

16
          DEPOSITION OF WALLACE DWAYNE PETERSON, JR.
17

18        Taken at the Pearl River County Sheriff's

19        Department, 171 Savannah Millard Road,

20        Poplarville, Mississippi, on Monday,

21        October 18, 2021, beginning at 9:08 a.m.

22

23

24

25

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684 - www.schroederlanoux.com**



```
 1    APPEARANCES:

 2
         G. MORGAN HOLDER, ESQUIRE
 3
         CHRISTOPHER E. SMITH, ESQUIRE
 4
         Smith & Holder, PLLC
 5
         1720 22nd Avenue
 6
         Gulfport, Mississippi  39501
 7
         morgan@smitholder.com
 8
         chris@smitholder.com
 9
             ATTORNEYS FOR PLAINTIFF
10

11       LANCE W. MARTIN, ESQUIRE

12       Allen, Allen, Breeland & Allen, PLLC

13       214 Justice Street

14       Brookhaven, Mississippi  39601

15       lmartin@aabalegal.com

16           ATTORNEY FOR DEFENDANTS

17

18

19

20

21   REPORTED BY:

22       NATALIE R. SEYMOUR, CSR #1637
         Schroeder-Lanoux Reporting & Legal Video, Inc.
23       220 Glen Eagles Drive
         Ocean Springs, Mississippi  39564
24       (228)875-2864
         Natalie@SchroederLanoux.com
25
```

1                          TABLE OF CONTENTS

2

3     Examination by:                              Page:

4         Mr. Martin                                  5

5         Mr. Holder                                 33

6         Mr. Martin                                 45

7

8     Exhibits:

9         Exhibit 1, Copy of photograph
             (CLT - (PETERSON) - 000036)            27

10        Exhibit 2, CAD Details
             (CLT - (PETERSON) - 000065 and 66)     28

11

12        Exhibit 3, Copy of photograph and
             schematic                              49

13    Certificate of Reporter                       50

14    Errata Sheet                                  51

15

16

17

18

19

20

21

22

23

24

25

```
 1                      STIPULATION
 2          It is hereby stipulated and agreed by and
 3     between the parties hereto, through their
 4     respective attorneys of record, that this
 5     deposition may be taken at the time and place
 6     hereinbefore set forth, by Natalie R. Seymour,
 7     Court Reporter and Notary Public, pursuant to the
 8     Federal Rules of Civil Procedure, as amended;
 9          That the formality of READING AND SIGNING is
10     specifically NOT WAIVED;
11          That all objections, except as to the form of
12     the questions and the responsiveness of the
13     answers, are reserved until such time as this
14     deposition, or any part thereof, may be used or is
15     sought to be used in evidence.
16                        -  -  -
17
18
19
20
21
22
23
24
25
```

```
 1              MR. MARTIN:  My name is Lance Martin,
 2         for the defendants, Pearl River County,
 3         Mississippi, and David Allison.
 4              Morgan, are we going to reserve all
 5         objections, except for as to form?
 6              MR. HOLDER:  That is correct.
 7              WALLACE DWAYNE PETERSON, JR.,
 8         having been first duly sworn, was
 9         examined and testified as follows:
10                        -  -  -
11                      EXAMINATION
12    BY MR. MARTIN:
13         Q.    Good morning, Mr. Peterson.
14         A.    Good morning.
15         Q.    My name is Lance Martin.  Like I just
16    said, I represent the sheriff and Pearl River
17    County, whom you have sued here based on events
18    from the morning of August 23rd, 2019.
19              Mr. Peterson, I want you to know I don't
20    have anything against you personally.  You know we
21    all have jobs to do.  This is my job.  As part of
22    that job, I may ask some prying questions today.
23    That's just so we can all get down to the nuts and
24    bolts of what your complaint is, we can figure out
25    what happened here and kick the can a little
```

```
 1    further down the road.

 2              As you can see -- nothing against your

 3    attorneys.  I appreciate that they are all

 4    well-put together and look good in their shirts

 5    and ties.  Look, I'm a country boy from Sontag,

 6    Mississippi, so we're just going to have a

 7    conversation today.

 8              MR. HOLDER:  Well, I'm Bubba Holder's

 9        son, so you don't have to worry about that.

10    BY MR. MARTIN:

11        Q.   And, Mr. Peterson, if you will, just

12    answer these first couple of questions with a yes

13    or no.

14              Do you recall the events of August 23rd,

15    2019?

16        A.   Yes.

17        Q.   All right.  And were you arrested on

18    that date?

19        A.   I was brought to jail.  I was never told

20    I was arrested.

21              (Discussion off the record.)

22    BY MR. MARTIN:

23        Q.   And was it the Pearl River County

24    Sheriff's Department that took you to jail?

25        A.   Yes.
```

```
 1        Q.    Have you ever been deposed before?
 2        A.    No.
 3        Q.    All right.  Have you ever testified in a
 4   trial before?
 5        A.    No.
 6        Q.    So this is your first time, like, giving
 7   testimony under oath?
 8        A.    No, I take that back.  I got in a wreck
 9   in 2011, and I had to do a deposition.
10        Q.    Okay.  So, like, the court reporter just
11   swore you in.  You know, it's just like you see on
12   court TV shows, right, swear to tell the truth,
13   whole truth and nothing but the truth.
14              Your attorneys can't really help you in
15   your questions -- or answers to my questions.
16   It's just, you know, between us.  When you answer,
17   answer out loud.  Don't just shake your head yeah
18   or no.  You know, the court reporter has got to
19   take your information down.
20              I've got this mask on.  If you can't
21   understand me, say, I didn't understand that,
22   speak a little louder, and I will.  If you don't
23   understand the question, let me know and I'll ask
24   it again.  If you need a break, you know, just
25   ask.
```

```
 1                  Are you on any kind of medication this
 2      morning that would impair your memory or your
 3      ability to speak truthfully?
 4           A.   No.
 5           Q.   Is there any other reason why you can't
 6      answer honestly or accurately today?
 7           A.   No.
 8           Q.   And what did you do to prepare for the
 9      deposition today?
10           A.   Nothing.
11           Q.   Nothing?  So you didn't review documents
12      or talk with your attorney?
13           A.   I've been in Gainesville, Florida, at a
14      softball tournament.  I just come in at 10:00 last
15      night.  I ain't talked to anyone.
16           Q.   All right.  Sounds good.  Sounds good.
17                Are you a football fan?
18           A.   Not really.
19           Q.   Oh, I was going to ask you if you saw
20      where LSU beat Florida this weekend.
21           A.   Softball, my daughter, that's all I do.
22           Q.   How old are your daughters?
23           A.   One, 14.
24           Q.   I had some cousins that were big in
25      travel softball.
```

