1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                  SOUTHERN DIVISION

4

5

6   WALLACE DWAYNE PETERSON, JR.,
        Plaintiff,
7

8   VERSUS          CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

9

10   PEARL RIVER COUNTY,
    MISSISSIPPI; DAVID ALLISON,
11   Individually; and JOHN AND
    JANE DOES 1-10, Individually,
12       Defendants.

13

14

15

16              DEPOSITION OF SHANE TUCKER

17

18      Taken at the Pearl River County Sheriff's

19      Department, 171 Savannah Millard Road,

20      Poplarville, Mississippi, on Monday,

21      November 8, 2021, beginning at 1:36 p.m.

22

23

24

25



```
1     APPEARANCES:

2
          G. MORGAN HOLDER, ESQUIRE
3
          Smith & Holder, PLLC
4
          1720 22nd Avenue
5
          Gulfport, Mississippi  39501
6
          morgan@smitholder.com
7
               ATTORNEY FOR PLAINTIFF
8

9         LANCE W. MARTIN, ESQUIRE

10        Allen, Allen, Breeland & Allen, PLLC

11        214 Justice Street

12        Brookhaven, Mississippi  39601

13        lmartin@aabalegal.com

14             ATTORNEY FOR DEFENDANTS

15

16
      ALSO PRESENT: Wallace D. Peterson, Jr.
17

18

19

20    REPORTED BY:

21        NATALIE R. SEYMOUR, CSR #1637
          Schroeder-Lanoux Reporting & Legal Video, Inc.
22        220 Glen Eagles Drive
          Ocean Springs, Mississippi  39564
23        (228)875-2864
          Natalie@SchroederLanoux.com
24

25
```

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

1                          TABLE OF CONTENTS

2

3   Examination by:                                    Page:

4     Mr. Holder                                          5

5     Mr. Martin                                         36

6     Mr. Holder                                         51

7

    Exhibits:

8
      Exhibit 1, Notice of Deposition                    5
9
      Exhibit 2, Pearl River County Sheriff's
10       Department, Narcotics Investigative
         Report (CLT - (PETERSON) - 000067-78)          28
11
      Exhibit 3, CAD report
12       (CLT - (PETERSON) - 000065 and 66)             31

13  Certificate of Reporter                             53

14

15

16

17

18

19

20

21

22

23

24

25

1                  STIPULATION

2       It is hereby stipulated and agreed by and

3 between the parties hereto, through their

4 respective attorneys of record, that this

5 deposition may be taken at the time and place

6 hereinbefore set forth, by Natalie R. Seymour,

7 Court Reporter and Notary Public, pursuant to the

8 Federal Rules of Civil Procedure, as amended;

9       That the formality of READING AND SIGNING is

10 specifically WAIVED;

11       That all objections, except as to the form of

12 the questions and the responsiveness of the

13 answers, are reserved until such time as this

14 deposition, or any part thereof, may be used or is

15 sought to be used in evidence.

16                 - - -

17

18

19

20

21

22

23

24

25

```
 1              (Exhibit 1 was marked.)

 2                    - - -

 3              SHANE TUCKER,

 4         having been first duly sworn, was

 5         examined and testified as follows:

 6                    - - -

 7              EXAMINATION

 8    BY MR. HOLDER:

 9         Q.   Mr. Tucker, I don't know if you want me

10    to call you Officer Tucker, Shane.

11         A.   Shane is fine.

12         Q.   Okay.  I'll call you Shane.

13              My name is Morgan Holder.  I represent

14    Mr. Peterson in this case.  I'm sure you're pretty

15    familiar with the proceedings, but I'm going to

16    ask you a series of questions.  Try to provide

17    verbal answers so she can get it down.  You know,

18    head nods and uh-huhs and nuh-uhs are difficult to

19    ascertain for the record, so just try to be clear

20    with verbalizing your answers.

21              If you don't understand a question that

22    I ask, just get me to repeat it; because I'm prone

23    to asking some, you know, stupid questions or

24    unclear questions or ambiguous questions.  So if

25    you don't understand what I'm asking you, just ask
```

1    me to restate it and I'll do the best that I can

2    so you can understand that.

3              Let's start just by stating your full

4    name, for the record.

5         A.    Terrence Shane Tucker.

6         Q.    So you were the Terrence Tucker that's

7    referenced in the CAD report from the incident

8    involving Mr. Peterson?  If there's a Terrence

9    Tucker, there's not another one, is there?

10        A.    No.  Two Shanes.  I go by Shane.  It's

11   my middle name.

12        Q.    I got you.  Have you ever had your

13   deposition taken before?

14        A.    I have.

15        Q.    How many times?

16        A.    Twice, if I remember correctly.

17        Q.    And when was the most recent time you

18   had your deposition taken?

19        A.    It was in Slidell.  My best guess would

20   be eight to ten years ago.

21        Q.    So it's been quite some time?

22        A.    Yes, sir.

23        Q.    Was that in the official law enforcement

24   capacity that that deposition was taken, or was

25   that a private matter?

1      A.    It was.

2      Q.    Tell me about this.  Tell me how long

3  you've been in law enforcement.

4      A.    Twenty-eight years.  I'm not in it now.

5  I'm retired.

6      Q.    Oh, you're retired?

7      A.    I am.

8      Q.    And when did you retire?

9      A.    December 13th of 2019.

10     Q.    Are you enjoying retirement?

11     A.    Yes, sir.

12     Q.    Good for you.  I'll never get to retire.

13            And where did you begin your career in

14  law enforcement?

15     A.    I started at Forrest County Sheriff's

16  Department, worked there for about two years.

17  Then I worked for the Hattiesburg Police

18  Department for 12-and-a-half years, and then I

19  finished my career here at Pearl River

20  County -- oh, I'm sorry.  I missed one.  From

21  Hattiesburg PD, I worked for the district

22  attorney's office here in Poplarville for about a

23  year and a half.  And then Sheriff Allison got

24  elected, and I got hired here in December of '07.

25     Q.    So you worked here about 12 years?

```
 1        A.    Yes, sir.

 2        Q.    And over the course of 28 years, I'm

 3   assuming that you were involved in the execution

 4   of numerous search warrants?

 5        A.    Yes, sir.

 6        Q.    Let me ask you this first so we can

 7   streamline this.  When you retired in December of

 8   '19, were you in the same position you were in in

 9   August of the same year?

10        A.    Yes, sir.

11        Q.    Okay.  And what was that position?

12        A.    I was the chief deputy of the sheriff's

13   department.

14        Q.    And did you know Wallace Peterson at

15   that time?

16        A.    The only time I met Mr. Peterson was on

17   the search warrant.

18        Q.    Now, before you came in here today, did

19   you review any materials?

20        A.    No, sir.

21        Q.    Have you discussed your deposition today

22   with anybody other than Mr. Martin?

23        A.    No, sir.

24        Q.    I think it was Officer Stachura, in his

25   deposition, he testified that you would have been
```

1   responsible at the time for any policies and

2   procedures that were in place with the sheriff's

3   department.  Would that be accurate?

4        A.   It would be.

5        Q.   Okay.  Did y'all have any policies and

6   procedures for, you know, the execution of search

7   warrants?

8        A.   Yes, sir.

9        Q.   And did they require an operations plan

10  be in place?

11       A.   Most likely, yes, sir.  If you're going

12  to ask me some things, I've forgotten a lot of

13  stuff, details.  But, yeah, I would expect that

14  there would have been in place.

15       Q.   And when you develop these things, I'm

16  assuming that you itemize, you know, previous

17  policies and procedures manuals from this

18  department and maybe other law enforcement offices

19  to guide you through it?

20       A.   As far as developing policies, yes.

21       Q.   Do you recall whose department you might

22  have used when you were developing these policies

23  and procedures?

24       A.   At the time, the standards and training

25  for Mississippi had a template for policy and

1    procedure, and I think they also developed that

2    into an accreditation system for the State, as

3    well.  So it was that model policy program that

4    was used.

5           Q.    Okay.  And what about, did you develop a

6    policy and procedure on the use of body cams?

7           A.    Yes, sir.  I think we did, yeah.

8    Uh-huh.

9           Q.    And in August of 2019, can you just

10   briefly describe what the policies and procedures

11   stated insofar as the use or the utilization of

12   body cameras?

13          A.    Mainly -- as I recall, mainly it was for

14   patrol deputies, uniformed officers.  I believe

15   our narcotics guys may have had them.  I really

16   don't remember if they did or not.  As far as the

17   policy went, I don't remember the specifics of the

18   policy.

19                For me, development of policy at the

20   time was, you know, not one of my favorite things

21   to do.  It was necessary, but I do recall that we

22   didn't have a hard, fast policy where anytime

23   there was interaction with the public, the body

24   cams needed to be activated.  So there was some

25   leeway in that policy, and I don't remember the

1    actual wordage, you know, in the policy itself.

2        Q.   So you're saying there was no

3    hard-and-fast rule about when they would be

4    activated and when they weren't?

5        A.   Outside of patrol, I can't think of any.

6        Q.   Let's just say, for instance, in this

7    case, in the execution of a search warrant, where

8    there's several officers going out to a residence

9    and a combination of patrol deputies and SWAT team

10   and narcotics members.  Would that be something

11   that would be encouraged or required to be turned

12   on if they had them?

13       A.   I really don't remember specifics of the

14   policy to say -- to answer that correctly.  I just

15   don't.

16       Q.   Do you recall if anybody had them on

17   that day?

18       A.   I don't.

19       Q.   Do you recall if you did?

20       A.   I didn't even have one.

21       Q.   Okay.  Do you recall if Officer Edgar

22   had one?

