1           IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                    SOUTHERN DIVISION

4

5

6   WALLACE DWAYNE PETERSON, JR.,
         Plaintiff,

7

8   VERSUS          CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

9

10  PEARL RIVER COUNTY,
    MISSISSIPPI; DAVID ALLISON,
11  Individually; and JOHN AND
    JANE DOES 1-10, Individually,
12       Defendants.

13

14

15

16              DEPOSITION OF DANIEL QUAVE

17

18       Taken at the Pearl River County Sheriff's

19       Department, 171 Savannah Millard Road,

20       Poplarville, Mississippi, on Friday,

21       October 22, 2021, beginning at 11:38 a.m.

22

23

24

25

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

EXHIBIT
6

```
 1    APPEARANCES:

 2
           G. MORGAN HOLDER, ESQUIRE
 3
           CHRISTOPHER E. SMITH, ESQUIRE
 4
           Smith & Holder, PLLC
 5
           1720 22nd Avenue
 6
           Gulfport, Mississippi  39501
 7
           morgan@smithholder.com
 8
           chris@smithholder.com
 9
                 ATTORNEYS FOR PLAINTIFF
10
11         LANCE W. MARTIN, ESQUIRE

12         Allen, Allen, Breeland & Allen, PLLC

13         214 Justice Street

14         Brookhaven, Mississippi  39601

15         lmartin@aabalegal.com

16               ATTORNEY FOR DEFENDANTS

17

18    ALSO PRESENT: Wallace D. Peterson, Jr.

19

20

21    REPORTED BY:

22         NATALIE R. SEYMOUR, CSR #1637
           Schroeder-Lanoux Reporting & Legal Video, Inc.
23         220 Glen Eagles Drive
           Ocean Springs, Mississippi  39564
24         (228)875-2864
           Natalie@SchroederLanoux.com
25
```

Schroeder-Lanoux Reporting & Legal Video, Inc.
(228) 875-2684

1               TABLE OF CONTENTS

2

3    Examination by:                          Page:

4      Mr. Holder                                5

5      Mr. Martin                               24

6

     Exhibits:
7
       Exhibit 7, Notice of Deposition          5
8
     Certificate of Reporter                    28
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    STIPULATION
 2        It is hereby stipulated and agreed by and
 3   between the parties hereto, through their
 4   respective attorneys of record, that this
 5   deposition may be taken at the time and place
 6   hereinbefore set forth, by Natalie R. Seymour,
 7   Court Reporter and Notary Public, pursuant to the
 8   Federal Rules of Civil Procedure, as amended;
 9        That the formality of READING AND SIGNING is
10   specifically WAIVED;
11        That all objections, except as to the form of
12   the questions and the responsiveness of the
13   answers, are reserved until such time as this
14   deposition, or any part thereof, may be used or is
15   sought to be used in evidence.
16                       - - -
17
18
19
20
21
22
23
24
25
```

```
 1                (Exhibit 7 was marked.)
 2                    DANIEL QUAVE,
 3          having been first duly sworn, was
 4          examined and testified as follows:
 5                       -  -  -
 6                     EXAMINATION
 7   BY MR. HOLDER:
 8       Q.    Can I just call you Daniel?
 9       A.    Yeah, that's fine.
10       Q.    Daniel, my name's Morgan Holder.  This
11   is Chris Smith.  We have the pleasure of
12   representing Wallace Peterson in this case.  I'm
13   going to ask you some questions today.
14             Have you taken a deposition before?
15       A.    I haven't.
16       Q.    Okay.  Well, basically I'm going to ask
17   you a series of questions.  Most of them you're
18   probably going to find to be completely
19   unnecessary, but we have to do it anyway.  If you
20   can't understand the question, just ask me to
21   repeat it.
22       A.    I will.
23       Q.    Try not to give, like, uh-huhs and
24   nuh-uhs or nods because she has to take everything
25   down.
```

1           Having said that, again, Lance, all

2  objections reserved, save to the form of the

3  question?

4           MR. MARTIN:  Yes.

5  BY MR. HOLDER:

6       Q.   State your full name for the record.

7       A.   Daniel T. Quave.

8       Q.   And, Daniel, how old are you?

9       A.   I am 35.

10      Q.   And how long have you been employed by

11  the Pearl River County Sheriff's Department?

12      A.   Since 2008.

13      Q.   And what capacity do you serve for them

14  now?

15      A.   I am captain over support operations.

16      Q.   And is that the same capacity you were

17  in in 2019?

18      A.   No, it was not.

19      Q.   Okay.  In 2019, what capacity were you

20  employed by Pearl River?

21      A.   I'm trying to think.  There was kind of

22  an adjustment within that time frame.  It was

23  narcotics, but before that it was criminal

24  interdiction.  So it would have been one of the

25  two.

1    Q.   Okay.  And do you recall an occasion

2    where there was a search warrant issued and

3    executed at Mr. Peterson's residence?

4    A.   I do.

5    Q.   And were you involved in that operation?

6    A.   I was.

7    Q.   Okay.  And do you recall when you got

8    involved?

9    A.   Just prior to the search warrant.

10   Q.   Okay.  And when you say "just prior,"

11   are you talking about the same day?

12   A.   No.  It would have been before that.

13   Q.   And when you say "prior to the search

14   warrant," are you talking about prior to the

15   search warrant being issued or prior to the search

16   warrant being executed?

17   A.   No, I believe I was in narcotics at the

18   time, and I wasn't involved in the investigation,

19   but I was there for the search warrant.

20   Q.   Okay.  And do you recall attending any

21   type of meeting or discussion of any operations

22   plan in executing that warrant?

23   A.   I remember attending a briefing, yes.

24   Q.   Do you recall where that was?

25   A.   It was here at the sheriff's office.  I

