```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

 3                      SOUTHERN DIVISION

 4

 5

 6   WALLACE DWAYNE PETERSON, JR.,
          Plaintiff,
 7

 8   VERSUS            CIVIL ACTION NO: 1:20-cv-216-HSO-RHWR

 9

10   PEARL RIVER COUNTY,
     MISSISSIPPI; DAVID ALLISON,
11   Individually; and JOHN AND
     JANE DOES 1-10, Individually,
12        Defendants.

13

14

15

16              DEPOSITION OF DAVID ALLISON

17

18      Taken at the Pearl River County Sheriff's

19      Department, 171 Savannah Millard Road,

20      Poplarville, Mississippi, on Friday,

21      October 22, 2021, beginning at 2:46 p.m.

22

23

24

25
```

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

EXHIBIT
7

```
 1    APPEARANCES:

 2
           G. MORGAN HOLDER, ESQUIRE
 3
           CHRISTOPHER E. SMITH, ESQUIRE
 4
           Smith & Holder, PLLC
 5
           1720 22nd Avenue
 6
           Gulfport, Mississippi  39501
 7
           morgan@smitholder.com
 8
           chris@smitholder.com
 9
                ATTORNEYS FOR PLAINTIFF
10
11         LANCE W. MARTIN, ESQUIRE

12         Allen, Allen, Breeland & Allen, PLLC

13         214 Justice Street

14         Brookhaven, Mississippi  39601

15         lmartin@aabalegal.com

16              ATTORNEY FOR DEFENDANTS

17
18    ALSO PRESENT: Wallace D. Peterson, Jr.

19
20
21    REPORTED BY:

22         NATALIE R. SEYMOUR, CSR #1637
           Schroeder-Lanoux Reporting & Legal Video, Inc.
23         220 Glen Eagles Drive
           Ocean Springs, Mississippi  39564
24         (228)875-2864
           Natalie@SchroederLanoux.com
25
```

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

```
 1                    TABLE OF CONTENTS
 2
 3   Examination by:                        Page:
 4     Mr. Holder                              5
 5     Mr. Martin                             16
 6     Mr. Holder                             23
 7
     Exhibits:
 8
       Exhibit 11, Notice of Deposition        5
 9
     Certificate of Reporter                  26
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    STIPULATION

 2        It is hereby stipulated and agreed by and

 3   between the parties hereto, through their

 4   respective attorneys of record, that this

 5   deposition may be taken at the time and place

 6   hereinbefore set forth, by Natalie R. Seymour,

 7   Court Reporter and Notary Public, pursuant to the

 8   Federal Rules of Civil Procedure, as amended;

 9        That the formality of READING AND SIGNING is

10   specifically WAIVED;

11        That all objections, except as to the form of

12   the questions and the responsiveness of the

13   answers, are reserved until such time as this

14   deposition, or any part thereof, may be used or is

15   sought to be used in evidence.

16                       - - -

17

18

19

20

21

22

23

24

25
```

```
 1              (Exhibit 11 was marked.)
 2                  DAVID ALLISON,
 3          having been first duly sworn, was
 4          examined and testified as follows:
 5                      - - -
 6                  EXAMINATION
 7   BY MR. HOLDER:
 8      Q.   Sheriff Allison, good afternoon.
 9      A.   Good afternoon.
10      Q.   My name is Morgan Holder.  Sitting next
11   to me is Chris Smith.  We represent Wallace
12   Peterson, who is sitting directly behind us.
13   We're here pursuant to notice to take your
14   deposition.
15           Lance, again, for the record, all
16   objections, save to the form, reserved?
17           MR. MARTIN:  Yes.
18   BY MR. HOLDER:
19      Q.   I'm assuming you've probably had your
20   deposition taken before?
21      A.   Yes, sir.
22      Q.   About how many times, do you think?
23      A.   Maybe five or six.
24      Q.   Okay.  Well, first of all, state your
25   full name for the record.
```

```
 1        A.    David M. Allison.

 2        Q.    And you are presently the sheriff of

 3   Pearl River County?

 4        A.    Yes, sir.

 5        Q.    How long have you been the duly-elected

 6   sheriff of Pearl River County?

 7        A.    Since 2008.

 8        Q.    So that means you were the sheriff in

 9   2019; is that correct?

10        A.    Yes, sir.

11        Q.    And you said you've had your deposition

12   taken about five times before?

13        A.    Yes, sir.

14        Q.    And do you recall when the most recent

15   deposition was?

16        A.    Shoot, I don't, no, sir.

17        Q.    Would you say it was in the last few

18   years, or would you say it was several years ago?

19        A.    Several years ago, yes, sir.

20        Q.    All right.  So just as a refresher, I'm

21   going to ask some questions.  If you don't

22   understand the question, feel free to ask me to

23   rephrase it or ask it again.  Try to give verbal

24   answers, rather than head nods or uh-uhs, so she

25   can get everything down on the record and the
```

1    record's clear.