1          A.    We go to Colorado, California.  We go

2     everywhere.

3          Q.    That's awesome.  That's fun.

4                When you testified in that deposition,

5     what was that related to?

6          A.    A lady had rear-ended me and flipped me.

7          Q.    Oh, wow.  Okay.  And did that go to

8     trial?

9          A.    As soon as the deposition, they settled

10    it right there.

11         Q.    And that was through the insurance

12    companies?

13         A.    Uh-huh.

14         Q.    Would you state your full name for the

15    record?

16         A.    Wallace Dwayne Peterson, Jr.

17         Q.    All right.  And what name do you

18    normally go by?

19         A.    Wallace, Wally.  It just depends who I'm

20    talking to.

21         Q.    I got you.  How old are you,

22    Mr. Peterson?

23         A.    Forty.

24         Q.    And what's your birth date?

25         A.    ████████

1      Q.    Okay.  Are you married?

2      A.    No.

3      Q.    Have you ever been married?

4      A.    Once.

5      Q.    And when was that?

6      A.    2010.

7      Q.    Okay.  And what was her name?

8      A.    Michelle.

9      Q.    Where does Michelle live now?

10     A.    No clue.

11     Q.    And is it with Michelle whom you share

12  your daughter?

13     A.    No.

14     Q.    Okay.  Who is your daughter's mother?

15     A.    Deshannon.  I guess her last name is

16  Matthews.

17     Q.    Okay.  And does she live here in Pearl

18  River County?

19     A.    Bogalusa, I think.

20     Q.    Okay.  And what's your daughter's full

21  name?

22     A.    ███████████████████████

23     Q.    And, Mr. Peterson, where do you

24  currently live?

25     A.    ███████████████████████

```
 1       Q.   All right.  And how long have you lived
 2   there?
 3       A.   Since '07.
 4       Q.   Okay.  Does anyone live with you?
 5       A.   My daughter.
 6       Q.   Okay.  Do you have full custody of her?
 7       A.   Yes.
 8       Q.   Prior to that, prior to 2007, where did
 9   you live?
10       A.   ████████████████████████, kind of.
11       Q.   And was that a house, a rental?
12       A.   A rental.
13       Q.   Okay.  Where did you go to high school?
14       A.   Hancock.
15       Q.   Is that down on the Coast?
16       A.   Hancock High, yeah.
17       Q.   Okay.  What year did you graduate?
18       A.   2000.
19       Q.   Well, you're right between us.  We have
20   some 2002s, and then I'm '95, and then maybe a
21   '97 is in here.  We're all in the same ballpark.
22   Greatest time to be alive, in my opinion.
23            Did you graduate?
24       A.   No, sir.
25       Q.   You did not.  Okay.  What year did you
```

```
 1   drop out?
 2        A.    '99.
 3        Q.    So which grade did you complete?
 4        A.    Eleventh.
 5        Q.    Okay.  Did you go on to get a GED?
 6        A.    No.
 7        Q.    Did you do any kind of trade school or
 8   anything like that?
 9        A.    No.
10        Q.    What do you do for a living?
11        A.    I'm an equipment operator.  I work for a
12   farm.
13        Q.    Okay.  Which farm is that?
14        A.    Green Bell Farm.
15        Q.    Green Bell Farm.  And what kind of
16   farming operation is that?
17        A.    Just cattle.
18        Q.    And who owns that corporation?
19        A.    Conrad Collins.
20        Q.    And are you related to Mr. Collins in
21   any way?
22        A.    No.
23        Q.    Okay.  That pretty much knocks out a lot
24   of our introductory questions.  I don't know if
25   your attorneys have really talked to you much
```

1    about this, but where we are in this case is a

2    thing called qualified immunity discovery.  It's

3    really just fact-finding.  You know, we're not

4    necessarily going to get into damages that you

5    incurred or anything like that.  We're looking at

6    your claims that have survived before the Court.

7              And when this is all wrapped up, you

8    know, I'm sure I'll file a motion.  Your attorneys

9    will respond to that motion, and then we'll keep

10   kicking the can a little further down the road and

11   see where we go.

12             So right now I want to get to the

13   specifics about the morning of your arrest.  We

14   established earlier that you were, in fact --

15   well, I say "arrest."  You say that you were taken

16   to jail.

17             You were taken into custody by the Pearl

18   River County Sheriff's Department on August 23rd,

19   2019; correct?

20        A.    Yes.

21        Q.    All right.  In your own words, just give

22   me, you know, your brief recollection of what

23   happened that morning.

24        A.    I had just put my -- I was sick that

25   morning.  I had put my daughter on the bus, come

1    back in and laid on the couch.  I wasn't feeling

2    good.  And then they kicked the door in, told me

3    to stand up.  When I stood up, they threw me down

4    and hit me in the face.

5            And I asked them what was going on, and

6    they said they had a warrant.  And I asked to see

7    it, and it's never been produced.  I was in my

8    underwear.  They handcuffed me in the

9    yard -- handcuffed me in the house and took me in

10   the yard and made me stand there after my face was

11   busted and blood was everywhere.