23       A.   Officer --

24       Q.   Edgar.

25       A.   I don't remember the specifics of -- I

```
 1   mean, I remember the day and I remember

 2   some -- you know, some of the events of that day,

 3   but I don't remember if anyone had or used a body

 4   camera that day.

 5        Q.   And rather than ask you about each

 6   individual one, do you recall anybody out there

 7   that you are certain would have had one?

 8        A.   That I'm certain, no, sir.

 9        Q.   And when I say -- let me clarify that

10   question.  Do you recall anybody that day that you

11   were certain would have been equipped with one,

12   not necessarily are certain they had it on?

13        A.   No, sir.

14        Q.   And on that day, you were the chief

15   deputy.  Were you the direct supervisor for Ryan

16   Stachura?

17        A.   Yeah.  I'm trying to remember the flow

18   chart, the organizational chart that day.  It was

19   either me and/or the sheriff, I think, is the way

20   that was initiated, so yeah.

21        Q.   All right.  I'm going to just get

22   straight to the events that took place on

23   August 23rd, which is -- I'll represent is the

24   date that the search warrant was executed at

25   Mr. Peterson's residence.
```

```
 1              Do you recall meeting with anybody
 2    beforehand?
 3         A.   Before the search warrant?
 4         Q.   Correct.
 5         A.   I don't remember where exactly, if it
 6    was, you know, in this old courtroom next door,
 7    the old justice courtroom, or if it was in
 8    narcotics, but we did meet and go over, you know,
 9    a plan, operation plan.
10         Q.   All right.  And do you recall the
11    specifics of that plan?
12         A.   I don't.  I just know -- I know somebody
13    was watching the mobile home, I guess, that was
14    the target of the search warrant.
15         Q.   And this was the time that y'all were
16    formulating the plan, somebody was there.  Is that
17    what you're saying?
18         A.   Yes, sir.  To my recollection, somebody
19    actually had eyes on the location of the warrant.
20         Q.   Do you recall outside the person or
21    persons that were watching the residence, whether
22    everybody else that's involved in executing the
23    warrant was present at this operations meeting?
24         A.   I'm pretty sure, yes, sir.  I mean, I
25    can't answer that 100 percent, but I'm pretty sure
```

1    everybody would have been there, yes.

2        Q.    Can you tell me with 100 percent

3    certainty you recall being at that meeting?

4        A.    I really don't.  I mean, I don't

5    remember.  I don't even remember who was at the

6    warrant.

7        Q.    Do you recall who was leading that

8    meeting?

9        A.    I believe it was Ryan.

10        Q.    Okay.  And during that meeting, is that

11    when you learned what your role would be in the

12    execution of this warrant, or was this something

13    you had already discussed before?

14        A.    No, we didn't discuss it before.  Like I

15    said, I didn't know anything about Mr. Peterson.

16    I didn't even know the location until this

17    briefing was held.

18        Q.    So you didn't know anything about the

19    investigation at all until the day of this

20    meeting?

21        A.    I remember hearing Mr. Peterson's name

22    previously from Ryan, but I -- you know, just that

23    he was a target of investigation.  I don't even

24    know if that was specific to this particular

25    warrant, but it was someone that they had, you

1    know, looked at or investigated.

2        Q.   All right.  Well, take me to -- let's go

3    to the scene.  You arrive at Mr. Peterson's

4    residence.  Tell me specifically what you recall

5    from that point forward.

6        A.   Okay.  I'm pretty sure Shane Edgar was

7    the lead in what we would call the stack, I guess.

8    It was our Special Response Team, or at least

9    members of it, that made the entry on the trailer.

10   If I recall, Shane Edgar was first in that, and I

11   think I was either second or third.

12            So I would have been right behind Shane

13   or there would have been a person in between, but

14   I'm pretty sure I was right behind Shane in that

15   stack.  And I really don't remember for certain

16   any order past that.

17            And understand this is something -- I

18   don't want to say it was something we did every

19   day, but it was a fairly regular thing for us on

20   these warrants, you know, to set up an operation

21   and go execute that.  So there wasn't really any

22   reason for this to stand out for me, is why I

23   don't remember a lot of specifics here.

24            So the door was -- I don't even know.

25   The door might have been unlocked.  I don't

 1   remember how entry was made, if the door was

 2   breached or if the door was unlocked; but I

 3   remember once the door was open, Shane went in.  I

 4   pushed in behind him.  He immediately went to the

 5   couch, because Mr. Peterson was on the couch.  If

 6   I remember, he was -- he was coming up out of a

 7   prone -- you know, he was laying on the couch,

 8   maybe on his side or something.

 9          By the time I actually caught sight of

10   him, he was sitting up and reached for a bottle on

11   a table.  He was pretty startled, and I would say

12   probably within a second or two, Shane already had

13   him and brought him around.  There might have

14   been -- I don't remember if there was a coffee

15   table in front of the couch, some kind of a table

16   there of some sort; but if there was, he brought

17   him around to the other side of that, onto the

18   living room floor and put him facedown on the

19   floor.

20          So all of this is probably two to three

21   seconds.  And my responsibility then, because he

22   had the situation under control, was to push

23   through to make sure there was nobody else in the

24   residence.  So we went through the kitchen.  I say

25   "we" because whoever was behind me in the stack

1    pushed up through the kitchen and down the hallway

2    and eventually, I think -- I don't remember if

3    there was another bedroom there on the left or

4    not, but there was a master bedroom in the back,

5    and then there was a bathroom, I think, on the

6    very end of the trailer behind the master bedroom.

7            So we continued to search for

8    individuals at that time just to secure the scene,

9    and there was nobody else in the -- in the home.

10       Q.   When you walked in, did you go to the

11   left, or did you go to the right?

12       A.   To the left.

13       Q.   And did you have your gun drawn?

14       A.   Yeah.  Yeah, we all had our weapons.

15       Q.   And Edgar had his firearm drawn, as

16   well?

17       A.   Yes, sir.

18       Q.   Do you recall what kind of firearms

19   y'all were carrying?

20       A.   On that particular event, no.

21            Typically I just carried a handgun.  It

22   wasn't very frequently I used a long gun,

23   especially in a mobile home.

24       Q.   Do you recall anybody else that was

25   carrying a long gun?

1      A.   I can't tell you who.  I mean, I can
2  only tell you that usually somebody, at least one
3  or two people in the stack, had a long gun, but I
4  couldn't tell you that particular day, no.
5      Q.   And after you secured the residence, did
6  you ever observe Mr. Peterson again?
7      A.   Yeah.  When I came back -- once we
8  cleared that end of the trailer and everybody
9  pretty much sounded all clear -- because there
10  might have been another bedroom on the opposite
11  side to the right when you went in the door.  I
12  think there was another bedroom and maybe even a
13  bathroom there that somebody else had cleared.
14            So the all clear was announced.
15  Mr. Peterson was all secure, and there was nobody
16  else in the home.  So we came back through into
17  the living room and --
18      Q.   And Wallace was still in the living room
19  at that point?
20      A.   Yeah, I'm trying to remember.  I really
21  don't remember the details as far as whether he
22  was standing up at that point or he was still on
23  the ground or what -- or on the floor, I meant.
24  But it seems like he might have had a bloody nose
25  or something.  I think there was blood coming from

1    his nose or his lip or something, which to me

2    wasn't a concern because I saw him go facedown on

3    the floor in the living room.

4         Q.   When you say you saw him go facedown on

5    the floor, describe that to me.

6         A.   Shane had grabbed him.  And, like I

7    said, this all happened probably within about two

8    seconds that he was in, had grabbed him and

9    basically just forced him to the floor in the

10   living room.  So he went facedown into the living

11   room floor, and we pushed on up through the

12   kitchen.

13        Q.   Do you recall what Wallace was wearing?

14        A.   Not specifically.  I don't think -- I

15   don't think he had much on.  I don't even think he

16   had a shirt on, but I can't be sure.  He might

17   have had shorts, but I'm not sure if he had a

18   shirt or not.

19        Q.   Was anybody else involved in forcing him

20   to the ground, handcuffing him?

21        A.   No, sir.

22        Q.   It was only Officer Edgar?

23        A.   Well, I don't know about handcuffing

24   now.  I can't answer that.  But I can tell you

25   that what I saw within that couple of seconds that

1    happened is when Shane grabbed him, he had him.

2         I don't remember if Mr. Peterson dropped

3    the bottle.  I don't remember exactly how that

4    went, but I remember he -- Shane's a big guy.

5    He's kind of one of them, I think -- a lot of us

6    nicknamed him Ogre, you know, because he just -- I

7    mean, he's not like a bodybuilder.  He's just a

8    big fellow.  He picked Wallace up and put him down

9    on the floor.  I don't know.

10        Q.   When you say he picked him up, did he

11   pick him up off the ground and throw him down on

12   the floor?

13        A.   I don't know if he's that strong.  I

14   mean, I can't say his feet left the floor, but he

15   put him down face first, with force.  I mean, it

16   wasn't -- you know, everything is very quick, and

17   it needs to be done, you know, in a hurry to get

18   things secured.

19        Q.   Well, did you notice Wallace asleep at

20   any point in time when y'all walked in?

21        A.   No, he wasn't asleep.  He probably was

22   sleeping, but I can't tell you what -- he was

23   sitting up at the time.  When we came through the

24   door, he was sitting up.  And I think the bottle

25   was actually not on the coffee table, as I

```
 1    remember, but there might have been a table on the
 2    end of the couch.  He grabbed the bottle.  I mean,
 3    about the time he's grabbing the bottle, Shane's
 4    already on him.
 5         Q.   So let me ask you this:  When y'all
 6    breached the door, what was said?
 7         A.   "Sheriff's department, search warrant."
 8         Q.   And who was saying it?
 9         A.   Everybody in the stack as we come
10    through the door.
11         Q.   And all of y'all's guns are drawn?
12         A.   Yes, sir.
13         Q.   And then Mr. Peterson, whether he was
14    asleep or not, at some point in time observes
15    everybody coming in with their guns drawn; is that
16    right?
17         A.   Well, that's what I saw.  He was sitting
18    up, so --
19         Q.   And in response, he grabbed a wine
20    bottle?
21         A.   I don't know what kind of bottle it was,
22    but it was a bottle.
23         Q.   And what did he do with the bottle?
24         A.   Well, by the time he grabbed it to pick
25    it up and have it in his hand, Shane was already
```

1    on him.

2         Q.    Okay.  So Shane was on him

3    simultaneously to him grabbing the bottle,

4    basically?

5         A.    Very close, yes.  He had the bottle in

6    his hand, but, you know, before he could swing or

7    do anything with it, Shane was on him.

8         Q.    Do you know what happened with that

9    bottle?