```
 1    believe it was at the narcotics division.
 2         Q.    And do you recall when that was?
 3         A.    I don't.
 4         Q.    Do you know if it was the same day it
 5    was -- it was executed at 8:00 in the morning.
 6    I'll just tell you that.
 7         A.    Okay.
 8         Q.    Would it be customary --
 9         A.    I believe it was the same day.
10         Q.    Okay.  Without going into an incredible
11    amount of detail, just generally speaking, what
12    was basically the operations plan insofar as
13    executing that warrant?
14         A.    I don't remember.  I'm not the one that
15    went over the brief.
16         Q.    Do you know who was?
17         A.    To be exact, no, sir.
18         Q.    Do you think it was Ryan Stachura?
19         A.    Possibly.
20         Q.    Was he the lead on that investigation?
21         A.    I believe he was.
22         Q.    Okay.  Well, let me ask you this.  Maybe
23    you'll remember this better.  What was
24    specifically your role?
25         A.    I was there to help assist with the
```

 1   search warrant at the residence.

 2        Q.   And were you there to assist in the

 3   entry to the residence?

 4        A.   I was.

 5        Q.   Okay.  And do you recall who went in the

 6   residence before you?

 7        A.   Shane Edgar, which is now a captain;

 8   Shane Tucker, which he was at the time a chief

 9   deputy; Rob Williams, which is a major.  And I

10   believe I was behind Rob Williams.  There was more

11   people in front of me.  I can't recall who that

12   was.

13        Q.   Do you recall Tyler Tate being in front

14   of you?

15        A.   I don't.  He was there, but I don't

16   recall where he was in the line.

17        Q.   So how many people were in, I'll call

18   it, the stack going in?

19        A.   I can't tell you an exact number, how

20   many people were in the stack.

21        Q.   Approximately?

22        A.   Six, seven.

23        Q.   Okay.  I know you were, to the best of

24   your recollection, fourth in there, fifth,

25   whatever it was.  But from the time that Shane

```
 1   Edgar entered first until the time that you
 2   entered, can you just make an estimate about how
 3   many seconds went by?
 4        A.   Within seconds, I mean, two, maybe
 5   three.
 6        Q.   So everybody was coming in basically one
 7   behind the other at the same time?
 8        A.   Correct.
 9        Q.   By the time you entered, was
10   Mr. Peterson already on the floor?
11        A.   I did not witness any of that because I
12   went to the right.  When I entered the residence,
13   I went to the right.
14        Q.   Okay.  So you didn't notice that
15   Mr. Peterson was already handcuffed on the floor
16   to the left?
17        A.   I did not witness that.  By the time he
18   was handcuffed, I was in the hallway checking
19   rooms.
20        Q.   But he wasn't on the couch when you
21   first walked in?
22        A.   I didn't see him.  There was a lot more
23   bigger, taller people in front of me.
24        Q.   I understand.  I understand.
25             So you went to the right?
```

1       A.    Correct.

2       Q.    Who else went to the right, to best of

3  your knowledge?

4       A.    I believe Rob Williams was in front of

5  me.

6       Q.    Okay.  And where was Shane Tucker?

7       A.    I believe he was in front of me, as

8  well.

9       Q.    Do you recall what type of weapons they

10  had drawn?

11      A.    I don't.

12      Q.    Do you recall what kind of weapon you

13  had drawn?

14      A.    It would have just been my sidearm.

15      Q.    Do you recall seeing anybody that had

16  any type of long weapon, like a rifle or a

17  shotgun?

18      A.    The only long gun that I recall, that I

19  remember was an outside perimeter.

20      Q.    And do you know who was carrying that?

21      A.    Nathan Davis.

22      Q.    So to the best of your recollection --

23  I'm going to see if I've got this right -- from

24  the time that Shane Edgar -- well, let me back up.

25            Y'all arrive basically at the same time?

1      A.    Within the same time, yes, sir.

2      Q.    Okay.  And then, you know, correct me if

3  I'm wrong, but Shane's not going in there and

4  breaching the front door until everybody else gets

5  there.  He's not going in there by himself; right?

6  So, I mean, whether the cars arrived within three

7  seconds of one another, y'all were getting ready

8  to go in together; right?

9      A.    Depending on how many people were with

10 him, yes.

11     Q.    And you were there, obviously?

12     A.    Correct.

13     Q.    When he approached the door -- did you

14 see him approach the door?

15     A.    I did not.

16     Q.    Okay.  Did you hear him say anything or

17 bang on the door or anything like that?

18     A.    I don't remember.

19     Q.    Okay.  Do you know if the door was

20 unlocked or not?

21     A.    I don't remember.

22     Q.    Do you recall seeing any damage to the

23 door?

24     A.    I don't.

25     Q.    Okay.  But from the time that he entered