2            You know, I've been known to ask some

3    really terrible questions.  So if you need me to

4    repeat it, I certainly will try to do my best to

5    do so.

6            Let's just get straight to the events

7    leading up to why we're here today.  Let me ask

8    you this:  Prior to your deposition today, have

9    you reviewed any materials or had any discussions

10   with anybody else?

11       A.   Just the attorneys, Joe Montgomery and

12   Will and Lance.  I've reviewed some of the

13   documents that's went back and forth where y'all

14   sent questions for us to answer.

15       Q.   Okay.  And do you recall signing those?

16       A.   Yes, sir.

17       Q.   Okay.  And do you know Wallace Peterson?

18       A.   Well, I know him now, but I didn't

19   before that morning.

20       Q.   Did you know who he was before that

21   morning?

22       A.   I had heard his name.  You know, it had

23   been talked about around here, but I didn't know

24   him, no, sir.

25       Q.   You didn't have any personal-type

1    knowledge or relationship with him prior to that

2    day?

3         A.    No, sir.

4         Q.    And leading up to that day, were you

5    familiar with an investigation that was going on?

6         A.    I was, yes, sir.

7         Q.    And do you know how long that

8    investigation had been going on?

9         A.    I want to say for months, but I don't

10   know for sure.

11        Q.    And when is the first time that you

12   learned that there had been a warrant -- a search

13   warrant issued for his residence?

14        A.    A few days prior to us going, I think,

15   if I'm remembering this case right.  Because we

16   usually serve them pretty quick, but I think they

17   might have had this one for a couple of days, if I

18   remember right.

19        Q.    That's correct.  The warrant was issued

20   on the 19th, and it was executed on the 23rd.  My

21   best understanding is that was a Monday and

22   Friday.

23             So you learned of the issuance of the

24   warrant sometime after that Monday and before that

25   Friday.  Would that be accurate to say?

```
1        A.    Yes, sir.

2        Q.    And were you involved in any way in the

3    planning of the execution of the warrant?

4        A.    I was.  I'm trying to think of where we

5    met at.  I don't remember where we met, but

6    anytime we go on a search warrant, yes, sir, we

7    have a little planning meeting before we go on

8    them, and I was at that meeting, yes, sir.

9        Q.    Is that plan ever put in writing; do you

10   know?

11       A.    I don't think so.

12       Q.    Okay.  And who was in charge of that

13   meeting?

14       A.    With me being there, I would have.  But

15   I'm sure Ryan would have been the one kind of

16   informing us on everything.

17       Q.    And do you recall whether this was a

18   no-knock warrant or not?

19       A.    I don't recall, no, sir.

20       Q.    And after this -- we'll call it the

21   operations meeting or the ops meeting.  After the

22   ops meeting, what was your understanding of the

23   various individuals' responsibilities as it

24   pertained to executing that warrant?

25       A.    We all proceeded to Mr. Peterson's house
```

```
 1   in multiple vehicles to execute that search
 2   warrant.
 3        Q.   And do you know who entered the house
 4   first?
 5        A.   I believe Shane Edgar was the first one
 6   in.  There was a couple more deputies there, Ryan
 7   with narcotics.  I'm usually the last one in when
 8   we go on these.
 9        Q.   Do you know where Ryan was?
10        A.   I don't know.  I don't remember where he
11   was.
12        Q.   Did Ryan ride with you out there?
13        A.   No, sir.  I rode by myself.  I think I
14   rode by myself.  You know, I really don't know if
15   anybody rode with me.  I know I left by myself,
16   but somebody could have rode with me -- that's
17   happened before -- and caught a ride back with
18   somebody else.
19        Q.   Were you already physically
20   present -- not necessarily inside, obviously, but
21   when Shane Edgar went in the door first, were you
22   already on the property?
23        A.   Yes, sir.
24        Q.   Did you see him go in?
25        A.   Yes, sir.
```

```
1        Q.    Did you see how he entered the door?

2        A.    Just opened it and walked in.

3        Q.    Okay.  So he didn't break it down or

4    anything like that; he just opened it and walked

5    in?

6        A.    That's what I remember, yes, sir.

7        Q.    And do you know who followed him in the

8    door?

9        A.    I don't know in what order.  Like I

10   said, there was probably eight or ten of us total

11   there.

12       Q.    Okay.  And when you walked in -- we'll

13   call it "the stack" -- you're at the end of the

14   stack.  So the initial wave goes through, and

15   you're coming in behind them.  By the time you got

16   to the front door and you could see inside, was

17   Mr. Peterson already in handcuffs?

18       A.    He was.

19       Q.    Was he on the ground?

20       A.    Yes, sir.  He was laying on the carpet

21   in front of the couch.

22       Q.    And as you walk in the front door, if

23   you're looking from the front door to the inside

24   of that residence, was he straight ahead, to your

25   left or to your right; do you recall?
```

```
 1        A.   The couch was kind of straight ahead of
 2   the door, but he would have been a little bit to
 3   the left of the door, at a little bit of an angle.
 4        Q.   Was anybody on top of him at that point
 5   in time?
 6        A.   No, sir.
 7        Q.   Did you notice him bleeding at that
 8   point in time?
 9        A.   I did, yes, sir.
10        Q.   Did you see him get escorted outside?
11        A.   I did, yes, sir.
12        Q.   Do you recall who escorted him outside?
13        A.   I don't remember, no, sir.
14        Q.   Do you know where he went when he got
15   outside?
16        A.   He was placed in the back of a patrol
17   unit, a marked unit.
18        Q.   And do you recall if that was the K9
19   unit or if that was another unit?
20        A.   I don't remember.  He was in two units
21   that day while we were there, but I don't remember
22   what they were.
23        Q.   One of them was a K9 unit.  I think that
24   was the last unit.  Do you recall that?
25        A.   When he was in the K9 unit?
```