12           They never once told me why I was being

13   arrested.  I asked what was going on, Sergeant

14   Bean, and he told me he didn't have to tell me

15   nothing.  And that was basically it.

16       Q.   I'm just going to unpack a few things,

17   okay, and we'll move forward.  Do you remember why

18   you were sick, like, that morning?

19       A.   Just wasn't feeling good.

20       Q.   Probably a little like me today, just

21   one of those mornings.

22           Were you at the address on Connie Hariel

23   when this happened?

24       A.   Yes.

25       Q.   And you said you walked your daughter to

```
 1   the school bus?
 2        A.   Put her on the bus.
 3        Q.   Okay.  About how far is that walk from
 4   your door to the road?
 5        A.   Fifty foot.
 6        Q.   Okay.  So pretty close?
 7        A.   I didn't have to walk.  I stood at the
 8   door while she walked.
 9        Q.   I got you.  I got you.  About what time
10   of the morning was that?
11        A.   She gets on the bus?
12        Q.   Uh-huh.
13        A.   6:45.
14        Q.   And to your recollection, when you went
15   back inside and lied down on the couch, how long
16   was it until the officers showed up?
17        A.   I don't really know.
18        Q.   No idea?
19        A.   I don't really know.  I dozed off.  I
20   was asleep when they come in.
21        Q.   Okay.  Had you stayed up late the night
22   before, or you were just sleepy?
23        A.   I was sick.
24        Q.   All right.  So you had dozed off and you
25   were sleepy.
```

1          You kind of gave me some tidbits of what

2    happened inside your house.  Can you put a time

3    stamp on about how long that took, like everything

4    from beginning to end?

5          A.    A couple of minutes.

6          Q.    Do you remember how many officers were

7    there?

8          A.    There was three or four in the house, I

9    think.  I mean, I was kind of out of it, you know.

10         Q.    And what do you mean by that, you were

11   kind of out of it?  Just dazed from being sleepy?

12         A.    No, when they hit me.

13         Q.    And you say, when they hit you.

14         A.    The cop, whoever he was.  I don't know

15   who he was.

16         Q.    So it was one cop who hit you?

17         A.    (Witness nodded affirmatively.)

18              THE COURT REPORTER:  I didn't get that.

19       Was that a "yes" or "no"?

20              THE WITNESS:  Yes -- I'm sorry -- it was

21       one cop.

22   BY MR. MARTIN:

23         Q.    And can you describe what he looked

24   like, any kind of recollection of what he looked

25   like?

1      A.    Big, bulky guy with, it looked like, an

2   assault rifle or shotgun.  I don't know.  He kind

3   of looked like he was on steroids or something.

4      Q.    Kind of like me?  How did he hit you?

5      A.    With the gun.  I don't know.  He threw

6   me on the ground, and he was on my back and hit me

7   in the face with, like, the butt of his gun.

8           And he had a camera on.  I don't

9   understand why they don't have the video.

10     Q.    So the hit to your face by this big,

11  bulky guy, it came after you were on the ground?

12     A.    (Witness nodded affirmatively.)

13     Q.    Explain to me how you got to be on the

14  ground.  Kind of step me through that.

15     A.    He told me to stand up and put my hands

16  up.  When I put my hands up, he threw me on the

17  ground, put his knee on my back and then hit me.

18     Q.    Do you remember what this officer was

19  wearing?

20     A.    Looked like tactical gear.

21     Q.    Okay.  Did it have any kind of markings

22  on it that you recall?

23     A.    No.

24     Q.    And when the hit came in and you were on

25  the ground, you said, face down, was your head

```
 1    facing to the left or was your head facing to the
 2    right?
 3        A.   I think to the left.
 4        Q.   To the left.  Okay.  And did the hit
 5    come in from behind you or in front of you?  Does
 6    that make sense?  Like, if you're laying on the
 7    ground, did it come in from behind or kind of in
 8    front?
 9        A.   Behind.
10        Q.   I'm not making light of your situation,
11    okay, but have you ever been hit in the face with
12    a firearm before?
13        A.   No.
14        Q.   Have you ever been in a fistfight?
15        A.   Yes.
16        Q.   Could you explain to me any difference
17    that you felt from what you were struck with that
18    day as opposed to a fist?
19        A.   Oh, I mean, I've never gotten hit by a
20    fist.  I've just been in a fistfight.
21        Q.   You Bruce Lee or something?  Not even
22    getting hit, that's awesome.
23             Okay.  Then just tell me what the hit
24    felt like.
25        A.   The hit busted my face and kind of dazed
```

1   me.

2        Q.   Okay.  And was that the only hit that

3   you suffered?

4        A.   I guess.  It kind of dazed me for a

5   minute.

6        Q.   So, I mean, you're saying you were

7   dazed, and you said "I guess."  You really can't

8   say one way or the other?

9        A.   It kind of knocked -- almost knocked me

10  out, I guess you would say.

11       Q.   And you come off the couch.  You hit the

12  ground.  You get hit.  Then you're handcuffed?

13       A.   (Witness nodded affirmatively.)

14            MR. HOLDER:  You've got to verbalize an

15       answer.

16            THE WITNESS:  Oh, I'm sorry.  Yes.

17  BY MR. MARTIN:

18       Q.   When you were taken off the couch and

19  everything else happened, was the officer who took

20  you off the couch the officer who handcuffed you?

21       A.   I'm not sure.  I was laying on the

22  ground.  I would assume.

23       Q.   And at that point in time --

24            (Discussion off the record.)