10        A.    I don't.

11        Q.    Do you know if it broke?

12        A.    I don't.

13              Like I said, I saw him take Wallace to

14   the floor, and by that time, we had pushed up to

15   the kitchen.  So anything else that happened with

16   the bottle or anything, we were already in the

17   other room.  I mean, I would venture to say that

18   we cleared the whole house in -- I don't

19   know -- maybe seven or eight seconds, ten at the

20   most.

21        Q.    Do you recall what the bottle looked

22   like?

23        A.    No, sir.

24        Q.    Do you know if it had, like, a wrapper

25   on it or a label of some sort?

```
 1        A.    It could have been a beer bottle.  It
 2   could have been a wine bottle.  I just don't know
 3   what it was.
 4        Q.    All right.  Did you interview anybody or
 5   were you interviewed by anybody about the events
 6   that took place during the execution of this
 7   warrant?
 8        A.    I don't understand what you mean.
 9        Q.    Well, let's just say, for record keeping
10   purposes -- law enforcement official record
11   keeping purposes, was there anybody that was
12   interviewed about the execution of this warrant by
13   you?
14        A.    No, sir.
15        Q.    Was there anybody that interviewed you
16   insofar as asking what happened when y'all made
17   entry?
18        A.    Not that I recall, no, sir.
19        Q.    Do you know who was responsible for
20   doing the incident report?
21        A.    I would assume Ryan.  As I recall, he's
22   the one that gave the briefing.  And that's
23   usually done by the case agent, typically.  Not
24   always, but typically.
25        Q.    And would you say Ryan was in a position
```

1    to observe these events or not?

2         A.    Sir, I can't tell you where Ryan was.  I

3    really don't know.  I can tell you where I was in

4    the stack.

5         Q.    Was he close to you in the stack?

6         A.    No.  I don't think he would have been in

7    the stack, because I think we used our Special

8    Response Team members in that, to the best of my

9    recollection.

10            So I don't remember exactly who all was

11   there.  If I had -- my best guess was that Tyler

12   Tate was behind me.  I'm almost certain it was him

13   behind me, but -- and Shane was in front of me.

14        Q.    Let me ask it this way.  If the events

15   giving rise to Mr. Peterson being taken to the

16   floor by Officer Edgar and then handcuffed or

17   whatever, if that only took a few seconds and Ryan

18   was not near you in the stack, he couldn't have

19   possibly observed what happened, I guess is what

20   I'm saying?

21            MR. MARTIN:  Object to the form.  You

22        can answer if you know.

23        A.    I don't know.  I don't know where Ryan

24   was.

25   BY MR. HOLDER:

```
 1        Q.    Could he have observed it if he was not
 2   in your general vicinity?
 3        A.    Could he have observed what?
 4        Q.    Mr. Peterson being taken down by Officer
 5   Edgar.
 6        A.    I don't see how, no.  Because I was the
 7   second one in the door, or third.  Pretty sure it
 8   was second, though.
 9        Q.    Did you ever hear Officer Edgar or
10   anybody else -- during that initial breach into
11   his residence, did anybody ever tell him he was
12   under arrest?
13        A.    I don't remember.
14        Q.    Let me ask you this:  Did you ever see a
15   copy of the search warrant?
16        A.    I can't -- I don't remember for sure if
17   I did.  At some point I probably did.  I may have
18   even reviewed this case after it was submitted for
19   approval, but -- which when you asked me earlier
20   about the chain of command, there was a point in
21   time where Ryan answered to the -- directly
22   answered to the chief investigator.  And I'm not
23   sure if that occurred before or after this event.
24        Q.    Who would that have been?
25        A.    Mark Ogden was the chief investigator.
```

1   And that's just a technical issue.  So what I'm

2   saying is there was a time where the narcotics

3   reports were reviewed by me, and then there was a

4   time where the narcotics reports were reviewed and

5   approved by the chief investigator.

6       Q.   But to your knowledge, you didn't -- you

7   don't recall speaking to Ryan about exactly what

8   went on in there between Officer Edgar and

9   Mr. Peterson?

10      A.   You talking about after the fact?

11      Q.   That day.  After the fact, that day,

12  yeah.

13      A.   Most of the conversation after the fact

14  was -- now, I was outside the trailer a good bit

15  of that time, but most of the conversation after

16  the fact was basically just trying to find what

17  they went there to look for.

18      Q.   Okay.  And when you say you were outside

19  a lot of the time after that, did you see

20  Mr. Peterson outside?

21      A.   Yeah.  He was actually in the backseat

22  of a patrol car.

23      Q.   Do you know whose car that was?

24      A.   No, I don't.  It was a marked car.

25      Q.   Could you see him in there?

1      A.    Yeah.

2      Q.    Was he still bleeding?

3      A.    You know, I don't remember.  Actively

4  bleeding, I don't think so; because if he was

5  still bleeding, I think we would have called an

6  ambulance for him.

7          Like I told you earlier, I do remember

8  seeing, I -- I think it was a bloody nose.  It

9  could have been his lip.  He had blood around his

10  nose and mouth area.  It wasn't, like, flowing,

11  streaming blood.

12      Q.    What you're saying is if he was still

13  bleeding, y'all would have called an ambulance?

14      A.    Yes, sir.

15      Q.    Were you out there the entire time,

16  until basically everybody left?

17      A.    I'm pretty sure I was, yes, sir.

18      Q.    Were you inside when they had

19  Mr. Peterson re-enter the residence to unlock the

20  safe?

21      A.    I was, yeah.

22      Q.    Were you inside the room when he

23  unlocked the safe?

24      A.    Yes, sir.

25      Q.    Do you recall what was in there?

1      A.   I don't.  I couldn't even tell you what
2   the safe looked like.
3      Q.   Would you describe it as, like, a little
4   safe or, like, a big 'ol gun safe?
5      A.   I don't know.  I don't even remember
6   what it looked like.
7           MR. HOLDER:  I'm going to have this one
8      marked as 2.  This is the Investigative
9      Report.
10                   - - -
11           (Exhibit 2 was marked.)
12   BY MR. HOLDER:
13      Q.   All right.  I'm going to hand you this.
14   This is the Investigative Report that was drafted
15   on August the 23rd, 2019, which would be the same
16   day as the execution of the warrant.  I'm going to
17   flip through to Page -- this is 12 pages.  I'm
18   going to flip through to Page 10 of 12 here.  I'm
19   just going to have you read Paragraph 27 real
20   quick.  I'll give you a few seconds to read that.
21   I'm going to try to find my copy while you're
22   doing it.
23           Have you had a chance to look at that?
24      A.   Yes, sir.
25      Q.   And do you see on the bottom of that

1    page the reporting officer?

2         A.    Yeah, Ryan Stachura.

3         Q.    Does that mean the officer that drafted

4    the report?

5         A.    Yes, sir.

6         Q.    And then reviewing supervisor, would

7    that have been you?

8         A.    Yeah, that's right.

9         Q.    So tell me, just generally speaking,

10   when you review a report like this, do you kind of

11   just read it to ensure everything's in there that

12   needs to be in there and then just sign off on it?

13   How does that process normally work?

14        A.    Yeah, I mean, it's a criminal case.  So,

15   you know, at the time I would have been ensuring

16   that all the articles that needed to be in the

17   report were there, you know, so the search

18   warrant, the affidavit and all of those items are

19   attached with the report and the report itself,

20   you know, is correct, you know, as far as --

21   mostly as far as grammar and that it makes sense,

22   the verbiage is there and the facts of the case

23   are there.

24        Q.    Okay.  And do you know who Ryan talked

25   to prior to drafting this report?

1      A.    Who he talked to?

2      Q.    Yes.

3      A.    As far as the investigation goes?

4      Q.    No, specifically this paragraph.  Who

5   would have provided this information to him in

6   Paragraph 27?

7      A.    I would assume the people that made

8   entry into -- you know, into the trailer.

9      Q.    And that's why I asked you earlier had

10   you been interviewed by anybody.  You don't recall

11   him interviewing you about this?

12      A.    I don't.  If he asked me, I don't

13   remember that conversation.

14      Q.    Okay.  But you would agree that it's

15   important, you know, to do accurate reports;

16   right?

17      A.    Yes, sir.

18      Q.    That's stressed and highlighted ad

19   nauseam in all of your law enforcement training;

20   is that right?

21      A.    Yes, sir.

22      Q.    You would agree when they entered, he

23   was sleeping on the couch; is that correct?

24      A.    It does say that, yes.

25      Q.    You would agree that it says Peterson

1    was struck by a SWAT deputy; is that correct?

2         A.    It does say that, yes, sir.

3         Q.    And then at the end, on the bottom of

4    that page, it says, after Peterson was taken into

5    custody.  Do you see that?

6         A.    Yeah.

7         Q.    Do you know what he was being taken into

8    custody for?

9         A.    No, I don't.  I can't answer that.

10        Q.    Do you recall if Sheriff Allison was

11   present?

12        A.    At some point he was, yes, sir.  I do

13   remember him being there.

14        Q.    Do you recall if he was, you know, part

15   of the initial stack that went inside?

16        A.    No, he wasn't.  And I only say that

17   because he never was.

18        Q.    So as custom would go, he was not part

19   of the team that would make the initial entry?

20        A.    Never a part of the entry team, no.

21             MR. HOLDER:  Let me mark this as an

22        exhibit, please.  This is the CAD detail.

23                        - - -

24             (Exhibit 3 was marked.)

25   BY MR. HOLDER:

1        Q.    I'm going to hand you what's been marked

2    as Exhibit 3, Shane.  That's the CAD detail on

3    that day.

4             If an officer is reporting as of that

5    day to execute a search warrant, do they call in

6    the dispatch to, you know, whatever you want to

7    call it, 10-8, whatever it is, to basically report

8    for duty, so to speak?

9        A.    On this specific incident, no.  They

10   would have that.  The person would have already

11   been on duty first thing that morning.

12       Q.    All right.  Let me just ask you this,

13   then.  How would these specific officers, their

14   identities and report times and whatnot be

15   included in this CAD report?  Generally speaking,

16   how does that work?

17       A.    Either they were listed by the deputy

18   that was in charge -- so in this case it would

19   have been Ryan would have given them names of

20   people who were on scene.  So typically that's how

21   it works.