```
 1    until the time that basically you entered to go
 2    case out the right side, we're talking a matter of
 3    just a few -- several seconds or a few seconds?
 4         A.    Correct.
 5         Q.    Did you remain in the trailer after you
 6    went to the right and noticed that there was
 7    nobody else there?
 8         A.    After I checked the rooms -- I think
 9    there were several bedrooms on the left, maybe a
10    bathroom -- I come back into the living room.  At
11    that point, I don't remember.  I could have went
12    out, could have stayed in and helped check the
13    other rooms.  That, I don't remember.
14         Q.    Do you remember how long you stayed out
15    there?
16         A.    No.
17         Q.    Do you recall if you stayed out there
18    throughout the execution of the whole operation or
19    if you left early?
20         A.    Oh, no.  I was there for the whole
21    execution.
22         Q.    Okay.  Is that kind of policy and
23    procedure, that everybody stays until everything's
24    over?
25         A.    It's a case-by-case basis.
```

1        Q.    In this case, do you recall anybody
2    leaving early?

3        A.    I don't remember.

4        Q.    Do you recall where Ryan and Sheriff
5    Allison were?

6        A.    I believe they showed up after the
7    search warrant was executed.

8        Q.    Do you know who had the copy of the
9    search warrant?

10        A.    I don't.

11        Q.    Do you ever recall seeing it?

12        A.    I don't.

13        Q.    Do you know who signed the warrant?

14        A.    I don't.

15        Q.    Do you recall if anybody that you know
16    of was wearing any type of body camera?

17        A.    I don't remember.

18        Q.    Did you have a body camera at the time?

19        A.    No, sir.

20        Q.    You weren't issued one or it wasn't on
21    or --

22        A.    It wasn't on my person.

23        Q.    Was one issued to you?

24        A.    I can't remember.

25        Q.    Has one ever been issued to you?

```
 1        A.    It has.
 2        Q.    Okay.  Would you still have access to
 3   one?
 4        A.    I don't at the moment, no, sir.
 5        Q.    In 2019, would you have had access to
 6   it?
 7        A.    I believe so.
 8        Q.    Was there any reason why you didn't have
 9   it on at that point in time?
10        A.    I don't remember.
11        Q.    Did you have any kind of camera with you
12   that day?
13        A.    No, sir.
14        Q.    Did you have a phone with you?
15        A.    It wasn't on my person.
16        Q.    Okay.  Well, then how did you videotape
17   Ryan pouring out bottles of moonshine if you
18   didn't have a camera or your phone with you?
19        A.    That, I don't remember.
20        Q.    You don't remember videotaping that?
21        A.    No, sir.  If I did, I don't remember.
22        Q.    Well, I believe that would be something
23   you would remember; right?
24        A.    Two years ago, no, sir.
25        Q.    How many moonshine bottles have you seen
```

```
 1   in the last couple of years executing a search
 2   warrant?
 3        A.   That, I don't know.
 4        Q.   More than one?
 5        A.   Yes, sir.
 6        Q.   Okay.  How many do you remember pouring
 7   out?
 8        A.   I don't remember.
 9        Q.   How many do you remember videoing?
10        A.   If I remember that -- if I recorded
11   that, I don't remember.
12        Q.   Okay.  You might not have.  I mean, I'm
13   just saying that they said you did.
14        A.   Okay.  If I did, I don't remember.
15        Q.   All right.  If you did, what would you
16   have done with that video?
17        A.   If anything, I would have turned it over
18   to Ryan Stachura.
19        Q.   As evidence; correct?
20        A.   Uh-huh.
21             THE COURT REPORTER:  Was that a "yes"?
22             THE WITNESS:  Yes.  I'm sorry.
23   BY MR. HOLDER:
24        Q.   I know you said you didn't, you know,
25   observe Mr. Peterson when you first came in.  Did
```