1      Q.    Yes.

2      A.    I didn't remember him being in the K9

3  unit.  I remember him being in two different

4  units, but I don't recall what they were.

5      Q.    Let me ask you this:  Do you recall why

6  he would have been in two units?

7      A.    We put him in one of the back units

8  closer to the road.  And some of his family came

9  up, and he started cutting up in the patrol car,

10 kind of putting on a show for them.  So we got him

11 out and talked to him and told him to calm down.

12 So to get him away from them, we walked him up to

13 the other unit and put him in it.

14     Q.    Do you know if it had anything to do

15 with him bleeding in car?

16     A.    No, sir, not the first time.  I think we

17 got him out a second time where he was complaining

18 with bleeding.

19     Q.    At that point in time, what's your best

20 recollection of what he was under arrest for?

21     A.    I think drug paraphernalia, I believe.

22 And I'm not even sure.  I guess he was under

23 arrest at that point and they charged him.

24     Q.    And do you recall what he was wearing?

25     A.    No, sir.

```
 1        Q.    Would it be accurate to say he was just
 2    in his shoes and his underwear?
 3        A.    Possible, but I'm not 100 percent sure.
 4        Q.    By the time you got inside, he was
 5    already on the ground?
 6        A.    He was.
 7        Q.    So you didn't see any of the events that
 8    took place from the time that Shane Edgar walked
 9    through the front door and the time that you
10    walked through the front door?
11        A.    That's correct.
12        Q.    Now, do you recall Mr. Peterson being
13    brought back inside at some point in time?
14        A.    Yes, sir.
15        Q.    And what was the purpose of that?
16        A.    We wanted to get in the safe that was in
17    one of the back bedrooms.  We didn't want to bust
18    it open or pry it open.  We didn't know the
19    combination.  We went and got him out of the first
20    unit that he was in and brought him inside and
21    asked him to open the safe for us.
22        Q.    Okay.  And did he do that?
23        A.    He did, yes, sir.
24        Q.    And what was inside the safe?
25        A.    Nothing that I remember.  Maybe a
```