25            MR. MARTIN:  What was the last thing I

```
 1       said?
 2       (Wherein, the partial question was read back.)
 3  BY MR. MARTIN:
 4       Q.   At that point in time, I believe earlier
 5  you said they took you outside?
 6       A.   (Witness nodded affirmatively.)
 7       Q.   Okay.  And when they took you outside,
 8  where did they put you?
 9       A.   Made me stand at the back of my truck.
10       Q.   Okay.  And how long would you say you
11  stood there?
12       A.   An hour.
13       Q.   Okay.  Did they ever put you in a squad
14  car?
15       A.   Yeah, finally.
16       Q.   About what time was that?
17       A.   I didn't have no watch on.
18       Q.   Okay.  Let's go back to the entry.  Did
19  you hear them knock on your door?
20       A.   No.
21       Q.   Did you hear them say anything?
22       A.   When they was walking in -- when they
23  was running in, they said "sheriff's department."
24       Q.   So after they made it through the door,
25  they started saying "sheriff's department," to
```

```
 1   your recollection?
 2        A.   (Witness nodded affirmatively.)
 3             THE COURT REPORTER:  Yes or no?  I
 4        didn't get a response.
 5             THE WITNESS:  Yes.  I'm sorry.
 6   BY MR. MARTIN:
 7        Q.   Was it one voice or a group of voices?
 8        A.   One.
 9        Q.   Okay.  Could you see where the voice was
10   coming from?
11        A.   Yes.
12        Q.   And who was it coming from?
13        A.   The guy that hit me.
14        Q.   Okay.  And you said it was a guy.  So it
15   was a male voice, not a female voice?
16        A.   Yes.
17        Q.   Were there any females there that day?
18        A.   Not that I recall.
19        Q.   Okay.  So you never got a chance to open
20   the door; right?
21        A.   No.
22        Q.   And you said, you know, maybe four or
23   five officers.  You can't really remember
24   correctly because you were on the floor and dazed;
25   correct?
```

1        A.    No.   There was, like, three that came
2    in.   Then they was all the way around the house
3    and in the yard.
4        Q.    And to your recollection, what were they
5    doing when they were all in the house?
6        A.    They took me out.   They destroyed the
7    house, I know that.
8        Q.    Okay.   And I understand that -- you
9    know, that claim.   Can you describe any of the
10   other officers?   I mean, we've got the -- I'll
11   just say the main guy that was kind of -- you said
12   looked like he was on steroids.   Can you describe
13   any of the others?
14       A.    Chris, the guy that led us in.
15       Q.    Okay.
16       A.    Van, I seen him there and that Sergeant
17   Bean, whoever he is.
18       Q.    The guy that led us in, which guy?
19   Because there has been a couple.
20       A.    Chris Ventura, whatever his name is,
21   Stachura.
22       Q.    Stachura?
23       A.    Whatever, yeah.
24       Q.    And had you seen him in the county
25   before?   Did you know him?

```
1        A.    Never seen him in my life.

2        Q.    Okay.  And you called out Van by name.

3   Did you know Van?

4        A.    Yes.

5        Q.    Okay.  How long have you known Van?

6        A.    He used to buy calves from us 20 years

7   ago.

8        Q.    Okay.  And if you had to describe what

9   Van looked like, what does Van look like?

10        A.    Overweight Mexican.

11        Q.    And you knew Van by name that day, like,

12   when he was there?

13        A.    (Witness nodded affirmatively.)

14        Q.    Did you have any conversations with Van

15   while he was on your property?

16        A.    Nuh-uh.  No.  Sorry.  Sorry.

17        Q.    All right.  I'm going to give you a

18   couple of items, and I'm just going to ask you

19   first if you can identify them.  And if you can

20   identify them, then we'll put them into evidence

21   and we will talk about them.  Okay?

22        A.    Uh-huh.

23        Q.    And the first couple, they haven't been

24   pre-marked or anything.  It's just something for

25   my benefit so we can kind of understand a little
```

```
 1    bit more what's going on.

 2              Now, this first snapshot -- I didn't

 3    drive by your trailer -- I got that off Google

 4    Maps.  Is that where you live?

 5        A.    Yeah.

 6        Q.    Okay.  And that second one is -- I know

 7    you're not a bird or anything, but would you think

 8    that that's a fair assessment of the overview of

 9    your house?

10        A.    I guess.

11        Q.    Best as you can tell?

12        A.    Yeah, I guess.

13        Q.    Okay.  Do you know the dimensions of

14    your house trailer?

15        A.    Sixteen-by-eighty, maybe.

16        Q.    That's kind of what I thought, 16-by-80.

17    And I don't need this to be exact, but could you

18    just give me an idea on that block graphic, just

19    kind of sketch out where you think your living

20    room is and your bedroom?  And, again, it doesn't

21    have to be exact.  This is just so I can get a

22    feel of the lay of the land.

23        A.    Okay.

24        Q.    Would you just hold that up?  You don't

25    have to pass it back to me.
```

1          Okay.  So your living room is basically

2     if we --

3          A.   Center.

4          Q.   Yeah, center.  So whenever they came in

5     through your front door, they would have been

6     right there on you?

7          A.   Yes.

8          Q.   Okay.  Where were you when they came in?

9          A.   Laying on the couch.

10         Q.   Was there anything between you and the

11    door, like a coffee table?

12         A.   Coffee table.

13         Q.   Okay.  About how much space is in

14    between the coffee table and the couch?

15         A.   Two foot.

16         Q.   Okay.  And is that where you were taken

17    to the ground?

18         A.   Towards the kitchen from the coffee

19    table.

20         Q.   Okay.  So if you're looking at your door

21    and you were towards the kitchen, would that be to

22    your right or to your left?