22             Because normally on these search

23   warrants, the briefing is done obviously at a

24   different location than the target.  Oftentimes

25   they're done here at the sheriff's department

 1    somewhere.  And that's when everyone knows the

 2    location, the reason for the warrant, for the

 3    search warrant and who's responsible for what

 4    area, whether that's entry or searching or

 5    whatever the case may be.

 6          Q.    For instance, how do they differentiate

 7    between, you know, a certain officer showing up at

 8    9:18 here and somebody showing up at 9:34?

 9          A.    Radio traffic.

10          Q.    So it is radio traffic that alerts

11    dispatch who needs to be reported on that?

12          A.    Yes, in most cases.

13                I can tell you if I were in charge of a

14    search warrant and we were going to a location, I

15    would call dispatch and say, hey, we're going to

16    123 Main Street; this is who's with me.  And then

17    right before we get there, before we turn into

18    that location, I'll radio and say, you know, we're

19    here, you know, we've arrived.  So then they have

20    a time when all of those people have arrived at a

21    scene.

22                Now, you may also have people that leave

23    early or that arrive late that call in

24    individually and say, I'm now here, or I was here,

25    but now I'm leaving.  So you can have different

 1    times based on one group call and individual radio

 2    calls.

 3        Q.    Do you know if there was a K9 officer

 4    there?

 5        A.    Could have been.  I don't remember.

 6        Q.    Okay.  Was David Bean a K9 officer?

 7        A.    He was, yes.

 8        Q.    Do you recall if he was there?

 9        A.    Looking at this, it says he was.

10        Q.    Look, I'm not trying to trick you.

11    There's been a lot of confusion about the CAD

12    report because we know that certain officers

13    weren't there that were included and certain

14    officers were that were not included.  Generally

15    speaking, I'm trying to understand exactly how it

16    works in Pearl River County.

17        A.    Right.  It may sound evasive, but I'm

18    just telling you the memory that I have of this.

19    We ran search warrants fairly regularly, so this

20    was one of many others.  It just didn't stand out

21    as anything that's going to seed in my memory.  So

22    there's some things I remember about it, but not a

23    lot.

24        Q.    So there wasn't anything exceptional

25    about this particular warrant that sticks out in

1    your mind?

2        A.    No.

3        Q.    Did you have any advance information

4    that Mr. Peterson might have been dangerous in any

5    way?

6        A.    I don't recall.  That would have been in

7    a briefing, but I don't recall if there was any

8    mention of any weapons or anything like that.  I

9    don't remember.

10            MR. HOLDER:  Let me take, like, a

11        three-minute comfort break.  I'm wrapping it

12        up extremely shortly thereafter.

13                (Off the record.)

14   BY MR. HOLDER:

15       Q.    All right.  Were you involved in any of

16   the photographs that were taken at the scene?

17       A.    No, sir.

18       Q.    Do you know who did photograph the

19   scene?

20       A.    No, sir.

21       Q.    Did you see anybody taking photographs?

22       A.    I don't remember.  I'm sure there were,

23   but I don't remember who that was.

24       Q.    Generally speaking, who would be the

25   person that's responsible for taking photographs?

1    A.    One of the narcotics guys.  They shared

2    responsibility, you know, on search warrants.   If

3    it wasn't the case agent, he would assign someone

4    else to do other tasks.

5    Q.    And from the time y'all breached the

6    front door -- whether it was unlocked, y'all broke

7    it up, that's not relevant.  I don't care.  But

8    from the time y'all breached the door and y'all

9    stepped inside, how many seconds would you say

10   elapsed from that time and the time Mr. Peterson

11   was on the ground?

12   A.    Maybe three.

13   Q.    And you said all of y'all, you, Edgar in

14   front of you and whoever was behind you -- I think

15   you said you thought it was Officer Tate?

16   A.    I believe it was.

17   Q.    And y'all all had y'all's weapons drawn?

18   A.    Yes.

19        MR. HOLDER:  That's all I have, Lance.

20                    - - -

21                  EXAMINATION

22   BY MR. MARTIN:

23   Q.    All right, Chief.  I just want to step

24   through a couple of things here.  Earlier

25   Mr. Holder was asking you about policies and

1   procedures, and you had mentioned that you hadn't

2   reviewed any documents prior to this deposition.

3           Did you review the policies and

4   procedures related to search warrants before you

5   came in here today?

6       A.   I haven't looked at that stuff since

7   before I retired.

8       Q.   You used two words.  You said you would

9   expect certain things to be in there, but you

10  can't say with certainty.  Was that correct?

11      A.   Correct.

12      Q.   And as you sit here this morning, you

13  don't have all of those committed to memory?

14      A.   I do not.

15      Q.   You also went on to say about the

16  policies and procedures, that it was not your

17  favorite thing, but it was necessary.  With it not

18  being your favorite thing, did that in any way

19  cause you to shirk your responsibility or duties

20  related to those policies and procedures?

21      A.   No, sir.  No, sir.

22      Q.   Would you describe for me what the Pearl

23  River County Special Response Team is?

24      A.   Yeah, we were a -- we trained regularly

25  for instances that are normally beyond the

1  capability of our patrol deputies or

2  investigators.  Some of that responsibility

3  included warrants or high-risk warrants, could be

4  hostage takers, negotiations, things of that

5  nature, that would require some more specialized

6  tactical and negotiation-type skills.

7       Q.   Do you recall how many officers were on

8  the SRT, ballpark?

9       A.   At that time?

10      Q.   Uh-huh.

11      A.   Not exactly, but maybe eight to ten.

12      Q.   Okay.  What would the qualifications to

13 be on that team be?

14      A.   At that time, you had to have -- we

15 didn't allow anyone to even apply for the team

16 until they had two years of full-time law

17 enforcement experience.  And then there was a

18 tryout period.  So those included some physical

19 skill levels and also some proficiency with

20 firearm training.  You didn't have to be an

21 expert, but you had to have some proficiency to

22 work with.

23      Q.   I got you.  Right.  And once the

24 officers were selected, did you have any

25 subsequent training as a team?

1     A.   Yes, sir.  Yeah, we trained eight hours

2     a month -- at least eight hours a month.

3     Q.   And what would have been some of the

4     things that you trained on?

5     A.   Entry protocol.  We've been to different

6     types of schools and training outside of the

7     agency.  We've trained with explosives and

8     breaching equipment and tools, tactics, just

9     several different aspects of laying out plans, you

10    know, operational plans and things of that nature.

11    Q.   To your recollection, as you sit here

12    today, was Shane Edgar on the SRT?

13    A.   He was.

14    Q.   What about a Tyler Tate?

15    A.   He was also.

16    Q.   And yourself?

17    A.   Yes, sir.

18    Q.   What about Rob Williams?

19    A.   He was.

20    Q.   What about Daniel Quave?

21    A.   Yes, sir.

22    Q.   Anybody else immediately come to mind,

23    other than those names that I mentioned, that

24    might have been on the SRT that day?

25    A.   That was at the warrant that day?

1       Q.   To your knowledge.

2       A.   You mentioned those guys.  I couldn't

3  even tell you if they were all there.  I'm pretty

4  sure Rob was.

5       Q.   Was Investigator Stachura a member of

6  the SRT?

7       A.   No, sir.

8       Q.   You mentioned just now your training

9  related to entry.  Tell me what a standard entry

10  looks like, you know, stack approaching the door,

11  yada, yada, yada.  Kind of step me through what

12  that's like.

13      A.   Okay.  Well, the stack basically -- and

14  every case is different.  Every structure is

15  different.  So your stack oftentimes is placed in

16  an order to use certain members' specialty skill

17  sets for a particular structure.  So some people

18  are particularly good at breaching.  So you would

19  have a breacher.  You have some people that are

20  just -- they're extremely fit, fast and they think

21  quickly, which everybody on the team should have

22  that to some degree.  So you want, you know, some

23  of your best guys typically -- I'll say except for

24  this case -- typically are going to be towards the

25  front of the stack because you're going to have to

1    manhandle.

2           A lot of times people don't listen or

3    they freeze or different things happen.  People

4    have different reactions when you go in.  Also,

5    there's stun devices or things of that nature that

6    are used in some instances, as well.

7           So your stack is based on those

8    specialties.  So I don't know how far you want to

9    go.

10      Q.   No, that's good.  That's getting us

11   where I want to go.

12           I do want to back up.  You just

13   mentioned not in this case with a little bit of

14   chuckle.  Were you referring to yourself at that

15   point in time?

16      A.   Yes, sir.  Yeah.

17      Q.   I take that, then, as a little

18   self-deprecation?

19      A.   I was the old guy, but I was in pretty

20   good shape.

21      Q.   But there hadn't been anything up to the

22   execution of the warrant on this day that would

23   have made you unfit to be an officer?

24      A.   No, sir.  I didn't intend for that to

25   sound that way.

1       Q.   Right.  When you're in a stack, for lack

2    of a better term, is it single file, or is it

3    stacked?  Like, how are you guys positioned

4    outside the door?

5       A.   Typically it's single file.

6            And the premise is the doorway is not

7    the place you want to be for very long at all.  So

8    the idea is to push people through that doorway.

9    I say "push."  I don't mean literally push, but,

10   you know, move yourself through, each individual

11   very quickly, because it's what they call the

12   fatal funnel.  It's basically a target.

13           If somebody has got a weapon, they know

14   where their door is, and that's where they're

15   going to be firing.  So once you move through the

16   door, you pick a direction.  And this is so fluid

17   and so fast that you have to think and react very

18   quickly.

19           So just from my perspective and what I

20   can tell you, just even in this instance, is

21   things happen so fast, that I have dual

22   responsibility coming in the door behind Shane.

23   One is -- he's already addressed a target, let's

24   say.  So Mr. Peterson is sitting up on the couch,

25   has something in his hand, you know, that can be

1   used as a weapon and Shane has got him and grabbed

2   him.  Now, at that point, I've got to decide does

3   Shane need help, does he have it under control, or

4   do I need to address any other people that could

5   be coming out with weapons.

6          And at that point, my decision was that

7   Shane had it under control and went on to address

8   any other potential -- and everybody else is doing

9   the same thing.  And we try not to do things

10  alone.

11      Q.   And you said you entered and went left;

12  is that correct?