```
 1   you ever see him outside at any time, or do you
 2   recall seeing him?
 3        A.   I think I recall seeing him one time in
 4   a patrol car.
 5        Q.   OKAY.  Do you know whose car that might
 6   have been?
 7        A.   I don't.
 8        Q.   Do you know if it was an SUV or if it
 9   was --
10        A.   It was a marked unit.
11        Q.   It was a marked unit?  It wasn't a K9
12   unit, was it, if you recall?
13        A.   I don't remember.
14        Q.   And when you say you observed him, you
15   just kind of saw him sitting in the back of the
16   car?
17        A.   Yes, sir.
18        Q.   Could you see his face?
19        A.   If I did, I don't remember.  It may have
20   been through the glass or something.
21        Q.   Do you recall seeing any blood or
22   anything like that?
23        A.   Maybe a little.
24        Q.   Okay.  Had you ever known Wallace
25   Peterson before that day?
```

1        A.    No, sir.

2        Q.    Had you ever heard of him before that

3    day?

4        A.    Heard, yes, sir.

5        Q.    And had you heard of him because of this

6    investigation?

7        A.    Possibly.

8        Q.    But you weren't involved in the

9    investigation in any capacity?

10       A.    No, sir.

11       Q.    It was all Ryan Stachura, to your

12   knowledge?

13       A.    To my knowledge, yes, sir.

14       Q.    Do you know if you wrote any type of

15   report or interviewed with anybody?

16       A.    No, sir.

17       Q.    Did Ryan or the sheriff or anybody else

18   ever ask you about your observations that day when

19   you executed the warrant?

20       A.    No, sir.

21       Q.    Would they normally do something like

22   that?

23       A.    No, sir.

24       Q.    Let me ask you this.  I mean, Rob said

25   the same thing.  So generally speaking, when you

```
 1   have eight officers out there, you know, assigned
 2   with different tasks to go out there and execute
 3   this warrant and y'all are all observing different
 4   things, because you're on different points of the
 5   house -- it might be from an evidentiary
 6   standpoint or for officer safety reasons, you
 7   know, securing the scene or whatever -- how are
 8   these events supposed to be memorialized if
 9   there's no report or interviews ever done?
10       A.   At that time, we didn't do that.  The
11   case agent is the one who would write the report.
12       Q.   Correct.  But he wasn't there, so -- or
13   he wasn't inside.  So anything that he's writing
14   in his report is coming from somebody, I would
15   assume.  So who is it coming from?
16            I mean, it didn't come from you.  It
17   didn't come from Rob.  Is he making it up?  I
18   mean, there's no body camera.  There's no
19   recordings of any kind.  So how would, normally
20   speaking, that be memorialized into an accurate
21   report that we all know y'all are trained to do?
22       A.   That, I can't tell you.
23       Q.   Well, if it was Daniel Quave in that
24   situation, would you have interviewed people that
25   went inside, asked them what they observed, what
```

1   happened?

2        A.    If there was anything of evidentiary

3   value.

4        Q.    Anything, theoretically, could be of

5   evidentiary value.  I guess you don't really know

6   at the time, but you want to get an accurate

7   reflection of exactly what happened there; right?

8        A.    Yes.

9        Q.    All right.  So in the investigative

10  report -- and I'm just going to read it to

11  you -- it says, Investigator Daniel Quave videoed

12  Investigator Stachura pouring out the liquor for

13  evidentiary purposes, as well.  So "for

14  evidentiary purposes," would that indicate to you

15  you videoed that and you gave it to Ryan?

16       A.    It shows I videoed it.  It does not show

17  which phone.

18       Q.    It just says that you videoed it.

19       A.    If I did, I don't remember.

20       Q.    I don't know.  That's why I was asking

21  whether you had a camera, a phone.  You might have

22  been using Ryan's phone.  Hell if I know.

23       A.    I don't remember.

24       Q.    That is a report written by Officer

25  Stachura, and would that indicate to you that that

1    video is part of the evidence?

2        A.    Correct.

3        Q.    And normally, you know, when y'all take

4    these videos for evidentiary purposes, what do

5    y'all normally do with them?

6        A.    Normally, if you have a video for

7    evidentiary purposes, it goes to a DVD, and you

8    log it in evidence.

9        Q.    Okay.  And it would stay there forever,

10   theoretically, right, unless it was deleted?

11       A.    Unless it was an order of destruction.

12       Q.    I'm going to hand you what's been marked

13   as Exhibit 5.  This is the CAD report.  I'm just

14   going to read from it, if you don't mind.

15             We know Joe Garcia wasn't there, but he

16   was on the CAD report.  We think he was not there.

17             Do you recall seeing Joe Garcia there?

18       A.    He was not there.

19       Q.    Okay.  Daniel Quave, that would be you;

20   correct?

21       A.    Yes.

22       Q.    Shane Tucker, he was there; correct?

23       A.    Yes, sir.

24       Q.    David Allison, the sheriff?

25       A.    Yes.