1    shotgun shell, maybe, if I remember right.  It
2    seemed like there was something else, but I don't
3    remember.  Nothing of any value or anything.
4         Q.   Did you know Mr. Peterson's father?
5         A.   I do know his father, yes, sir.
6         Q.   Do you know his sister?
7         A.   I do, yes, sir.
8         Q.   Are you involved in any training of your
9    employees insofar as report writing, you know,
10   following policies and procedures and that type of
11   thing, or is that something that is done through a
12   third party?
13        A.   I don't understand what you're asking
14   me.
15        Q.   Well, I mean, do you teach your officers
16   how they're supposed to write reports or how --
17        A.   No.  That's done through the academy,
18   when they go to the academy, and then we follow it
19   up with some FTO training with the deputy FTOs.
20        Q.   Would you agree in their reports,
21   they're not supposed to be putting assumptions in
22   there, that they're supposed to be putting facts
23   in there that they either observed or were told?
24   Would you agree with that?
25        A.   Sometimes they'll word one where they

```
 1   have an assumption in it.  It just depends on the
 2   particular case.  They're writing a report on what
 3   happened, you know, to make a paper trail of it.
 4        Q.   Let me ask you this:  If they're writing
 5   a report and another officer at the scene tells
 6   them what happened and he's in charge of writing
 7   the report, he needs to write down exactly what
 8   that officer told him happened; right?
 9        A.   He would write it down the best he would
10   remember.
11             You know, citizens give us reports, too.
12   You know, we write down stuff that they tell us,
13   too, the best you remember.
14        Q.   And it's important because two years
15   later, memories fade, right, so it's important to
16   write these things accurately?
17        A.   Uh-huh.
18             MR. HOLDER:  That's all I have, Lance.
19                      - - -
20                   EXAMINATION
21   BY MR. MARTIN:
22        Q.   Sheriff, you said you were in the last
23   vehicle that arrived?
24        A.   That's correct, yes, sir.
25        Q.   And you said that once you were on the
```

```
 1    property, you saw Shane open the door and walk in;

 2    correct?

 3         A.    Yes, sir.

 4         Q.    Where were you when you saw that happen?

 5         A.    I was pulling up in the driveway.  I was

 6    the last vehicle in the driveway.  So out at the

 7    edge of the road, I turned into the driveway of

 8    the house, and I could see the mobile home to my

 9    right there.

10         Q.    About how many feet, if you had to

11    guesstimate?

12         A.    Maybe 100 feet.

13         Q.    Okay.  When you made your way to the

14    residence, had the entering stack fully entered?

15         A.    Yes, sir.

16         Q.    Okay.  Do you know how long it took you

17    to pull in, park and make your way up to the

18    residence?

19         A.    I wasn't running, but I was walking

20    fast.  You know, they had already made entry.  I

21    would say no more than 30 seconds, 40 seconds,

22    maybe.

23         Q.    And you said that when you entered, you

24    saw Peterson on the ground, with nobody on top of

25    him; correct?
```

```
 1        A.    That's correct.

 2        Q.    Were any officers standing around

 3   Mr. Peterson?

 4        A.    Shane Edgar was standing there and

 5   seemed like one other one, but I don't remember

 6   who it was.

 7        Q.    Okay.  Were either Shane Edgar or that

 8   other officer beating Mr. Peterson?

 9        A.    No, sir.

10        Q.    Did you see either of those officers

11   strike Mr. Peterson at any time?

12        A.    They did not strike him, no, sir.

13        Q.    But you did state that you saw a little

14   bit of blood on his face?

15        A.    Yes, sir.

16        Q.    Did you see anything that would cause

17   that blood to be on Mr. Peterson's face?

18        A.    I did not.

19        Q.    Did you, yourself, go over to

20   Mr. Peterson and strike him in any way?

21        A.    No, sir.

22        Q.    Once you entered the home while

23   everything else was going on, about how long were

24   you there before Mr. Peterson was taken outside?

25        A.    We took him out pretty quick.  It wasn't
```

```
 1   very long.  I would say maybe three or four
 2   minutes, something like that.
 3        Q.   Was he on the ground the entire time?
 4        A.   That I was in there?
 5        Q.   Yes, sir.
 6        A.   I can't remember, Lance.
 7        Q.   Do you remember who took him outside?
 8        A.   I believe Shane Edgar walked him out,
 9   but I'm not 100 percent sure, but I think it was
10   Shane.
11        Q.   Did you stay in the living room the
12   whole time, or did you make your way through the
13   house, as well?
14        A.   I made my way through the house and
15   outside.
16        Q.   Did any of the officers say anything to
17   you about striking Mr. Peterson?
18        A.   I asked Shane what happened to him when
19   I saw that his lip was bleeding a little bit.
20   Because, you know, he was laying there when I
21   walked in.  Whenever I came in, he kind of looked
22   up at me, and I saw the blood on his lip.  And
23   there was a wine bottle laying there on the floor.
24             So I asked Shane what happened to him,
25   and he said that whenever he made entry into the
```

```
 1   house, that Wally -- you know, he identified
 2   himself as "sheriff's department, search warrant."
 3   Wally jumped up off the couch and grabbed that
 4   wine bottle off, like, a end table of the couch
 5   and grabbed it back to hit him.  That's what made
 6   him take him to the ground.  And the force of
 7   taking him to the ground, I don't know if his
 8   mouth hit the floor or what, but his mouth got
 9   busted.  But that happened before I was in there.
10   I just asked Shane.
11        Q.   That's what you learned from Mr. Edgar,
12   Officer Edgar?
13        A.   Uh-huh.
14        Q.   You mentioned that Mr. Peterson said
15   something about -- complaining about bleeding.
16   Did he make that complaint directly to you?
17        A.   He did, I think.
18             When the family got there, I went and
19   stayed outside with the family and was talking to
20   them.  He was in the car.  He was in the backseat
21   of the car in front of my truck.
22             And, of course, he knew they were there.
23   His father was there, and his grandparents live
24   across the street.  Both of them were there,
25   grandmother and grandfather.
```