23         A.   Left.

24              MR. HOLDER:  Okay.  Can we clarify the

25         record here?  If you're looking at the door

```
 1        from the inside or the outside?
 2              MR. MARTIN:  From his perspective, from
 3        the inside.
 4              THE WITNESS:  It would be to the right.
 5              MR. MARTIN:  Thanks, Morgan.
 6   BY MR. MARTIN:
 7        Q.   So if you're looking at the door from
 8   the couch, to your right would have been the
 9   kitchen, and that's the direction you were.
10              Okay.  How did you get there?  Was it a
11   straight takedown move?  Were you picked up?
12        A.   I stood up -- I stood up behind the
13   coffee table, and they laid me down towards the
14   kitchen.
15        Q.   Okay.  How did they lay you down?
16        A.   With force.  I don't know.  They grabbed
17   me and threw me down.
18        Q.   Grab you on your left arm, your right
19   arm?
20        A.   I don't know.  They grabbed me and threw
21   me down.
22        Q.   Oh, and I also showed you a picture of
23   yourself.  Is that a fair representation of what
24   you looked like that day?
25        A.   I guess so.
```

```
1       Q.   Do you remember who took that photo?

2       A.   No clue.

3            MR. MARTIN:  Madam Court Reporter, that

4       photo is marked as CLT Peterson-000036.  It's

5       been produced in discovery, and I'd like to

6       introduce it as Exhibit 1.

7                        -  -  -

8                 (Exhibit 1 was marked.)

9   BY MR. MARTIN:

10      Q.   And that amount of blood, Mr. Peterson,

11  that's coming from your nose and your mouth?

12      A.    Inside my mouth.  I was drinking most of

13  it.

14      Q.   Okay.  When this photo was taken, you

15  established that was after some time, before you

16  had been put in the police car?

17      A.   Yeah.

18      Q.   Okay.  And I can clearly see that you

19  didn't have a shirt on.  What was the temperature

20  that day?

21      A.   No clue, really.

22           MR. MARTIN:  Gentlemen, this is CLT 65.

23      It's the CAD sheet.  It's close to the back.

24      I'm going to introduce this as Exhibit 2.

25                       -  -  -
```

```
 1                 (Exhibit 2 was marked.)
 2    BY MR. MARTIN:
 3        Q.    All right, Mr. Peterson.  I know this
 4    probably looks like Greek to you.  It sometimes
 5    does to me, as well.  If you will, I want you to
 6    read some of these things that are on here for me.
 7              At the top, what date does it say?
 8        A.    8/23/19.
 9        Q.    Okay.  And you would agree with me that
10    it says that it's a search warrant?
11        A.    Yes.
12        Q.    And then it says, ████████████████
13    ████ ?
14        A.    Yes.
15        Q.    All right.  And then below that, it says
16    "responding units" and starts naming off several
17    names; correct?
18        A.    Yeah.
19        Q.    All right.  I'm just going to ask you
20    about these gentlemen.  You tell me whether you
21    know them or not.
22              Do you know Joe Garcia?
23        A.    Yes.
24        Q.    Okay.  How do you know Joe?
25        A.    Grew up with him.
```

1        Q.    And would you describe Joe?   What does

2    he look like?

3        A.    Kind of short and fat.

4              He wasn't there.   Why is he on there?

5        Q.    He's just on the list.

6        A.    Okay.

7        Q.    So Joe wasn't there?

8        A.    No.

9        Q.    All right.   What about the second

10   gentleman, Daniel T. Quave?   No idea?

11       A.    No idea.

12       Q.    The third person, Terrence Tucker?

13       A.    No idea.

14       Q.    Okay.   Fourth person, David M. Allison?

15       A.    The sheriff.

16       Q.    Did you know the sheriff before that

17   day?

18       A.    He come to our store when he was running

19   for sheriff to campaign.   Yes.

20       Q.    So you knew what he looked like?

21       A.    Yes.

22       Q.    And then the next person is Van.   How do

23   you pronounce Van's last name?

24       A.    No clue.

25       Q.    You've just known him for a long time.

1   I get it.  Even if I knew him for a long time, I

2   don't know if I could pronounce that one.

3           The next person is a David Bean.  Do you

4   know David?

5       A.   No, sir.

6       Q.   What about Nathan Davis?

7       A.   No, sir.

8       Q.   Okay.  Ryan Stachura?

9       A.   No, sir.

10      Q.   But you identified him earlier; correct?

11      A.   Yes.

12      Q.   Okay.  And Jeffrey Horner; is that

13   correct?

14      A.   Yes.  I don't know him, but --

15      Q.   Right.  Were any of those gentlemen that

16   are listed the one who allegedly hit you?

17      A.   No idea.  I don't know the guy's name.

18      Q.   Okay.  And I'm not boxing you in here.

19   It's really just an agreement with what this

20   document says.  It says on here, received, RECV;

21   dispatch, DISP; and arrive, ARIV.  All three of

22   those have at the very top an 8:10 time stamp;

23   correct?

24      A.   Yes.

25      Q.   Just according to this document.  And

```
1     then after that, it says, clear, 10:09; correct?

2          A.    Yeah.

3          Q.    When all of this was taking place, do

4     you remember seeing the sheriff as it was all

5     taking place?

6          A.    Yes, sir.

7          Q.    Okay.  When did you first see the

8     sheriff?

9          A.    When I was outside.

10          Q.    When you were outside.  Okay.  And where

11     did you notice him?

12          A.    Standing out in the yard.

13          Q.    Okay.  Can you remember what he was

14     wearing that day?

15          A.    He had his badge on.

16          Q.    Okay.  Had the sheriff come into your

17     house prior to when you saw him?

18          A.    I don't think.  I don't know.

19          Q.    Okay.  Do you know whether or not the

20     sheriff knew that the arresting officer had taken

21     you to the ground?

22               MR. HOLDER:  Object to the form.  You

23          can answer.

24          A.    I don't even know what -- say that

25     again.
```

```
 1    BY MR. MARTIN:
 2         Q.    What do you know about the sheriff's
 3    knowledge of what happened inside your trailer?
 4               MR. HOLDER:   Object to the form.
 5         A.    I don't even know how to answer that.
 6    BY MR. MARTIN:
 7         Q.    Did the sheriff have a chance, to your
 8    knowledge, to stop the alleged excessive force?
 9         A.    Yeah.
10         Q.    How so?
11         A.    He was there, wasn't he?
12         Q.    You kind of just established that he
13    wasn't inside your trailer.  You didn't see him
14    first until after you were taken outside.
15         A.    Well, I mean, he sent them in there,
16    didn't he?  That would have been his chance to
17    stop it, not send them in there.
18         Q.    So your position is that stopping their
19    entry into your home would have stopped anything
20    that happened inside the home?
21         A.    I guess.
22         Q.    Okay.  Do you have any proof that the
23    sheriff chose not to act?
24         A.    I don't know how to answer that.
25               MR. MARTIN:   All right, Mr. Peterson.
```

1       That does it for me for right now.  Your

2       attorney's going to ask you some questions.