13      A.   Yes, sir.

14      Q.   Is there anything to suggest, like, why

15  you should make that decision, left versus right?

16      A.   No.  It just -- that was the biggest,

17  open area, and it needed to be addressed.  So I

18  knew somebody behind me is going to go the

19  opposite way.

20          Having worked with these guys and gone

21  through the situation, everybody has a job.  We're

22  always looking for work.  By that, I mean what's

23  next, what do we have to take care of, what room,

24  what area needs to be addressed so we can get this

25  secure and safe.

1      Q.   Got it.  What's your protocol as you're

2  outside the door prior to entry related to your

3  firearms?  Explain that to me.

4      A.   Okay.  Again, different people carry

5  different weapons in different scenarios.  I think

6  I mentioned in this case it was a mobile home.  I

7  don't use a long gun in a mobile home.  That's

8  just my personal preference because, you know,

9  it's thin walls and so on.  Usually we have

10  perimeter officers outside that are watching

11  windows and back doors and things like that to

12  make sure nobody flees.

13           So I don't like to use a long gun that's

14  going to probably have more penetration for safety

15  purposes.

16      Q.   Sure.

17      A.   I don't remember on this who had what

18  weapon.  It's kind of an individual choice.

19  Sometimes it's good to have a long gun in case you

20  meet force with somebody with a long gun.  You

21  don't want to get in a gunfight when all you have

22  is a handgun with somebody with an assault rifle.

23      Q.   Is it standard to have guns drawn prior

24  to entry?

25      A.   It is.

1       Q.    And why would that be?

2       A.    You don't know what the threat is on the

3   other side of the door, and reaction times are

4   very -- well, they can save your life.

5       Q.    Right.

6       A.    The tactical response in that position

7   is, you know, the noise, the force, the speed,

8   everything to disorient the person that's on the

9   other side.  When they're disoriented, it gives

10  you that second or two before their mind starts

11  to, okay, here's how I need to react.  So it gives

12  us time.  It's kind of like a stun device in a

13  sense.

14      Q.    Okay.  Earlier you said that you've

15  executed lots of search warrants before; is that

16  correct?

17      A.    Yes, sir.

18      Q.    About how many did you say?  I know you

19  didn't give a specific figure, but --

20      A.    I don't even know.  Eighty to 100,

21  maybe.

22      Q.    Was there anything about the execution

23  of this warrant that was unusual to you?

24      A.    No, sir.

25      Q.    When, again, to the best of your

1    recollection, did the all clear announcement come

2    after breach?

3        A.    I think it would have taken us maybe

4    eight to ten seconds tops to clear that.  And so

5    since we were on one end -- and I say "we."  Me

6    and I assume Tyler, since we cleared the far end

7    all the way to the bathroom, when we got to the

8    very end of that structure, somebody else had

9    reached the other end of the structure on the

10   other side to clear all the rooms in between.

11   Then we would yell "all clear" on our end.  We

12   would get the all clear, and then everybody is all

13   clear.

14       Q.    And then once you hear "all clear," then

15   what's your --

16       A.    Things, you know, settle down.

17   Everybody can take a breath.  You know, anybody

18   that needs to be secured is secured.  There's no

19   other threats available.  Everybody can dial it

20   down and start the work that needs to be done

21   related to the warrant.

22       Q.    Got it.  Do you have, like, a set rally

23   point whenever you hear an "all clear" where

24   everybody reconvenes?

25       A.    No, sir.

1      Q.    Earlier you said that Deputy Edgar took

2   down Mr. Peterson in a hurry?

3      A.    Yes, sir.

4      Q.    In that situation, why would timing

5   and/or speed be a factor?

6      A.    Well, one is you don't want to give any

7   person with a weapon a chance to use it.  And

8   that's the main issue.  Secondly is we don't know

9   what other threats are available, so every

10  threat --

11          And we use these words not in an

12  aggressive manner.  I'm just telling you just how

13  we refer to people on the other side of a door

14  that we don't know.  They're all potential threats

15  to us.  We don't know how many threats are there

16  after that first one is dealt with and a second

17  one and a third.  So they have to be done quickly

18  so that we can have that support for other

19  potential threats or more unmanageable threats.

20     Q.    You mentioned that, you know, Sheriff

21  Allison was there at some point in time.  Do you

22  recall when you first saw him, when you first saw

23  Sheriff Allison?

24     A.    I spent most of the time -- after the

25  initial entry was made and everything was clear, I

1    helped them inside.  I think I was actually back

2    in the master bedroom for a little bit looking

3    around.  I didn't find anything during my search.

4              So I went outside, started poking

5    around.  The sheriff was talking to some people.

6    I think Mr. Peterson's -- I want to say it was his

7    grandparents, maybe his grandmother.  Maybe she

8    worked for Hancock or Harrison County -- I don't

9    know -- maybe as a court clerk or something.  I

10   don't remember what she was saying, but I remember

11   having a conversation.  The sheriff was there

12   talking with her, and I want to say his father may

13   have come up also and talked with the sheriff.

14   But I was kind of really just out there with him.

15             So I knew he was out there.  And that's

16   where I think I spent probably most of the time,

17   was outside.  And I do also remember looking

18   around fence lines and different areas outside.  I

19   want to say there might have been a little kind of

20   shed of some sort, little kind of structure.  I

21   was just looking for hiding places.

22        Q.   After the all clear, do you remember

23   seeing the sheriff in the living room?

24        A.   I don't remember.  He could have been.

25   I don't remember.

1       Q.   Was Sheriff Allison in front of you in

2   the stack?

3       A.   No, sir.

4       Q.   To your knowledge, as you sit here

5   today, was he in the stack immediately behind you?

6       A.   No, sir.

7       Q.   And why would that not have been?

8       A.   We didn't put anybody in a stack that

9   didn't have the level of training and safety that

10  you needed to have for those instances.

11          And I don't mean to speak negatively.

12  It just wasn't his thing.  He wasn't trained.  He

13  wasn't in those situations.  Frankly, we didn't

14  want him in those situations because of his

15  position, number one.  You don't want your leader,

16  you know, out in front for the potential to be

17  harmed or anything else.  That never happened.

18      Q.   Mr. Holder asked you about your sign-off

19  of the Investigative Report.

20      A.   Yes, sir.

21      Q.   But you also indicated that you don't

22  recall Investigator Stachura asking you any

23  questions about that.  Is that a fair assessment

24  of what I heard earlier?

25      A.   On this warrant?

1    Q.   Yes.

2    A.   I don't remember any specific

3  conversations with anyone.  Again, there's just

4  nothing that stood out for this to seed in my

5  memory.

6    Q.   As that reviewing officer, had there

7  been something that you needed to make sure was in

8  the report, would you have had opportunity to do

9  that after Ryan had drafted it?

10   A.   You talking about when I reviewed it?

11   Q.   Yes.

12   A.   Yeah, I've sent back reports before for

13  missing information or some typographical issues

14  or grammatical, you know, that type of thing.  So

15  I've rejected reports that need to later have

16  those items corrected or added and resubmitted.

17   Q.   One last question.  Earlier you

18  mentioned a model policy that you guys used as

19  kind of like a template.  Do you remember which

20  organization placed that template out in

21  circulation?

22   A.   Standards and training for the State of

23  Mississippi actually put that out, that policy.  I

24  don't recall the name of the company that

25  developed it.

```
 1            MR. MARTIN:  Thank you, sir.  No further
 2      questions.
 3                      -  -  -
 4                  FURTHER EXAMINATION
 5  BY MR. HOLDER:
 6      Q.    Going back to the report that Lance was
 7  just asking you about, Shane, the report states
 8  that there was a forced entry.  What does that
 9  mean to you, forced entry, in that report?
10      A.    Forced entry, that we had to breach the
11  door.
12      Q.    By breaching the door, what exactly do
13  you mean?
14      A.    Well, if the door was locked, didn't
15  readily open, then we would either pry it or use a
16  ram or some other device to breach or open the
17  door so we could get through it.
18      Q.    And if the door was unlocked, would the
19  term "forced entry" be used?
20      A.    Not likely.
21      Q.    And do you recall if this was a no-knock
22  warrant or not?
23      A.    I don't.
24      Q.    Do you recall if y'all knocked?
25      A.    I don't.
```

1        Q.    Do you recall how long it was from the

2    time y'all approached the door until the time

3    y'all were inside the door?

4        A.    Again, a few seconds.  Typically

5    it's -- everyone as soon as we hit park, we're

6    bailing out and actually running to the position

7    of the door.

8        Q.    In this stack, you indicated, you know,

9    it's predominately a single-file-line type of

10   approach.  I mean, are y'all basically shoulder to

11   shoulder?

12       A.    I've got a hand on the guy's shoulder.

13       Q.    So you're within an arm's length at the

14   very most?

15       A.    Yes, sir.

16       Q.    Y'all are that close together, stacked

17   up?

18       A.    Uh-huh.

19             MR. HOLDER:  That's all I have.

20                      -  -  -

21        (Deposition concluded at 2:51 p.m.)

22

23

24

25

1        CERTIFICATE OF COURT REPORTER

2        I, NATALIE R. SEYMOUR, Court Reporter and

3    Notary Public, in and for the County of Harrison,

4    State of Mississippi, hereby certify that the

5    foregoing pages, and including this page, contain a

6    true and correct transcript of the testimony of the

7    witness, as taken by me at the time and place

8    heretofore stated, and later reduced to typewritten

9    form by computer-aided transcription under my

10   supervision, to the best of my skill and ability.

11       I further certify that I placed the witness

12   under oath to truthfully answer all questions in

13   this matter under the authority vested in me by the

14   State of Mississippi.

15       I further certify that I am not in the employ

16   of, or related to, any counsel or party in this

17   matter, and have no interest, monetary or

18   otherwise, in the final outcome of the proceedings.

19       Witness my signature and seal, this the 18th

20   day of November, 2021.

21

22

23   _____
     Natalie R. Seymour, CSR #1637
24   My commission expires 6/12/2022.