```
 1      Q.   Van Giadrosich?

 2      A.   I don't recall if he was there or not.

 3      Q.   Okay.  David Bean?

 4      A.   I don't recall if he was there or not.

 5      Q.   Nathan Davis?

 6      A.   Yes.

 7      Q.   Ryan Stachura?

 8      A.   Yes.

 9      Q.   Okay.  Jeffrey Horner?

10      A.   I don't remember.

11      Q.   Okay.  And those are the only officers

12  listed on this CAD report.  We also know that Rob

13  Williams was there; correct?

14      A.   Correct.

15      Q.   And Shane Edgar was there; correct?

16      A.   Correct.

17      Q.   And Tyler Tate was there?

18      A.   Correct.

19      Q.   Is there anybody else that you can think

20  of that was there that is not on this report?

21      A.   No, sir.

22      Q.   Okay.  Total, how many officers were

23  there?  Approximately eight or nine, maybe?

24      A.   Approximately.

25      Q.   Do you recall approximately how long you
```

1   were out there that day?

2       A.    Oh, it would have been an hour or so.

3       Q.    Okay.  Do you recall what Mr. Peterson

4   was wearing?

5       A.    I don't.

6       Q.    Did you ever see him come back inside

7   the trailer?

8       A.    I don't -- at one point I was searching

9   the backyard of the residence.

10      Q.    And when you say you were searching the

11  backyard, was there a dog out there or anything

12  like that, that you recall?

13      A.    At some point.

14      Q.    There was a dog?

15      A.    I believe so.

16      Q.    Okay.  Do you ever recall seeing a gun

17  safe inside?

18      A.    I believe I do, yes.

19      Q.    Or a safe, in general?

20      A.    A safe, yes.

21      Q.    Do you recall Wallace coming inside to

22  help the officers open that up?

23      A.    I don't remember.

24            MR. HOLDER:  Okay.  That's all I have

25      for now.

1                    - - -

2                  EXAMINATION

3    BY MR. MARTIN:

4        Q.    All right, Investigator Quave.  When

5    y'all effectuated the search warrant, at the door,

6    you said that Shane Edgar, Shane Tucker and Rob

7    Williams were in front of you; correct?

8        A.    Correct.

9        Q.    Do you remember anyone else being in

10   front of you?

11       A.    I believe there was a few more people.

12   Because I was toward the back, so possibly.

13       Q.    Was Sheriff Allison one of those people?

14       A.    No, sir.

15       Q.    And you said that Nathan Davis stood on

16   the outside perimeter with a long gun?

17       A.    Yes, sir.

18       Q.    What's the outside perimeter?  Where

19   would he have been?

20       A.    He was around the back, in the backyard.

21       Q.    What would be his purpose for being

22   there?

23       A.    He had a -- he was perimeter security,

24   and I believe what he had was a less lethal

25   shotgun.

1      Q.    My question is why would he be perimeter

2   security?  What's the need for that?

3      A.    In case anyone flees from the rear.

4      Q.    Did anyone flee this day?

5      A.    No, sir.

6      Q.    You said that when you entered the door,

7   you went straight to the right; is that correct?

8      A.    Yes, sir.

9      Q.    At any point in time did you stop and

10  pause to look at Shane Tucker and Mr. Peterson?

11     A.    No, sir.

12     Q.    When you went straight to the right,

13  what did you do?

14     A.    Cleared bedrooms that were to the right

15  of the trailer.

16     Q.    And what do you mean when you say

17  "cleared"?

18     A.    Looked for any bodies, any persons or

19  anything that would be within our danger -- that

20  would endanger us.

21     Q.    Did you find anything that would

22  endanger you?

23     A.    Persons, no, sir.

24     Q.    Were you alone when you were clearing

25  that side of the trailer?

```
 1        A.    No, sir.

 2        Q.    Who was with you?

 3        A.    Rob Williams.

 4        Q.    About how long did that take?

 5        A.    Within seconds, 15, 20 seconds.

 6        Q.    Okay.  Did you stay on that side of the

 7   trailer, or did you come back into the living

 8   room?

 9        A.    Once it would have been cleared, I would

10   have come back to the center of the trailer.  But

11   at that point, I don't remember if I went outside

12   or what I did.