1           So he got to cutting up, and I went and

2    opened the door and told him to calm down.  His

3    mouth wasn't bleeding.  It had that little bit of

4    blood on it, but it wasn't bleeding so that he was

5    dripping blood when he was in the house or in the

6    car until they got there.  And it appeared that he

7    gnawed on his lip more to make it bleed.

8           So I went and told him that he needed to

9    calm down and quit cutting up.  He did for a few

10   minutes, and then he started again.  I think he

11   knocked on the door or the window or something and

12   said that he was bleeding at that point.

13          You know, we moved him up closer to the

14   mobile home to get him away from his family.  If I

15   remember right, we might have let his daddy talk

16   to him there for a minute before we moved him when

17   we got him out of that first unit.

18       Q.   Sheriff, I know you're a sheriff and not

19   a doctor.  I certainly wouldn't want you to make

20   any kind of, you know, medical diagnosis or

21   anything, but did anything about -- what did the

22   blood on Mr. Peterson's face -- how did that make

23   you feel?

24       A.   What do you mean?

25       Q.   I mean, did it indicate to you any type

```
 1    of emergency?

 2         A.    Oh, no, sir.

 3         Q.    And why not?

 4         A.    It was minor.  It was minor.

 5         Q.    All right.  And when you moved him to

 6    the second unit, to your memory, was it bleeding

 7    profusely?

 8         A.    It never was bleeding bad.  It was just

 9    bleeding worse.  You could tell he had did

10    something to it and made it worse.  That's why we

11    kind of thought that he gnawed on it, because it

12    just went from a speck of blood to, you know,

13    hardly not bleeding or really wasn't bleeding.  It

14    was a speck of blood on it.  We walked him

15    outside, and it's not dripping blood.  We put him

16    in the car, and it's not dripping blood on him

17    nowhere.

18              It was a minor cut.  He got it bleeding

19    by gnawing on it or something in that car.  It was

20    a little worse, but it still wasn't bad.

21         Q.    And I guess regardless of the bleeding,

22    you didn't see him get struck in the face to cause

23    that; correct?

24         A.    No, sir, I didn't.

25         Q.    And you didn't see him actually bite
```

```
 1    himself; you just noticed that there was more
 2    blood than when he came out of the trailer?
 3         A.    That's correct, yeah.
 4              MR. MARTIN:  That's all I have.
 5                         - - -
 6                    FURTHER EXAMINATION
 7    BY MR. HOLDER:
 8         Q.    I have a couple of little follow-ups
 9    real quick.
10              You don't know whether he was initially
11    swallowing some blood, either, do you?
12         A.    Nuh-uh.
13         Q.    Which could have made it look like he
14    wasn't bleeding very bad if he was swallowing it?
15         A.    No.  It wasn't bleeding enough to
16    swallow it.  Whatever he was doing there in the
17    car, whether it was gnawing it or something, he
18    might have had some blood in his mouth then.
19         Q.    Well, where was the cut?
20         A.    It was on his lip.
21         Q.    So, I mean, he could have easily been
22    swallowing the blood.  It could have gotten in his
23    mouth, and that's why he appeared to not be
24    bleeding, and then he stopped swallowing the
25    blood.  Isn't that just as likely an explanation
```

1    as him gnawing on his lip?

2         A.    I don't know.  It didn't appear to be

3    bleeding that bad.  I was standing over him.  You

4    know, he was laying on the floor, looking up at

5    me, so I could see his bottom lip real well.  You

6    know, it didn't appear that any blood was going in

7    his mouth.  You know, other than talking to him, I

8    didn't examine his mouth.

9         Q.    But in between, you know, checking on

10   him and his family, you were also going inside and

11   searching the house and all of that, too; right?