3       And if I have any follow-up afterwards, I'll

4       re-ask.  Okay?  So thank you.

5                      - - -

6                  EXAMINATION

7   BY MR. HOLDER:

8       Q.    Wallace, how long has your daughter

9   lived with you?

10      A.    Her entire life.

11      Q.    So 14 years?

12      A.    Yeah.

13      Q.    Has she ever lived with anyone else?

14      A.    No.

15      Q.    And have y'all always lived at the

16  address y'all live at now?

17      A.    Yes.

18      Q.    Was there ever an occasion where y'all

19  spent weeks or months at a time living with anyone

20  else?

21      A.    Yeah.  Well, I had a girlfriend one

22  time -- I had a fiancée.  We moved into her house.

23      Q.    Did you ever move into your parents'

24  house?

25      A.    No.

```
 1          Q.    You said Sergeant Bean was present; is
 2    that right?
 3          A.    Yes.
 4          Q.    How did you become aware of that?
 5          A.    He's the one that took me to jail.
 6          Q.    And was he there when they brought you
 7    outside?
 8          A.    Yes.
 9          Q.    So you were speaking to him when you
10    went outside?
11          A.    Yes.
12          Q.    And how long was it from the incident
13    with the officer who first came into your house
14    until they took you outside?
15          A.    Few minutes.
16          Q.    But once you got outside, Sergeant Bean
17    was already there?
18          A.    Yes.
19          Q.    And do you know what he looks like?
20          A.    Kind of black hair with glasses.
21          Q.    And was he out there by himself, or was
22    he talking to other officers; do you recall?
23          A.    He stood by me by the back of my truck
24    by myself, but there was other officers back
25    there.
```

```
 1          Q.    You testified that you stood behind your
 2    truck for quite some time?
 3          A.    Yeah.  It seemed like an hour, but I
 4    didn't have a watch on.
 5          Q.    What were you wearing?
 6          A.    Underwear.
 7          Q.    What else?
 8          A.    Handcuffs.
 9          Q.    Did you ask them if you could put
10    clothes on?
11          A.    I even asked for shoes.
12          Q.    Were you bleeding the entire time?
13          A.    Yes.
14          Q.    Did they offer you any medical aid?
15          A.    No.
16          Q.    Did the sheriff see you bleeding?
17          A.    Yes.
18          Q.    Did he offer you any medical aid?
19          A.    No.
20          Q.    How did they bring you outside?
21          A.    Walked me out in handcuffs.
22          Q.    There are stairs that lead up to your
23    trailer?
24          A.    Yes.
25          Q.    Do you recall who it was that brought
```

```
 1   you outside?

 2        A.   No, I don't.

 3        Q.   You said that you know Joe Garcia?

 4        A.   Yeah.

 5        Q.   And he was not there?

 6        A.   He was not there.

 7        Q.   But he's listed on this report that he

 8   showed you; right?

 9        A.   Yeah.

10        Q.   You said David Bean was present at the

11   very latest from the second they brought you

12   outside?

13        A.   Yes.

14        Q.   Okay.  So if it said he arrived there at

15   9:34, that would not be accurate?

16        A.   No.

17        Q.   Can you describe, to the best of your

18   recollection, the firearm that the officer had

19   that initially came into the trailer?

20        A.   I thought it was an assault rifle or a

21   shotgun.  He had it in both hands.

22        Q.   It wasn't a pistol?

23        A.   I don't think.  He had it in both hands,

24   up like this (indicating).  I mean, it could have

25   been a long pistol.
```

```
 1        Q.    But to the best of your recollection,
 2   you thought it was some type of rifle or a
 3   shotgun?
 4        A.    Yeah.
 5        Q.    Okay.  And to the best of your
 6   recollection, the strike to your face was from the
 7   butt of that gun?
 8        A.    Yeah.
 9        Q.    And when you say "the butt of that gun,"
10   are you talking about the flat portion of the
11   bottom of the handle?
12        A.    Yeah.
13        Q.    Okay.  You also testified that he had a
14   body camera on?
15        A.    Yes.
16        Q.    How were you aware of that?
17        A.    Because I seen it.  Every one of them
18   walking around that was dressed in tactical gear
19   had the little round thing on their chest.
20        Q.    And when you say the ones wearing
21   tactical gear, were there two separate uniforms
22   that the officers were wearing out there?
23        A.    Some of them was in plain uniforms, and
24   the other ones was in the tactical stuff.
25        Q.    And when you say "plain uniforms," are
```

1    you talking about the uniforms such as you see the

2    officers in walking around here today?

3        A.    Yeah.

4        Q.    And the others are wearing more -- you

5    call it tactical.  Can you explain that?

6        A.    More like the Army.

7        Q.    And it's the ones that were wearing the

8    tactical gear that you say you personally observed

9    wearing body cameras?

10        A.    Yeah.

11        Q.    Now, Lance got into kind of the

12    schematics of the trailer.  There's the front

13    door, and in between the front door and the couch,

14    there's what?

15        A.    Coffee table.

16        Q.    All right.  And you said how far was the

17    coffee table from the couch?

18        A.    Maybe two foot.

19        Q.    How far was the other edge of the coffee

20    table to the front door?