25

i1

**Exhibits**

**Exhibit 1**  3:8 5:1
**Exhibit 2**  3:9 28:11
**Exhibit 3**  3:11 31:24
  32:2

**0**

**07**  7:24

**1**

**1**  5:1
**10**  28:18
**10-8**  32:7
**100**  13:25 14:2 45:20
**12**  7:25 28:17,18
**12-and-a-half**  7:18
**123**  33:16
**13th**  7:9
**19**  8:8

**2**

**2**  28:8,11
**2019**  7:9 10:9 28:15
**23rd**  12:23 28:15
**27**  28:19 30:6
**28**  8:2
**2:51**  52:21

**3**

**3**  31:24 32:2

**9**

**9:18**  33:8
**9:34**  33:8

**A**

**accreditation**  10:2
**accurate**  9:3 30:15
**activated**  10:24 11:4
**Actively**  27:3
**actual**  11:1
**ad**  30:18
**added**  50:16
**address**  43:4,7
**addressed**  42:23
  43:17,24
**advance**  35:3
**affidavit**  29:18
**agency**  39:7
**agent**  23:23 36:3
**aggressive**  47:12
**agree**  30:14,22,25
**alerts**  33:10
**Allison**  7:23 31:10
  47:21,23 49:1
**ambiguous**  5:24
**ambulance**  27:6,13
**and/or**  12:19 47:5
**announced**  18:14
**announcement**  46:1
**answers**  5:17,20
**anytime**  10:22
**apply**  38:15
**approach**  52:10
**approached**  52:2
**approaching**  40:10
**approval**  25:19
**approved**  26:5
**area**  27:10 33:4 43:17,
  24
**areas**  48:18

**arm's**  52:13
**arrest**  25:12
**arrive**  15:3 33:23
**arrived**  33:19,20
**articles**  29:16
**ascertain**  5:19
**asleep**  20:19,21 21:14
**aspects**  39:9
**assault**  44:22
**assessment**  49:23
**assign**  36:3
**assume**  23:21 30:7
  46:6
**assuming**  8:3 9:16
**attached**  29:19
**attorney's**  7:22
**August**  8:9 10:9 12:23
  28:15

**B**

**back**  17:4 18:7,16
  41:12 44:11 48:1 50:12
  51:6
**backseat**  26:21
**bailing**  52:6
**ballpark**  38:8
**based**  34:1 41:7
**basically**  19:9 22:4
  26:16 27:16 32:7 40:13
  42:12 52:10
**bathroom**  17:5 18:13
  46:7
**Bean**  34:6
**bedroom**  17:3,4,6
  18:10,12 48:2
**beer**  23:1
**begin**  7:13
**big**  20:4,8 28:4
**biggest**  43:16

**bit**  26:14 41:13 48:2
**bleeding**  27:2,4,5,13
**blood**  18:25 27:9,11
**bloody**  18:24 27:8
**body**  10:6,12,23 12:3
**bodybuilder**  20:7
**bottle**  16:10 20:3,24
  21:2,3,20,21,22,23
  22:3,5,9,16,21 23:1,2
**bottom**  28:25 31:3
**breach**  25:10 46:2
  51:10,16
**breached**  16:2 21:6
  36:5,8
**breacher**  40:19
**breaching**  39:8 40:18
  51:12
**break**  35:11
**breath**  46:17
**briefing**  14:17 23:22
  32:23 35:7
**briefly**  10:10
**broke**  22:11 36:6
**brought**  16:13,16

**C**

**CAD**  6:7 31:22 32:2,15
  34:11
**call**  5:10,12 15:7 32:5,7
  33:15,23 34:1 42:11
**called**  27:5,13
**calls**  34:2
**camera**  12:4
**cameras**  10:12
**cams**  10:6,24
**capability**  38:1
**capacity**  6:24
**car**  26:22,23,24
**care**  36:7 43:23

**career** 7:13,19

**carried** 17:21

**carry** 44:4

**carrying** 17:19,25

**case** 5:14 11:7 23:23 25:18 29:14,22 32:18 33:5 36:3 40:14,24 41:13 44:6,19

**cases** 33:12

**caught** 16:9

**certainty** 14:3 37:10

**chain** 25:20

**chance** 28:23 47:7

**charge** 32:18 33:13

**chart** 12:18

**chief** 8:12 12:14 25:22, 25 26:5 36:23

**choice** 44:18

**chuckle** 41:14

**circulation** 50:21

**clarify** 12:9

**clear** 5:19 18:9,14 46:1, 4,10,11,12,13,14,23 47:25 48:22

**cleared** 18:8,13 22:18 46:6

**clerk** 48:9

**close** 22:5 24:5 52:16

**coffee** 16:14 20:25

**combination** 11:9

**comfort** 35:11

**command** 25:20

**committed** 37:13

**company** 50:24

**concern** 19:2

**concluded** 52:21

**confusion** 34:11

**continued** 17:7

**control** 16:22 43:3,7

**conversation** 26:13,15 30:13 48:11

**conversations** 50:3

**copy** 25:15 28:21

**correct** 13:4 29:20 30:23 31:1 37:10,11 43:12 45:16

**corrected** 50:16

**correctly** 6:16 11:14

**couch** 16:5,7,15 21:2 30:23 42:24

**County** 7:15,20 34:16 37:23 48:8

**couple** 19:25 36:24

**court** 48:9

**courtroom** 13:6,7

**criminal** 29:14

**custody** 31:5,8

**custom** 31:18

**D**

**dangerous** 35:4

**Daniel** 39:20

**date** 12:24

**David** 34:6

**day** 11:17 12:1,2,4,10, 14,18 14:19 15:19 18:4 26:11 28:16 32:3,5 39:24,25 41:22

**dealt** 47:16

**December** 7:9,24 8:7

**decide** 43:2

**decision** 43:6,15

**degree** 40:22

**department** 7:16,18 8:13 9:3,18,21 21:7 32:25

**deposition** 6:13,18,24 8:21,25 37:2 52:21

**deputies** 10:14 11:9

**38:1

**deputy** 8:12 12:15 31:1 32:17 47:1

**describe** 10:10 19:5 28:3 37:22

**detail** 31:22 32:2

**details** 9:13 18:21

**develop** 9:15 10:5

**developed** 10:1 50:25

**developing** 9:20,22

**development** 10:19

**device** 45:12 51:16

**devices** 41:5

**dial** 46:19

**differentiate** 33:6

**difficult** 5:18

**direct** 12:15

**direction** 42:16

**directly** 25:21

**discuss** 14:14

**discussed** 8:21 14:13

**disorient** 45:8

**disoriented** 45:9

**dispatch** 32:6 33:11,15

**district** 7:21

**documents** 37:2

**door** 13:6 15:24,25 16:1,2,3 18:11 20:24 21:6,10 25:7 36:6,8 40:10 42:4,14,16,22 44:2 45:3 47:13 51:11, 12,14,17,18 52:2,3,7