13        Q.    When you went back to the center of the

14   trailer, did you see Mr. Peterson?

15        A.    I don't remember.

16        Q.    Did you see Captain Edgar?

17        A.    I don't remember.

18        Q.    Was the sheriff in the center of the

19   trailer?

20        A.    I don't remember.

21        Q.    Okay.  Did you ever go outside?

22        A.    Yes, sir.

23        Q.    When you went outside, did you see the

24   sheriff outside?

25        A.    Yes, sir.
```

```
 1        Q.   Okay.  I know you say you kind of can't
 2    remember when you went to the center of the
 3    trailer.  When you were in the center of the
 4    trailer until you went outside, about how long was
 5    that?
 6        A.   That, I don't remember.
 7        Q.   Okay.  Did you at any point in time see
 8    Captain Edgar strike Mr. Peterson?
 9        A.   No, sir.
10             MR. MARTIN:  Okay.  No questions.
11             MR. HOLDER:  I don't have anything else.
12                        - - -
13         (Deposition concluded at 12:02 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1              CERTIFICATE OF COURT REPORTER

2       I, NATALIE R. SEYMOUR, Court Reporter and

3  Notary Public, in and for the County of Harrison,

4  State of Mississippi, hereby certify that the

5  foregoing pages, and including this page, contain a

6  true and correct transcript of the testimony of the

7  witness, as taken by me at the time and place

8  heretofore stated, and later reduced to typewritten

9  form by computer-aided transcription under my

10 supervision, to the best of my skill and ability.

11      I further certify that I placed the witness

12 under oath to truthfully answer all questions in

13 this matter under the authority vested in me by the

14 State of Mississippi.

15      I further certify that I am not in the employ

16 of, or related to, any counsel or party in this

17 matter, and have no interest, monetary or

18 otherwise, in the final outcome of the proceedings.

19      Witness my signature and seal, this the 8th

20 day of November, 2021.

21

22

23      _____

24      Natalie R. Seymour, CSR #1637
        My commission expires 6/12/2022.

25

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

i1

**Exhibits**

**Exhibit 7** 3:7 5:1

**1**

**12:02** 27:13
**15** 26:5

**2**

**20** 26:5
**2008** 6:12
**2019** 6:17,19 15:5

**3**

**35** 6:9

**5**

**5** 21:13

**7**

**7** 5:1

**8**

**8:00** 8:5

**A**

access 15:2,5
accurate 19:20 20:6
adjustment 6:22
agent 19:11
Allison 14:5 21:24 24:13
amount 8:11
approach 12:14
approached 12:13
approximately 9:21

22:23,24,25
arrive 11:25
arrived 12:6
assigned 19:1
assist 8:25 9:2
assume 19:15
attending 7:20,23

**B**

back 11:24 13:10 17:15 23:6 24:12,20 26:7,10, 13
backyard 23:9,11 24:20
bang 12:17
basically 5:16 8:12 10:6 11:25 13:1
basis 13:25
bathroom 13:10
Bean 22:3
bedrooms 13:9 25:14
bigger 10:23
blood 17:21
bodies 25:18
body 14:16,18 19:18
bottles 15:17,25
breaching 12:4
briefing 7:23

**C**

CAD 21:13,16 22:12
call 5:8 9:17
camera 14:16,18 15:11,18 19:18 20:21
capacity 6:13,16,19 18:9
captain 6:15 9:7 26:16 27:8

car 17:4,5,16
carrying 11:20
cars 12:6
case 5:12 13:2 14:1 19:11 25:3
case-by-case 13:25
center 26:10,13,18 27:2,3
check 13:12
checked 13:8
checking 10:18
chief 9:8
Chris 5:11
cleared 25:14,17 26:9
clearing 25:24
completely 5:18
concluded 27:13
copy 14:8
correct 10:8 11:1 12:2, 12 13:4 16:19 19:12 21:2,20,22 22:13,14,15, 16,18 24:7,8 25:7
couch 10:20
County 6:11
couple 16:1
COURT 16:21
criminal 6:23
customary 8:8

**D**

damage 12:22
danger 25:19
Daniel 5:2,8,10 6:7,8 19:23 20:11 21:19
David 21:24 22:3
Davis 11:21 22:5 24:15
day 7:11 8:4,9 15:12 17:25 18:3,18 23:1 25:4

deleted 21:10
Department 6:11
Depending 12:9
deposition 5:14 27:13
deputy 9:9
destruction 21:11
detail 8:11
discussion 7:21
division 8:1
dog 23:11,14
door 12:4,13,14,17,19, 23 24:5 25:6
drawn 11:10,13
duly 5:3
DVD 21:7