12        A.    I think once I got outside with the

13   family, I stayed out there the rest of the time.

14   I don't remember going back in the house, you

15   know.

16        Q.    And you said Shane Edgar, you saw he

17   opened the door and walked in; is that correct?

18        A.    Yes, sir.

19        Q.    And he didn't force the door open?

20        A.    I don't remember him forcing it open.

21   If he did, he did it before I turned in the

22   driveway.

23        Q.    Have you talked to Shane Edgar today?

24        A.    I have not, no, sir.

25             MR. HOLDER:  That's all I have.

```
 1                  -  -  -

 2     (Deposition concluded at 3:11 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              CERTIFICATE OF COURT REPORTER

 2         I, NATALIE R. SEYMOUR, Court Reporter and

 3    Notary Public, in and for the County of Harrison,

 4    State of Mississippi, hereby certify that the

 5    foregoing pages, and including this page, contain a

 6    true and correct transcript of the testimony of the

 7    witness, as taken by me at the time and place

 8    heretofore stated, and later reduced to typewritten

 9    form by computer-aided transcription under my

10    supervision, to the best of my skill and ability.

11         I further certify that I placed the witness

12    under oath to truthfully answer all questions in

13    this matter under the authority vested in me by the

14    State of Mississippi.

15         I further certify that I am not in the employ

16    of, or related to, any counsel or party in this

17    matter, and have no interest, monetary or

18    otherwise, in the final outcome of the proceedings.

19         Witness my signature and seal, this the 8th

20    day of November, 2021.

21

22

23
                  _____
24                Natalie R. Seymour, CSR #1637
                  My Commission Expires 6/12/2022.

25
```

**Schroeder-Lanoux Reporting & Legal Video, Inc.**
**(228) 875-2684**

**Exhibits**

**Exhibit 11**  3:8 5:1

**1**

**100**  14:3 17:12 19:9
**11**  5:1
**19th**  8:20

**2**

**2008**  6:7
**2019**  6:9
**23rd**  8:20

**3**

**30**  17:21
**3:11**  25:2

**4**

**40**  17:21

**A**

academy  15:17,18
accurate  8:25 14:1
accurately  16:16
afternoon  5:8,9
agree  15:20,24
ahead  11:24 12:1
Allison  5:2,8 6:1
angle  12:3
answers  6:24
anytime  9:6
appeared  21:6 23:23
arrest  13:20,23
arrived  16:23

assuming  5:19
assumption  16:1
assumptions  15:21
attorneys  7:11

**B**

back  7:13 10:17 12:16
  13:7 14:13,17 20:5
  24:14
backseat  20:20
bad  22:8,20 23:14 24:3
beating  18:8
bedrooms  14:17
bit  12:2,3 18:14 19:19
  21:3
bite  22:25
bleed  21:7
bleeding  12:7 13:15,18
  19:19 20:15 21:3,4,12
  22:6,8,9,13,18,21
  23:14,15,24 24:3
blood  18:14,17 19:22
  21:4,5,22 22:12,14,15,
  16 23:2,11,18,22,25
  24:6
bottle  19:23 20:4
bottom  24:5
break  11:3
brought  14:13,20
bust  14:17
busted  20:9

**C**

call  9:20 11:13
calm  13:11 21:2,9
car  13:9,15 20:20,21
  21:6 22:16,19 23:17
carpet  11:20
case  8:15 16:2

caught  10:17
charge  9:12 16:6
charged  13:23
checking  24:9
Chris  5:11
citizens  16:11
clear  7:1
closer  13:8 21:13
combination  14:19
complaining  13:17
  20:15
complaint  20:16
concluded  25:2
correct  6:9 8:19 14:11
  16:24 17:2,25 18:1
  22:23 23:3 24:17
couch  11:21 12:1 20:3,
  4
County  6:3,6
couple  8:17 10:6 23:8
cut  22:18 23:19
cutting  13:9 21:1,9

**D**

daddy  21:15
David  5:2 6:1
day  8:2,4 12:21
days  8:14,17
department  20:2
depends  16:1
deposition  5:14,20
  6:11,15 7:8 25:2
deputies  10:6
deputy  15:19
diagnosis  21:20
directly  5:12 20:16
discussions  7:9
doctor  21:19

documents  7:13
door  10:21 11:1,8,16,
  22,23 12:2,3 14:9,10
  17:1 21:2,11 24:17,19
dripping  21:5 22:15,16
driveway  17:5,6,7
  24:22
drug  13:21
duly  5:3
duly-elected  6:5