21        A.    Eight, twelve -- eight foot, maybe.

22        Q.    So how far was it total from the

23    entryway to your front door to the couch?  Just

24    your best estimate.

25        A.    Twelve foot at the most.

```
 1        Q.    Okay.  So just a few steps?

 2        A.    Yes.

 3        Q.    And when they initially -- well, let me

 4   back up.

 5              You said you never heard them knock on

 6   your door?

 7        A.    No.

 8        Q.    And you were on the couch, 12 feet from

 9   the door?

10        A.    Yes.

11        Q.    Had you been drinking anything?

12        A.    No.

13        Q.    Any alcoholic beverages or anything like

14   that?

15        A.    No.

16        Q.    You said you didn't feel well?

17        A.    Didn't feel well.

18        Q.    And this was a little after 8:00 in the

19   morning?

20        A.    Yes.

21        Q.    Okay.  And you had already been up?

22        A.    Yeah.  I got up and put her on the bus

23   and then was sick feeling, so I laid on the couch.

24        Q.    The first time you heard them after they

25   came into your trailer, tell me exactly where they
```

```
 1     were when you opened your eyes and you saw them.

 2          A.    The other side of the coffee table from

 3     me.

 4          Q.    So within a few feet, several feet?

 5          A.    Few feet.

 6          Q.    And they told you to do what?

 7          A.    Stand up.

 8          Q.    Was there anything on that coffee table?

 9          A.    Nothing.

10          Q.    Where was your truck parked?

11          A.    Right outside the front door.

12          Q.    Approximately how many feet from the

13     front door?

14          A.    Ten.

15          Q.    How many patrol cars were out there, to

16     the best of your recollection?

17          A.    Six to eight.  I know there was two

18     behind my truck, two beside the trailer, and they

19     was all the way down the driveway to the road.

20          Q.    Were their lights on?

21          A.    I don't think so.

22          Q.    You didn't see any flashing lights or

23     anything?

24          A.    No.

25          Q.    The photo that was introduced as Exhibit
```

```
 1    1, do you know where you were when that photo was
 2    taken?
 3         A.    Looks like in the back of a cop car.
 4         Q.    And so was this -- let me back up on
 5    that.
 6              When did they put you in the back of the
 7    patrol car?
 8         A.    After I complained about -- I was trying
 9    to sit down.  They wouldn't let me ever sit there.
10    Then they put me in the cop car, and I was
11    bleeding.  And he didn't want blood in there, so
12    he put me in the dog part of the SUV, the dog
13    compartment of the SUV.
14         Q.    Was this a K9 unit?
15         A.    Yeah.  The car was not.  Blood was in
16    the car, and he didn't want me in there.  So he
17    put me in the K9 unit, in the dog compartment.
18         Q.    Did you ever see a K9 there?
19         A.    Yeah.  It was throwing a fit, barking.
20         Q.    Was it a German Shepherd?
21         A.    I was on the other side.  I don't know.
22         Q.    So you never saw the actual dog in the
23    K9 unit?
24         A.    No.
25         Q.    From the best of your recollection, how
```

1    long was it from the first time you were thrown in

2    any law enforcement vehicle until the time y'all

3    left your property to go to jail?

4         A.    It seemed like three hours.  I don't

5    know.

6         Q.    Okay.  Let me ask you this:  Were you

7    standing behind your truck longer than you were in

8    the patrol car or vice versa?

9         A.    I thought I was behind my truck longer.

10        Q.    So this was taken well after the initial

11   breach into your trailer?

12        A.    Oh, yeah.

13        Q.    Now, you said you saw Sheriff Allison

14   outside; is that right?

15        A.    Yes, sir.

16        Q.    Who was he standing with; do you recall?

17        A.    I have no idea.

18        Q.    Was he alone, or was he with someone

19   else?

20        A.    I thought he was alone.

21        Q.    And you said that you are unsure whether

22   he had already been in your house or not?