**doors** 44:11

**doorway** 42:6,8

**drafted** 28:14 29:3 50:9

**drafting** 29:25

**drawn** 17:13,15 21:11, 15 36:17 44:23

**dropped** 20:2

**dual** 42:21

**duly** 5:4

**duties** 37:19

**duty** 32:8,11

**E**

**earlier** 25:19 27:7 30:9 36:24 45:14 47:1 49:24 50:17

**early** 33:23

**Edgar** 11:21,24 15:6,10 17:15 19:22 24:16 25:5, 9 26:8 36:13 39:12 47:1

**Eighty** 45:20

**elapsed** 36:10

**elected** 7:24

**encouraged** 11:11

**end** 17:6 18:8 21:2 31:3 46:5,6,8,9,11

**enforcement** 6:23 7:3, 14 9:18 23:10 30:19 38:17

**enjoying** 7:10

**ensure** 29:11

**ensuring** 29:15

**entered** 30:22 43:11

**entire** 27:15

**entry** 15:9 16:1 23:17 30:8 31:19,20 33:4 39:5 40:9 44:2,24 47:25 51:8,9,10,19

**equipment** 39:8

**equipped** 12:11

**evasive** 34:17

**event** 17:20 25:23

**events** 12:2,22 23:5 24:1,14

**eventually** 17:2

**everything's** 29:11

**EXAMINATION** 5:7

i3

36:21 51:4

**examined** 5:5

**exceptional** 34:24

**execute** 15:21 32:5

**executed** 12:24 45:15

**executing** 13:22

**execution** 8:3 9:6 11:7
14:12 23:6,12 28:16
41:22 45:22

**exhibit** 5:1 28:11 31:22,
24 32:2

**expect** 9:13 37:9

**experience** 38:17

**expert** 38:21

**Explain** 44:3

**explosives** 39:7

**extremely** 35:12 40:20

**eyes** 13:19

---

**F**

---

**face** 20:15

**facedown** 16:18 19:2,
4,10

**fact** 26:10,11,13,16

**factor** 47:5

**facts** 29:22

**fair** 49:23

**fairly** 15:19 34:19

**familiar** 5:15

**fast** 10:22 40:20 42:17,
21

**fatal** 42:12

**father** 48:12

**favorite** 10:20 37:17,18

**feet** 20:14

**fellow** 20:8

**fence** 48:18

**figure** 45:19

**file** 42:2,5

**find** 26:16 28:21 48:3

**fine** 5:11

**finished** 7:19

**firearm** 17:15 38:20

**firearms** 17:18 44:3

**firing** 42:15

**fit** 40:20

**flees** 44:12

**flip** 28:17,18

**floor** 16:18,19 18:23
19:3,5,9,11 20:9,12,14
22:14 24:16

**flow** 12:17

**flowing** 27:10

**fluid** 42:16

**force** 20:15 44:20 45:7

**forced** 19:9 51:8,9,10,
19

**forcing** 19:19

**forgotten** 9:12

**form** 24:21

**formulating** 13:16

**Forrest** 7:15

**forward** 15:5

**Frankly** 49:13

**freeze** 41:3

**frequently** 17:22

**front** 16:15 24:13 36:6,
14 40:25 49:1,16

**full** 6:3

**full-time** 38:16

**funnel** 42:12

---

**G**

---

**gave** 23:22

**general** 25:2

**generally** 29:9 32:15
34:14 35:24

**give** 28:20 45:19 47:6

**giving** 24:15

**good** 7:12 26:14 40:18
41:10,20 44:19

**grabbed** 19:6,8 20:1
21:2,19,24 43:1

**grabbing** 21:3 22:3

**grammar** 29:21

**grammatical** 50:14

**grandmother** 48:7

**grandparents** 48:7

**ground** 18:23 19:20
20:11 36:11

**group** 34:1

**guess** 6:19 13:13 15:7
24:11,19

**guide** 9:19

**gun** 17:13,22,25 18:3
28:4 44:7,13,19,20

**gunfight** 44:21

**guns** 21:11,15 44:23

**guy** 20:4 41:19

**guy's** 52:12

**guys** 10:15 36:1 40:2,
23 42:3 43:20 50:18

---

**H**

---

**half** 7:23

**hallway** 17:1

**Hancock** 48:8

**hand** 21:25 22:6 28:13
32:1 42:25 52:12

**handcuffed** 24:16

**handcuffing** 19:20,23

**handgun** 17:21 44:22

**happen** 41:3 42:21

**happened** 19:7 20:1

22:8,15 23:16 24:19
49:17

**hard** 10:22

**hard-and-fast** 11:3

**harmed** 49:17

**Harrison** 48:8

**Hattiesburg** 7:17,21

**head** 5:18

**hear** 25:9 46:14,23

**heard** 49:24

**hearing** 14:21

**held** 14:17

**helped** 48:1

**hey** 33:15

**hiding** 48:21

**high-risk** 38:3

**highlighted** 30:18

**hired** 7:24

**hit** 52:5

**Holder** 5:8,13 24:25
28:7,12 31:21,25 35:10,
14 36:19,25 49:18 51:5
52:19

**home** 13:13 17:9,23
18:16 44:6,7

**hostage** 38:4

**hours** 39:1,2

**house** 22:18

**hurry** 20:17 47:2

---

**I**

---

**idea** 42:8

**identities** 32:14

**immediately** 16:4
39:22 49:5

**important** 30:15

**incident** 6:7 23:20 32:9

**included** 32:15 34:13,
14 38:3,18

i4

**individual** 12:6 34:1 42:10 44:18

**individually** 33:24

**individuals** 17:8

**information** 30:5 35:3 50:13

**initial** 25:10 31:15,19 47:25

**initiated** 12:20

**inside** 27:18,22 31:15 36:9 48:1 52:3

**instance** 11:6 33:6 42:20

**instances** 37:25 41:6 49:10

**intend** 41:24

**interaction** 10:23

**interview** 23:4

**interviewed** 23:5,12, 15 30:10

**interviewing** 30:11

**investigated** 15:1

**investigation** 14:19,23 30:3

**Investigative** 28:8,14 49:19

**investigator** 25:22,25 26:5 40:5 49:22

**investigators** 38:2

**involved** 8:3 13:22 19:19 35:15

**involving** 6:8

**issue** 26:1 47:8

**issues** 50:13

**itemize** 9:16

**items** 29:18 50:16

---

**J**

**job** 43:21

**justice** 13:7

---

**K**

**K9** 34:3,6

**keeping** 23:9,11

**kind** 16:15 17:18 20:5 21:21 29:10 40:11 44:18 45:12 48:14,19, 20 50:19

**kitchen** 16:24 17:1 19:12 22:15

**knew** 43:18 48:15

**knocked** 51:24

**knowledge** 26:6 40:1 49:4

---

**L**

**label** 22:25

**lack** 42:1

**Lance** 36:19 51:6

**late** 33:23

**law** 6:23 7:3,14 9:18 23:10 30:19 38:16

**laying** 16:7 39:9

**lead** 15:7

**leader** 49:15

**leading** 14:7

**learned** 14:11

**leave** 33:22

**leaving** 33:25

**leeway** 10:25

**left** 17:3,11,12 20:14 27:16 43:11,15

**length** 52:13

**level** 49:9

**levels** 38:19

**life** 45:4

**lines** 48:18

**lip** 19:1 27:9

---

**listed** 32:17

**listen** 41:2

**literally** 42:9

**living** 16:18 18:17,18 19:3,10 48:23

**location** 13:19 14:16 32:24 33:2,14,18

**locked** 51:14

**long** 7:2 17:22,25 18:3 42:7 44:7,13,19,20 52:1

**looked** 15:1 22:21 28:2, 6 37:6

**lot** 9:12 15:23 20:5 26:19 34:11,23 41:2

**lots** 45:15

---

**M**

**made** 15:9 16:1 23:16 30:7 41:23 47:25

**main** 33:16 47:8

**make** 16:23 31:19 43:15 44:12 50:7

**makes** 29:21

**manhandle** 41:1

**manner** 47:12

**manuals** 9:17

**mark** 25:25 31:21

**marked** 5:1 26:24 28:8, 11 31:24 32:1

**Martin** 8:22 24:21 36:22 51:1

**master** 17:4,6 48:2

**materials** 8:19

**matter** 6:25

**meant** 18:23

**meet** 13:8 44:20

**meeting** 13:1,23 14:3, 8,10,20

**member** 40:5

---

**members** 11:10 15:9 24:8

**members'** 40:16

**memory** 34:18,21 37:13 50:5

**mention** 35:8

**mentioned** 37:1 39:23 40:2,8 41:13 44:6 47:20 50:18

**met** 8:16

**middle** 6:11

**mind** 35:1 39:22 45:10

**missed** 7:20

**missing** 50:13

**Mississippi** 9:25 50:23

**mobile** 13:13 17:23 44:6,7

**model** 10:3 50:18

**month** 39:2

**Morgan** 5:13

**morning** 32:11 37:12

**mouth** 27:10

**move** 42:10,15

---

**N**

**names** 32:19 39:23

**narcotics** 10:15 11:10 13:8 26:2,4 36:1

**nature** 38:5 39:10 41:5

**nauseam** 30:19

**necessarily** 12:12

**needed** 10:24 29:16 43:17 49:10 50:7

**negatively** 49:11

**negotiation-type** 38:6

**negotiations** 38:4

**nicknamed** 20:6

**no-knock** 51:21

nods 5:18

noise 45:7

nose 18:24 19:1 27:8, 10

notice 20:19

nuh-uhs 5:18

number 49:15

numerous 8:4

**O**

Object 24:21

observe 18:6 24:1

observed 24:19 25:1,3

observes 21:14

occurred 25:23

office 7:22

officer 5:10 8:24 11:21, 23 19:22 24:16 25:4,9 26:8 29:1,3 32:4 33:7 34:3,6 36:15 41:23 50:6

officers 10:14 11:8 32:13 34:12,14 38:7,24 44:10

offices 9:18

official 6:23 23:10

oftentimes 32:24 40:15

Ogden 25:25

Ogre 20:6

ol 28:4

open 16:3 43:17 51:15, 16

operation 13:9 15:20

operational 39:10

operations 9:9 13:23

opportunity 50:8

opposite 18:10 43:19

order 15:16 40:16

organization 50:20

organizational 12:18

**P**

p.m. 52:21

pages 28:17

paragraph 28:19 30:4, 6

park 52:5

part 31:14,18,20

past 15:16

patrol 10:14 11:5,9 26:22 38:1

PD 7:21

Pearl 7:19 34:16 37:22

penetration 44:14

people 18:3 30:7 32:20 33:20,22 40:17,19 41:2, 3 42:8 43:4 44:4 47:13 48:5

percent 13:25 14:2

perimeter 44:10

period 38:18

person 13:20 15:13 32:10 35:25 45:8 47:7

personal 44:8

persons 13:21

perspective 42:19

Peterson 5:14 6:8 8:14,16 14:15 16:5 18:6,15 20:2 21:13 24:15 25:4 26:9,20 27:19 30:25 31:4 35:4 36:10 42:24 47:2

Peterson's 12:25 14:21 15:3 48:6

photograph 35:18

photographs 35:16, 21,25

physical 38:18

pick 20:11 21:24 42:16

picked 20:8,10

place 9:2,10,14 12:22 23:6 42:7

places 48:21

plan 9:9 13:9,11,16

plans 39:9,10

point 15:5 18:19,22 20:20 21:14 25:17,20 31:12 41:15 43:2,6 46:23 47:21

poking 48:4

Police 7:17

policies 9:1,5,17,20,22 10:10 36:25 37:3,16,20

policy 9:25 10:3,6,17, 18,19,22,25 11:1,14 50:18,23

Poplarville 7:22

position 8:8,11 23:25 45:6 49:15 52:6

positioned 42:3

possibly 24:19

potential 43:8 47:14,19 49:16

predominately 52:9

preference 44:8

premise 42:6

present 13:23 31:11

pretty 5:14 13:24,25 15:6,14 16:11 18:9 25:7 27:17 40:3 41:19

previous 9:16

previously 14:22

prior 29:25 37:2 44:2, 23

private 6:25

procedure 10:1,6

procedures 9:2,6,17, 23 10:10 37:1,4,16,20

proceedings 5:15

process 29:13

proficiency 38:19,21

program 10:3

prone 5:22 16:7

protocol 39:5 44:1

provide 5:16

provided 30:5

pry 51:15

public 10:23

purposes 23:10,11 44:15

push 16:22 42:8,9

pushed 16:4 17:1 19:11 22:14

put 16:18 20:8,15 49:8 50:23

**Q**

qualifications 38:12

Quave 39:20

question 5:21 12:10 50:17

questions 5:16,23,24 49:23 51:2

quick 20:16 28:20

quickly 40:21 42:11,18 47:17

**R**

radio 33:9,10,18 34:1

rally 46:22

ram 51:16

ran 34:19

re-enter 27:19

reached 16:10 46:9

react 42:17 45:11

reaction 45:3

reactions 41:4

read 28:19,20 29:11

readily 51:15

**real** 28:19

**reason** 15:22 33:2

**recall** 9:21 10:13,21
11:16,19,21 12:6,10
13:1,10,20 14:3,7 15:4,
10 17:18,24 19:13
22:21 23:18,21 26:7
27:25 30:10 31:10,14
34:8 35:6,7 38:7 47:22
49:22 50:24 51:21,24
52:1