**E**

early 13:19 14:2
Edgar 9:7 10:1 11:24 22:15 24:6 26:16 27:8
effectuated 24:5
employed 6:10,20
endanger 25:20,22
entered 10:1,2,9,12 12:25 13:1 25:6
entry 9:3
estimate 10:2
events 19:8
everything's 13:23
evidence 16:19 21:1,8
evidentiary 19:5 20:2, 5,13,14 21:4,7
exact 8:17 9:19
EXAMINATION 5:6 24:2
examined 5:4
execute 19:2
executed 7:3,16 8:5

i2

14:7 18:19

**executing** 7:22 8:13
16:1

**execution** 13:18,21

**exhibit** 5:1 21:13

**F**

**face** 17:18

**find** 5:18 25:21

**fine** 5:9

**flee** 25:4

**flees** 25:3

**floor** 10:10,15

**forever** 21:9

**form** 6:2

**fourth** 9:24

**frame** 6:22

**front** 9:11,13 10:23
11:4,7 12:4 24:7,10

**full** 6:6

**G**

**Garcia** 21:15,17

**gave** 20:15

**general** 23:19

**generally** 8:11 18:25

**Giadrosich** 22:1

**give** 5:23

**glass** 17:20

**guess** 20:5

**gun** 11:18 23:16 24:16

**H**

**hallway** 10:18

**hand** 21:12

**handcuffed** 10:15,18

**happened** 20:1,7

**hear** 12:16

**heard** 18:2,4,5

**Hell** 20:22

**helped** 13:12

**Holder** 5:7,10 6:5 16:23
23:24 27:11

**Horner** 22:9

**hour** 23:2

**house** 19:5

**I**

**incredible** 8:10

**inside** 19:13,25 23:6,
17,21

**interdiction** 6:24

**interviewed** 18:15
19:24

**interviews** 19:9

**investigation** 7:18
8:20 18:6,9

**investigative** 20:9

**Investigator** 20:11,12
24:4

**involved** 7:5,8,18 18:8

**issued** 7:2,15 14:20,23,
25

**J**

**Jeffrey** 22:9

**Joe** 21:15,17

**K**

**K9** 17:11

**kind** 6:21 11:12 13:22
15:11 17:15 19:19 27:1

**knowledge** 11:3 18:12,
13

**L**

**Lance** 6:1

**lead** 8:20

**leaving** 14:2

**left** 10:16 13:9,19

**lethal** 24:24

**liquor** 20:12

**listed** 22:12

**living** 13:10 26:7

**log** 21:8

**long** 6:10 11:16,18
13:14 22:25 24:16 26:4
27:4

**Looked** 25:18

**lot** 10:22

**M**

**major** 9:9

**make** 10:2

**making** 19:17

**marked** 5:1 17:10,11
21:12

**MARTIN** 6:4 24:3 27:10

**matter** 13:2

**meeting** 7:21

**memorialized** 19:8,20

**mind** 21:14

**moment** 15:4

**moonshine** 15:17,25

**Morgan** 5:10

**morning** 8:5

**N**

**name's** 5:10

**narcotics** 6:23 7:17 8:1

**Nathan** 11:21 22:5

24:15

**nods** 5:24

**notice** 10:14

**noticed** 13:6

**nuh-uhs** 5:24

**number** 9:19

**O**

**objections** 6:2

**observations** 18:18

**observe** 16:25

**observed** 17:14 19:25

**observing** 19:3

**occasion** 7:1

**office** 7:25

**officer** 19:6 20:24

**officers** 19:1 22:11,22
23:22

**open** 23:22

**operation** 7:5 13:18

**operations** 6:15 7:21
8:12

**order** 21:11

**P**

**p.m.** 27:13

**part** 21:1

**patrol** 17:4

**pause** 25:10

**Pearl** 6:11,20

**people** 9:11,17,20
10:23 12:9 19:24 24:11,
13

**perimeter** 11:19 24:16,
18,23 25:1

**person** 14:22 15:15

**persons** 25:18,23

**Peterson** 5:12 10:10,

i3

15 16:25 17:25 23:3 25:10 26:14 27:8

**Peterson's** 7:3

**phone** 15:14,18 20:17, 21,22

**plan** 7:22 8:12

**pleasure** 5:11

**point** 13:11 15:9 23:8, 13 25:9 26:11 27:7

**points** 19:4

**policy** 13:22

**possibly** 8:19 18:7 24:12

**pouring** 15:17 16:6 20:12

**prior** 7:9,10,13,14,15

**procedure** 13:23

**purpose** 24:21

**purposes** 20:13,14 21:4,7

**Q**

**Quave** 5:2 6:7 19:23 20:11 21:19 24:4

**question** 5:20 6:3 25:1

**questions** 5:13,17 27:10

**R**

**read** 20:10 21:14

**ready** 12:7

**rear** 25:3

**reason** 15:8

**reasons** 19:6

**recall** 7:1,7,20,24 8:2 9:5,11,13,16 11:9,12, 15,18 12:22 13:17 14:1, 4,11,15 17:2,3,12,21 21:17 22:2,4,25 23:3, 12,16,21