**E**

easily  23:21
Edgar  10:5,21 14:8
  18:4,7 19:8 20:11,12
  24:16,23
edge  17:7
emergency  22:1
employees  15:9
end  11:13 20:4
entered  10:3 11:1
  17:14,23 18:22
entering  17:14
entire  19:3
entry  17:20 19:25
escorted  12:10,12
events  7:6 14:7
EXAMINATION  5:6
  16:20 23:6
examine  24:8
examined  5:4
execute  10:1
executed  8:20
executing  9:24
execution  9:3
exhibit  5:1
explanation  23:25

**F**

face 18:14,17 21:22 22:22
facts 15:22
fade 16:15
familiar 8:5
family 13:8 20:18,19 21:14 24:10,13
fast 17:20
father 15:4,5 20:23
feel 6:22 21:23
feet 17:10,12
floor 19:23 20:8 24:4
follow 15:18
follow-ups 23:8
force 20:6 24:19
forcing 24:20
form 5:16
free 6:22
Friday 8:22,25
front 11:16,21,22,23 14:9,10 20:21
FTO 15:19
FTOS 15:19
full 5:25
fully 17:14

**G**

give 6:23 16:11
gnawed 21:7 22:11
gnawing 22:19 23:17 24:1
good 5:8,9
grabbed 20:3,5
grandfather 20:25
grandmother 20:25

grandparents 20:23
ground 11:19 14:5 17:24 19:3 20:6,7
guess 13:22 22:21
guesstimate 17:11

**H**

handcuffs 11:17
happen 17:4
happened 10:17 16:3, 6,8 19:18,24 20:9
head 6:24
heard 7:22
hit 20:5,8
Holder 5:7,10,18 16:18 23:7 24:25
home 17:8 18:22 21:14
house 9:25 10:3 17:8 19:13,14 20:1 21:5 24:11,14

**I**

identified 20:1
important 16:14,15
individuals' 9:23
informing 9:16
initial 11:14
initially 23:10
inside 10:20 11:16,23 14:4,13,20,24 24:10
investigation 8:5,8
involved 9:2 15:8
issuance 8:23
issued 8:13,19

**J**

Joe 7:11
jumped 20:3

**K**

K9 12:18,23,25 13:2
kind 9:15 12:1 13:10 19:21 21:20 22:11
knew 20:22
knocked 21:11
knowledge 8:1

**L**

Lance 5:15 7:12 16:18 19:6
laying 11:20 19:20,23 24:4
leading 7:7 8:4
learned 8:12,23 20:11
left 10:15 11:25 12:3
lip 19:19,22 21:7 23:20 24:1,5
live 20:23
living 19:11
long 6:5 8:7 17:16 18:23 19:1
looked 19:21

**M**

made 17:13,20 19:14, 25 20:5 22:10 23:13
make 16:3 17:17 19:12 20:16 21:7,19,22
marked 5:1 12:17
MARTIN 5:17 16:21 23:4
materials 7:9
means 6:8
medical 21:20
meeting 9:7,8,13,21,22
memories 16:15
memory 22:6

mentioned 20:14
met 9:5
minor 22:4,18
minute 21:16
minutes 19:2 21:10
mobile 17:8 21:14
Monday 8:21,24
Montgomery 7:11
months 8:9
Morgan 5:10
morning 7:19,21
mouth 20:8 21:3 23:18, 23 24:7,8
moved 21:13,16 22:5
multiple 10:1

**N**

narcotics 10:7
necessarily 10:20
needed 21:8
no-knock 9:18
nods 6:24
notice 5:13 12:7
noticed 23:1
Nuh-uh 23:12

**O**

objections 5:16
observed 15:23
officer 16:5,8 18:8 20:12
officers 15:15 18:2,10 19:16
open 14:18,21 17:1 24:19,20
opened 11:2,4 21:2 24:17
operations 9:21

i3

ops 9:21,22
order 11:9

**P**

p.m. 25:2
paper 16:3
paraphernalia 13:21
park 17:17
party 15:12
patrol 12:16 13:9
Pearl 6:3,6
percent 14:3 19:9
personal-type 7:25
pertained 9:24
Peterson 5:12 7:17
11:17 14:12 17:24 18:3,
8,11,20,24 19:17 20:14
Peterson's 9:25 15:4
18:17 21:22
physically 10:19
place 14:8
plan 9:9
planning 9:3,7
point 12:4,8 13:19,23
14:13 21:12
policies 15:10
present 10:20
presently 6:2
pretty 8:16 18:25
prior 7:8 8:1,14
procedures 15:10
proceeded 9:25
profusely 22:7
property 10:22 17:1
pry 14:18
pull 17:17
pulling 17:5