23        A.    Yeah.

24        Q.    Did the sheriff allow you to remain

25   handcuffed?

```
 1      A.   Yes.

 2      Q.   Allowed you to remain bleeding outside,

 3  too?

 4      A.   Huh?

 5      Q.   He allowed you to remain bleeding

 6  outside, too?

 7      A.   Yes.

 8      Q.   And he didn't offer you any aid at all?

 9      A.   Nothing.

10      Q.   Did anybody ever tell you you were under

11  arrest?

12      A.   No.

13      Q.   Did you ask for a copy of the purported

14  search warrant?

15      A.   Yes.

16      Q.   And did you get a copy?

17      A.   No.

18      Q.   Who did you ask?

19      A.   I asked Allison and Chris, whatever his

20  last name is, Stachura, whatever.

21      Q.   Stachura?

22      A.   Yeah.

23      Q.   And what did they tell you?

24      A.   Allison told me he didn't have to have a

25  warrant, and Chris Stachura just never answered
```

```
 1    me -- or Ryan Stachura, whatever his name is.
 2         Q.   So the sheriff said he didn't need a
 3    warrant?
 4         A.   Yes.  He said he didn't have to have a
 5    warrant to be at my house, is what he said.
 6              MR. HOLDER:  Can we go off the record
 7         for a minute?
 8              MR. MARTIN:  Sure.
 9                   (Off the record.)
10    BY MR. HOLDER:
11         Q.   All right, Wallace.  Picking back up,
12    what was on that coffee table, you said?
13         A.   Nothing that I know.  Maybe a remote.
14         Q.   Okay.  And when they asked you to stand
15    up, did you threaten the officer in any way?
16         A.   No.
17         Q.   Did you offer any resistance?
18         A.   No.
19         Q.   Did you have anything in your hands?
20         A.   No.
21              MR. HOLDER:  I believe that's all I've
22         got for now.
23                        - - -
24              FURTHER EXAMINATION
25    BY MR. MARTIN:
```

```
 1         Q.    Just a couple of quick, you know,
 2    redirects, Mr. Peterson.
 3              Again, whenever you were hit, you were
 4    down on the ground; correct?
 5         A.    Uh-huh.  Yes.  I'm sorry.
 6         Q.    You established earlier that you
 7    couldn't clearly see?
 8         A.    Yes.
 9         Q.    You had never been hit in the face with
10    the butt of a firearm before?
11         A.    No.
12         Q.    So you really have nothing to compare
13    what happened to you on this day to; correct?
14         A.    No.
15         Q.    Morgan just asked you about if anything
16    was on the coffee table.  Does the couch have end
17    tables?
18         A.    No.
19         Q.    There are no end tables on the couch?
20         A.    No, sir.
21         Q.    And he asked you if you had threatened
22    officers; correct?
23         A.    Yes.
24         Q.    Have you heard the statement that you
25    had a wine bottle in your hand on this particular
```

```
 1   morning?

 2        A.   Yes.

 3        Q.   Okay.   And your testimony is there's no

 4   truth to that?

 5        A.   None at all.

 6        Q.   And, Mr. Peterson, as I'm sure you can

 7   appreciate, in a lot of respects, that comes down

 8   to a he said, she said.   You're going to say I

 9   didn't have a wine bottle, and the officers will

10   likely say that you did.   That's one of our

11   sticking points.

12             But, again, your testimony is you did

13   not have a wine bottle?

14        A.   No, sir.

15        Q.   And your counsel just clarified with

16   you -- and this is also in your complaint -- that

17   your testimony is you didn't do anything

18   threatening to the officer; correct?

19        A.   Correct.

20        Q.   You have said numerous times in your

21   deposition this morning that you didn't have a

22   watch on.   So your estimation of three hours,

23   that's just what that is, right, just an

24   estimation?

25        A.   Just an estimation.
```

```
1        Q.    You have no way of proving that?

2        A.    No way.

3        Q.    And then briefly about Sheriff Allison,

4    you said you first saw him outside and that he was

5    alone?

6        A.    Yes.

7        Q.    And that you're unsure as to whether or

8    not he was ever inside your home?

9        A.    No, I know he was inside my home.

10       Q.    And what point in time do you know that

11   he was inside your home?

12       A.    I know when they wanted me to go back in

13   and open my gun safe for them.

14       Q.    But not prior to that point, you're not

15   certain, I guess is my --

16       A.    I don't know.

17       Q.    Okay.  And you brought it up -- this

18   will be my last question -- the gun safe.  You

19   said you opened it?

20       A.    Yes.

21       Q.    Okay.  And who took you inside to open

22   that safe?

23       A.    Ryan, whatever his last name is.

24       Q.    How did you open it?

25       A.    They uncuffed me.
```

1      Q.    Okay.  And is it a padlock, combination
2  lock?

3      A.    Combination.

4      Q.    Okay.  And I'm guessing you knew the
5  combination and didn't want anybody else to have
6  the combination; right?

7      A.    Yes.  Well, he told me they was going to
8  cut it open if I wouldn't open it.

9      Q.    Okay.  So you opened it?

10     A.    (Witness nodded affirmatively.)

11         MR. MARTIN:  All right, you guys.  I
12       think that's good for me, too.  Appreciate
13       it, Mr. Peterson.

14              (Off the record)

15         MR. MARTIN:  Before we wrap up, since
16       Mr. Peterson did look at his trailer photos
17       and we discussed them, both parties did,
18       let's enter those as Exhibit 3, along with
19       the one Mr. Peterson drew on.

20         MR. HOLDER:  Which ones did he look at?

21         MR. MARTIN:  He looked at the front of
22       his trailer, the overview of his trailer and
23       then his orientation as to --

24         THE WITNESS:  I guess that's it.  I
25       don't really know.

```
 1          MR. MARTIN:  If you don't want to put
 2     the overview in there, I'm fine with that.
 3          MR. HOLDER:  You talking about these
 4     two?
 5          MR. MARTIN:  Yeah.  Just put that in as
 6     Exhibit 3, and we'll be good.
 7          For the record, I'd like a copy of this.
 8     I'll give you a card with my contact
 9     information.
10                    -  -  -
11          (Exhibit 3 was marked.)
12                    -  -  -
13       (Deposition concluded at 10:11 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, NATALIE R. SEYMOUR, Court Reporter and

 3    Notary Public, in and for the County of Harrison,

 4    State of Mississippi, hereby certify that the

 5    foregoing pages, and including this page, contain a

 6    true and correct transcript of the testimony of the

 7    witness, as taken by me at the time and place

 8    heretofore stated, and later reduced to typewritten

 9    form by computer-aided transcription under my

10    supervision, to the best of my skill and ability.

11         I further certify that I placed the witness

12    under oath to truthfully answer all questions in

13    this matter under the authority vested in me by the

14    State of Mississippi.

15         I further certify that I am not in the employ

16    of, or related to, any counsel or party in this

17    matter, and have no interest, monetary or

18    otherwise, in the final outcome of the proceedings.

19         Witness my signature and seal, this the 27th

20    day of October, 2021.

21

22

23
                    _____
24                  Natalie R. Seymour, CSR #1637
                    My Commission Expires 6/12/2022.
25
```

```
 1                        ERRATA SHEET

 2      I, _____ , do solemnly
    swear that I have read the foregoing _____ pages
 3  of the testimony given by me at the time and place
    hereinbefore set forth, with the following
 4  corrections:

 5

 6  Page:  Line:  Correction:   Reason for change:

 7  _____

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16                        _____

17                      NOTARIZATION

18      I, _____ , notary public

19  for the State of Mississippi, _____

20  County, do hereby certify that _____

21  personally appeared before me this _____ day of

22  _____, 2021, at _____, Mississippi.

23  My Commission Expires:

24  _____  _____
                                    (NOTARY PUBLIC)
25                                              (NRS)
```