**recent** 6:17

**recollection** 13:18
24:9 39:11 46:1

**reconvenes** 46:24

**record** 5:19 6:4 23:9,10
35:13

**refer** 47:13

**referenced** 6:7

**referring** 41:14

**regular** 15:19

**regularly** 34:19 37:24

**rejected** 50:15

**related** 37:4,20 40:9
44:2 46:21

**relevant** 36:7

**remember** 6:16 10:16,
17,25 11:13,25 12:1,3,
17 13:5 14:5,21 15:15,
23 16:1,3,6,14 17:2
18:20,21 20:2,3,4 21:1
24:10 25:13,16 27:3,7
28:5 30:13 31:13 34:5,
22 35:9,22,23 44:17
48:10,17,22,24,25 50:2,
19

**repeat** 5:22

**report** 6:7 23:20 28:9,
14 29:4,10,17,19,25
32:7,14,15 34:12 49:19
50:8 51:6,7,9

**reported** 33:11

**reporting** 29:1 32:4

**reports** 26:3,4 30:15
50:12,15

**represent** 5:13 12:23

**require** 9:9 38:5

**required** 11:11

**residence** 11:8 12:25
13:21 15:4 16:24 18:5
25:11 27:19

**response** 15:8 21:19
24:8 37:23 45:6

**responsibility** 16:21
36:2 37:19 38:2 42:22

**responsible** 9:1 23:19
33:3 35:25

**restate** 6:1

**resubmitted** 50:16

**retire** 7:8,12

**retired** 7:5,6 8:7 37:7

**retirement** 7:10

**review** 8:19 29:10 37:3

**reviewed** 25:18 26:3,4
37:2 50:10

**reviewing** 29:6 50:6

**rifle** 44:22

**rise** 24:15

**River** 7:19 34:16 37:23

**Rob** 39:18 40:4

**role** 14:11

**room** 16:18 18:17,18
19:3,10,11 22:17 27:22
43:23 48:23

**rooms** 46:10

**rule** 11:3

**running** 52:6

**Ryan** 12:15 14:9,22
23:21,25 24:2,17,23
25:21 26:7 29:2,24
32:19 50:9

---

**S**

**safe** 27:20,23 28:2,4
43:25

**safety** 44:14 49:9

**save** 45:4

**scenarios** 44:5

**scene** 15:3 17:8 32:20
33:21 35:16,19

**schools** 39:6

**search** 8:4,17 9:6 11:7
12:24 13:3,14 17:7 21:7
25:15 29:17 32:5,22
33:3,14 34:19 36:2 37:4
45:15 48:3

**searching** 33:4

**seconds** 16:21 19:8,25
22:19 24:17 28:20 36:9
46:4 52:4

**secure** 17:8 18:15
43:25

**secured** 18:5 20:18
46:18

**seed** 34:21 50:4

**selected** 38:24

**self-deprecation**
41:18

**sense** 29:21 45:13

**series** 5:16

**set** 15:20 46:22

**sets** 40:17

**settle** 46:16

**Shane** 5:3,10,11,12
6:5,10 15:6,10,12,14
16:3,12 19:6 20:1 21:25
22:2,7 24:13 32:2 39:12
42:22 43:1,3,7 51:7

**Shane's** 20:4 21:3

**Shanes** 6:10

**shape** 41:20

**shared** 36:1

**shed** 48:20

**sheriff** 7:23 12:19
31:10 47:20,23 48:5,11,
13,23 49:1

**sheriff's** 7:15 8:12 9:2

21:7 32:25

**shirk** 37:19

**shirt** 19:16,18

**shortly** 35:12

**shorts** 19:17

**shoulder** 52:10,11,12

**showing** 33:7,8

**side** 16:8,17 18:11
45:3,9 46:10 47:13

**sight** 16:9

**sign** 29:12

**sign-off** 49:18

**simultaneously** 22:3

**single** 42:2,5

**single-file-line** 52:9

**sir** 6:22 7:11 8:1,5,10,
20,23 9:8,11 10:7 12:8,
13 13:18,24 17:17
19:21 21:12 22:23
23:14,18 24:2 27:14,17,
24 28:24 29:5 30:17,21
31:2,12 35:17,20 37:21
39:1,17,21 40:7 41:16,
24 43:13 45:17,24
46:25 47:3 49:3,6,20
51:1 52:15

**sit** 37:12 39:11 49:4

**sitting** 16:10 20:23,24
21:17 42:24

**situation** 16:22 43:21
47:4

**situations** 49:13,14

**skill** 38:19 40:16

**skills** 38:6

**sleeping** 20:22 30:23

**Slidell** 6:19

**sort** 16:16 22:25 48:20

**sound** 34:17 41:25

**sounded** 18:9

**speak** 32:8 49:11

**speaking** 26:7 29:9

i7

32:15 34:15 35:24

**Special** 15:8 24:7 37:23

**specialized** 38:5

**specialties** 41:8

**specialty** 40:16

**specific** 14:24 32:9,13 45:19 50:2

**specifically** 15:4 19:14 30:4

**specifics** 10:17 11:13, 25 13:11 15:23

**speed** 45:7 47:5

**spent** 47:24 48:16

**SRT** 38:8 39:12,24 40:6

**Stachura** 8:24 12:16 29:2 40:5 49:22

**stack** 15:7,15 16:25 18:3 21:9 24:4,5,7,18 31:15 40:10,13,15,25 41:7 42:1 49:2,5,8 52:8

**stacked** 42:3 52:16

**stand** 15:22 34:20

**standard** 40:9 44:23

**standards** 9:24 50:22

**standing** 18:22

**start** 6:3 46:20

**started** 7:15 48:4

**startled** 16:11

**starts** 45:10

**State** 10:2 50:22

**stated** 10:11

**states** 51:7

**stating** 6:3

**step** 36:23 40:11

**stepped** 36:9

**sticks** 34:25

**stood** 50:4

**straight** 12:22

**streaming** 27:11

**streamline** 8:7

**Street** 33:16

**stressed** 30:18

**strong** 20:13

**struck** 31:1

**structure** 40:14,17 46:8,9 48:20

**stuff** 9:13 37:6

**stun** 41:5 45:12

**stupid** 5:23

**submitted** 25:18

**subsequent** 38:25

**suggest** 43:14

**supervisor** 12:15 29:6

**support** 47:18

**SWAT** 11:9 31:1

**swing** 22:6

**sworn** 5:4

**system** 10:2

### T

**table** 16:11,15 20:25 21:1

**tactical** 38:6 45:6

**tactics** 39:8

**takers** 38:4

**taking** 35:21,25

**talked** 29:24 30:1 48:13

**talking** 26:10 48:5,12 50:10

**target** 13:14 14:23 32:24 42:12,23

**tasks** 36:4

**Tate** 24:12 36:15 39:14

**team** 11:9 15:8 24:8 31:19,20 37:23 38:13, 15,25 40:21

**technical** 26:1

**telling** 34:18 47:12

**template** 9:25 50:19,20

**ten** 6:20 22:19 38:11 46:4

**term** 42:2 51:19

**Terrence** 6:5,6,8

**testified** 5:5 8:25

**thin** 44:9

**thing** 15:19 32:11 37:17,18 43:9 49:12 50:14

**things** 9:12,15 10:20 20:18 34:22 36:24 37:9 38:4 39:4,10 41:3,5 42:21 43:9 44:11 46:16

**thought** 36:15

**threat** 45:2 47:10

**threats** 46:19 47:9,14, 15,19

**three-minute** 35:11

**throw** 20:11

**time** 6:17,21 8:15,16 9:1,24 10:20 13:15 16:9 17:8 20:20,23 21:3,14, 24 22:14 25:21 26:2,4, 15,19 27:15 29:15 33:20 36:5,8,10 38:9,14 41:15 45:12 47:21,24 48:16 52:2

**times** 6:15 32:14 34:1 41:2 45:3

**timing** 47:4

**today** 8:18,21 37:5 39:12 49:5

**told** 27:7

**tools** 39:8

**tops** 46:4

**traffic** 33:9,10

**trailer** 15:9 17:6 18:8 26:14 30:8

**trained** 37:24 39:1,4,7 49:12

**training** 9:24 30:19 38:20,25 39:6 40:8 49:9 50:22

**trick** 34:10

**tryout** 38:18

**Tucker** 5:3,9,10 6:5,6,9

**turn** 33:17

**turned** 11:11

**Twenty-eight** 7:4

**Tyler** 24:11 39:14 46:6

**type** 50:14 52:9

**types** 39:6

**typically** 17:21 23:23, 24 32:20 40:23,24 42:5 52:4

**typographical** 50:13

### U

**Uh-huh** 10:8 38:10 52:18

**uh-huhs** 5:18

**unclear** 5:24

**understand** 5:21,25 6:2 15:17 23:8 34:15

**unfit** 41:23

**uniformed** 10:14

**unlock** 27:19

**unlocked** 15:25 16:2 27:23 36:6 51:18

**unmanageable** 47:19

**unusual** 45:23

**utilization** 10:11

### V

**venture** 22:17

**verbal** 5:17

**verbalizing** 5:20

**verbiage** 29:22

i 8

**versus** 43:15

**vicinity** 25:2

**W**

**walked** 17:10 20:20

**Wallace** 8:14 18:18
19:13 20:8,19 22:13

**walls** 44:9

**warrant** 8:17 11:7
12:24 13:3,14,19,23
14:6,12,25 21:7 23:7,12
25:15 28:16 29:18 32:5
33:2,3,14 34:25 39:25
41:22 45:23 46:21
49:25 51:22

**warrants** 8:4 9:7 15:20
32:23 34:19 36:2 37:4
38:3 45:15

**watching** 13:13,21
44:10

**weapon** 42:13 43:1
44:18 47:7

**weapons** 17:14 35:8
36:17 43:5 44:5

**wearing** 19:13

**whatnot** 32:14

**Williams** 39:18

**windows** 44:11

**wine** 21:19 23:2

**wordage** 11:1

**words** 37:8 47:11

**work** 29:13 32:16 38:22
43:22 46:20

**worked** 7:16,17,21,25
43:20 48:8

**works** 32:21 34:16

**wrapper** 22:24

**wrapping** 35:11

**Y**

**y'all** 9:5 13:15 17:19

20:20 21:5 23:16 27:13
36:5,6,8,13,17 51:24
52:2,3,10,16

**y'all's** 21:11 36:17

**yada** 40:11

**year** 7:23 8:9

**years** 6:20 7:4,16,18,25
8:2 38:16

**yell** 46:11

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**