**recollection** 9:24 11:22

**record** 6:6

**recorded** 16:10

**recordings** 19:19

**reflection** 20:7

**remain** 13:5

**remember** 7:23 8:14, 23 11:19 12:18,21 13:11,13,14 14:3,17,24 15:10,19,20,21,23 16:6, 8,9,10,11,14 17:13,19 20:19,23 22:10 23:23 24:9 26:11,15,17,20 27:2,6

**repeat** 5:21

**report** 18:15 19:9,11, 14,21 20:10,24 21:13, 16 22:12,20

**REPORTER** 16:21

**representing** 5:12

**reserved** 6:2

**residence** 7:3 9:1,3,6 10:12 23:9

**rifle** 11:16

**River** 6:11,20

**Rob** 9:9,10 11:4 18:24 19:17 22:12 24:6 26:3

**role** 8:24

**room** 13:10 26:8

**rooms** 10:19 13:8,13

**Ryan** 8:18 14:4 15:17 16:18 18:11,17 20:15 22:7

**Ryan's** 20:22

**S**

**safe** 23:17,19,20

**safety** 19:6

**save** 6:2

**scene** 19:7

**search** 7:2,9,13,15,19 9:1 14:7,9 16:1 24:5

**searching** 23:8,10

**seconds** 10:3,4 12:7 13:3 26:5

**securing** 19:7

**security** 24:23 25:2

**series** 5:17

**serve** 6:13

**Shane** 9:7,8,25 11:6,24 21:22 22:15 24:6 25:10

**Shane's** 12:3

**sheriff** 14:4 18:17 21:24 24:13 26:18,24

**sheriff's** 6:11 7:25

**shotgun** 11:17 24:25

**show** 20:16

**showed** 14:6

**shows** 20:16

**side** 13:2 25:25 26:6

**sidearm** 11:14

**signed** 14:13

**sir** 8:17 12:1 14:19 15:4, 13,21,24 16:5 17:17 18:1,4,10,13,16,20,23 21:23 22:21 24:14,17 25:5,8,11,23 26:1,22,25 27:9

**sitting** 17:15

**situation** 19:24

**Smith** 5:11

**speaking** 8:11 18:25 19:20

**specifically** 8:24

**Stachura** 8:18 16:18 18:11 20:12,25 22:7

**stack** 9:18,20

**standpoint** 19:6

**State** 6:6

**stay** 21:9 26:6

**stayed** 13:12,14,17

**stays** 13:23

**stood** 24:15

**stop** 25:9

**straight** 25:7,12

**strike** 27:8

**support** 6:15

**supposed** 19:8

**SUV** 17:8

**sworn** 5:3

**T**

**talking** 7:11,14 13:2

**taller** 10:23

**tasks** 19:2

**Tate** 9:13 22:17

**testified** 5:4

**theoretically** 20:4 21:10

**thing** 18:25

**things** 19:4

**time** 6:22 7:18 9:8,25 10:1,7,9,17 11:24,25 12:1,25 13:1 14:18 15:9 17:1,3 19:10 20:6 25:9 27:7

**today** 5:13

**Total** 22:22

**trailer** 13:5 23:7 25:15, 25 26:7,10,14,19 27:3,4

**trained** 19:21

**Tucker** 9:8 11:6 21:22 24:6 25:10

**turned** 16:17

**Tyler** 9:13 22:17

**type** 7:21 11:9,16 14:16 18:14

i4

**U**

**Uh-huh** 16:20
**uh-huhs** 5:23
**understand** 5:20 10:24
**unit** 17:10,11,12
**unlocked** 12:20
**unnecessary** 5:19

**V**

**Van** 22:1
**video** 16:16 21:1,6
**videoed** 20:11,15,16,
 18
**videoing** 16:9
**videos** 21:4
**videotape** 15:16

**W**

**walked** 10:21
**Wallace** 5:12 17:24
 23:21
**warrant** 7:2,9,14,15,16,
 19,22 8:13 9:1 14:7,9,
 13 16:2 18:19 19:3 24:5
**weapon** 11:12,16
**weapons** 11:9
**wearing** 14:16 23:4
**Williams** 9:9,10 11:4
 22:13 24:7 26:3
**write** 19:11
**writing** 19:13
**written** 20:24
**wrong** 12:3
**wrote** 18:14

**Y**

**y'all** 11:25 12:7 19:3,21

21:3,5 24:5
**years** 15:24 16:1