purpose 14:15
pursuant 5:13
put 9:9 13:7,13 22:15
putting 13:10 15:21,22

**Q**

question 6:22
questions 6:21 7:3,14
quick 8:16 18:25 23:9
quit 21:9

**R**

real 23:9 24:5
recall 6:14 7:15 9:17,19
11:25 12:12,18,24 13:4,
5,24 14:12
recent 6:14
recollection 13:20
record 5:15,25 6:25
record's 7:1
refresher 6:20
relationship 8:1
remember 8:18 9:5
10:10 11:6 12:13,20,21
13:2,3 14:25 15:1,3
16:10,13 18:5 19:6,7
21:15 24:14,20
remembering 8:15
repeat 7:4
rephrase 6:23
report 15:9 16:2,5,7
reports 15:16,20 16:11
represent 5:11
reserved 5:16
residence 8:13 11:24
17:14,18
responsibilities 9:23
rest 24:13

reviewed 7:9,12
ride 10:12,17
River 6:3,6
road 13:8 17:7
rode 10:13,14,15,16
room 19:11
running 17:19
Ryan 9:15 10:6,9,12

**S**

safe 14:16,21,24
save 5:16
scene 16:5
search 8:12 9:6 10:1
20:2
searching 24:11
seconds 17:21
serve 8:16
Shane 10:5,21 14:8
17:1 18:4,7 19:8,10,18,
24 20:10 24:16,23
shell 15:1
sheriff 5:8 6:2,6,8
16:22 21:18
sheriff's 20:2
shoes 14:2
Shoot 6:16
shotgun 15:1
show 13:10
signing 7:15
sir 5:21 6:4,10,13,16,19
7:16,24 8:3,6 9:1,6,8,19
10:13,23,25 11:6,20
12:6,9,11,13 13:16,25
14:14,23 15:5,7 16:24
17:3,15 18:9,12,15,21
19:5 22:2,24 24:18,24
sister 15:6
sitting 5:10,12

Smith 5:11
speck 22:12,14
stack 11:13,14 17:14
standing 18:2,4 24:3
started 13:9 21:10
state 5:24 18:13
stay 19:11
stayed 20:19 24:13
stopped 23:24
straight 7:6 11:24 12:1
street 20:24
strike 18:11,12,20
striking 19:17
struck 22:22
stuff 16:12
supposed 15:16,21,22
swallow 23:16
swallowing 23:11,14,
22,24
sworn 5:3

**T**

table 20:4
taking 20:7
talk 21:15
talked 7:23 13:11 24:23
talking 20:19 24:7
teach 15:15
tells 16:5
ten 11:10
terrible 7:3
testified 5:4
thing 15:11
things 16:16
thought 22:11
time 8:11 11:15 12:5,8
13:16,17,19 14:4,8,9,13

i4

| | |
|---|---|
| 18:11 19:3,12 24:13 | **Wally**  20:1,3 |
| **times**  5:22 6:12 | **wanted**  14:16 |
| **today**  7:7,8 24:23 | **warrant**  8:12,13,19,24 9:3,6,18,24 10:2 20:2 |
| **told**  13:11 15:23 16:8 21:2,8 | **wave**  11:14 |
| **top**  12:4 17:24 | **wearing**  13:24 |
| **total**  11:10 | **window**  21:11 |
| **trail**  16:3 | **wine**  19:23 20:4 |
| **trailer**  23:2 | **word**  15:25 |
| **training**  15:8,19 | **worse**  22:9,10,20 |
| **truck**  20:21 | **write**  15:16 16:7,9,12, 16 |
| **turned**  17:7 24:21 | **writing**  9:9 15:9 16:2,4, 6 |
| **type**  15:10 21:25 | |

**U**

Uh-huh  16:17 20:13

uh-uhs  6:24

understand  6:22 15:13

understanding  8:21 9:22

underwear  14:2

unit  12:17,19,23,24,25 13:3,13 14:20 21:17 22:6

units  12:20 13:4,6,7

**V**

vehicle  16:23 17:6

vehicles  10:1

verbal  6:23

**W**

walk  11:22 17:1

walked  11:2,4,12 13:12 14:8,10 19:8,21 22:14 24:17

walking  17:19

Wallace  5:11 7:17

**Y**

y'all  7:13

years  6:18,19 16:14