IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

WALLACE DWAYNE PETERSON, JR.                                    PLAINTIFF


VERSUS                                    CIVIL ACTION NO. 1:20-cv-216-HSO-BWR


PEARL RIVER COUNTY, MISSISSIPPI; and
SHANE EDGAR, Individually                                    DEFENDANTS

_____

**MEMORANDUM BRIEF IN OPPOSITION TO SHANE EDGAR'S MOTION FOR
SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY [D.E. 47]**
_____

The Plaintiff, WALLACE DWAYNE PETERSON, JR., submits this Memorandum

Brief in Opposition to *Shane Edgar's Motion for Summary Judgment Based on Qualified*

*Immunity* [D.E. 47], and says:

**BACKGROUND FACTS AND RELEVANT PROCEDURAL HISTORY**

Mr. Peterson suffered damages and personal injuries when he was assaulted by

member(s) of the Pearl River County Sheriff's Department, same amounting to an

excessive use of force, said assault having occurred on the morning of August 23, 2019,

at Mr. Peterson's residence located at 424 Connie Hariel Road in Perkinston, Mississippi.

More specifically, on the morning of August 23, 2019, Mr. Peterson woke up, got his

daughter ready for school, and observed her load the school bus at approximately 6:45

a.m.[1] After his daughter departed for school, Mr. Peterson felt ill and decided to take a nap on the couch in his living room.[2]

Shortly thereafter, at approximately 7:30 a.m., agents and/or employees of the Pearl River County Sheriff's Department, including Defendant Shane Edgar ("Edgar"), while performing within the scope of their duties as agents and/or employees of the Pearl River County Sheriff's Department, drove to Mr. Peterson's home.[3] Upon their arrival, Mr. Peterson was still asleep on the couch inside his living room only several feet from the front door.[4] Edgar could not recall whether he had intelligence or other information indicating that Mr. Peterson had a history of violence.[5] However, while running point for the "entry" team, Edgar approached the front door without a warrant, failed to knock or otherwise announce his presence, and proceeded to break in absent any legal or justifiable cause.[6]

After breaking into the residence, Edgar only then announced his presence and requested Mr. Peterson to stand up and show his hands, to which Mr. Peterson complied.[7] Nevertheless, Edgar proceeded to recklessly, maliciously, and without reason assault Mr. Peterson by slamming him to the floor and striking him in the face with his firearm.[8] To justify his actions, Edgar testified as follows:

Q.      And when you walked in, Mr. Peterson was asleep on the couch?

---

[1]      *Wallace Peterson Dep.* [D.E. 35-4] at 15:2-13.
[2]      *Id.*
[3]      *Shane Edgar Dep.* [D.E. 35-1] at 16:18-23.
[4]      *Wallace Peterson Dep.* [D.E. 35-4] at 15:19-20.
[5]      *Shane Edgar Dep.* [D.E. 35-1] at 16:13-17.
[6]      *Wallace Peterson Dep.* [D.E. 35-4] at 13:21-25; 14:1-15.
[7]      *Id.*
[8]      *Id.*

A.      He was laying on the couch, correct?

Q.      Now, you walked in first?

A.      That's correct.

. . .

Q.      Okay. And when you breached the front door, all right, tell me what happens at that point.

A.      Upon breaching the front door, I was announcing myself as sheriff's department. I said it multiple times as I was coming into the door and through the door. I started in. I noticed that there was a white male laying on the couch which we later identified as Wally Peterson.

        As I came in, he sat up, looked at me. We made eye contact. I was making verbal commands, show me his hands and get on the ground. He looked at me. He then – I saw him look to the right. As I was approaching, I was beginning to holster my sidearm as I was **going to take him into custody**, at which point he grabbed a wine bottle. And when he grabbed the wine bottle with his right hand, he picked it up, spun it around as if to be used as a weapon. The wine **bottle was on a little table beside the couch**.

Q.      Like a coffee table?

A.      Yes.

Q.      Was this on the coffee table between the front door and the couch?

A.      It was kind of **toward the right of him**. So when he sat up, he reached to his right. And he was laying with his head to the left when I came in the door.

Q.      And when you came through the door, did you have your firearm drawn?

A.      I did.

3

*Shane Edgar Dep.* [D.E. 35-1] at 17:12-16; 20:1-25; 21:1-6 (emphasis our own). Curiously, despite many photographs being taken of the residence, Edgar could not identify this alleged wine bottle, testifying:

> Q.     Okay. Do you recall what the wine bottle looked like that he allegedly picked up?
>
> A.     It was dark in color, but I don't remember much else from it.
>
> Q.     Do you remember if it was empty?
>
> A.     I don't.
>
> Q.     Can you show me in these pictures a picture of it?
>
> A.     No, I cannot. At least I didn't see it unless it's one of those that are sitting there, but I don't --
>
> Q.     I mean, would you ***agree that it would be important to take a picture of the "perceived weapon"*** that he was threatening y'all with?
>
> A.     Probably, ***yes***.
>
> Q.     Was there any body cameras being worn?
>
> A.     I wasn't wearing one.
>
> Q.     Does the county have body cameras?
>
> A.     They do.

*Shane Edgar Dep.* [D.E. 35-1] at 29:9-25; 30:1-2 (emphasis our own).

In contrast, Mr. Peterson is certain he never provided any resistance, never failed to comply with any orders (whether legally justified or not), never had a wine bottle, and

was stunned at the events occurring in his home.[9] Describing Edgar's entry into the

residence and subsequent assault using excessive force, Mr. Peterson testified throughout

his deposition as follows:

> Q.    All right. In your own words, just give me, you know, your brief recollection of what happened that morning.
>
> A.    I had just put my – I was sick that morning. I had put my daughter on the bus, come back in and laid on the couch. I wasn't feeling good. And then they **kicked the door in, told me to stand up. When I stood up, they threw me down and hit me in the face.**
>
> And I asked them what was going on, and they said they had a warrant. And I asked to see it, and it's never been produced. I was in my underwear. They handcuffed me in the yard – handcuffed me in the house and took me in the yard and **made me stand there after my face was busted and blood was everywhere.**

*Wallace Peterson Dep.* [D.E. 35-4] at 13:21-25; 14:1-15. (emphasis our own). When pressed

by defense counsel for more details, Mr. Peterson testified:

> Q.    And can you describe what he looked like, any kind of recollection of what he looked like?
>
> A.    Big, bulky guy with, it looked like, an assault rifle or shotgun. I don't know. He kind of looked like he was on steroids or something.
>
> Q.    Kind of like me? How did he hit you?
>
> A.    **With the gun**. I don't know. He threw me on the ground, and he was on my back and **hit me in the face with, like, the butt of his gun**.
>
> And **he had a camera on**. I don't understand why they don't have the video.
>
> Q.    So the hit to your face by this big, bulky guy, it came after you were on the ground?

---

[9]    *Wallace Peterson Dep*. [D.E. 35-4] at 13:21-25; 14:1-15; 16:10-21; 19:6-10; 40:6-9; 44:11-20; 45:15-25; 46:1-5.

A.     (Witness nodded affirmatively.)

Q.     Explain to me how you got to be on the ground. Kind of step me through that.

A.     He told me to stand up and put my hands up. ***When I put my hands up, he threw me on the ground, put his knee on my back and then hit me.***

. . .

Q.     Okay. How did you get there? Was it a straight takedown move? Were you picked up?

A.     I stood up – I stood up behind the coffee table, and they laid me down towards the kitchen.

Q.     Okay. How did they lay you down?

A.     ***With force***. I don't know. They grabbed me and threw me down.

*Wallace Peterson Dep.* [D.E. 35-4] at 16:23-25; 17:1-17; 26:10-17 (emphasis our own).

Regarding Edgar's contention that Mr. Peterson grabbed a wine bottle off a table and threatened to use it as a weapon, Mr. Peterson was unequivocal that these accusations are wholly unfounded:

Q.     All right, Wallace. Picking back up, what was on that coffee table, you said?

A.     ***Nothing*** that I know. Maybe a remote.

Q.     Okay. And when they asked you to stand up, ***did you threaten*** the officer in any way?

A.     ***No***.

Q.     Did you offer ***any resistance***?

A.     ***No***.

> Q.  Did you have ***anything in your hands***?
>
> A.  ***No***.

*Wallace Peterson Dep.* [D.E. 35-4] at 44:11-22 (emphasis our own). Later, when defense

counsel attempted to distinguish between a coffee table and an end table, Mr. Peterson

opined:

> Q.  Morgan just asked you about if anything was on the coffee table.
>     ***Does the couch have end tables***?
>
> A.  ***No***.
>
> Q.  There are ***no end tables*** on the couch?
>
> A.  ***No, sir***.
>
> Q.  And he asked you if you had threatened officers, correct?
>
> A.  Yes.
>
> Q.  Have you heard the statement that you ***had a wine bottle*** in your
>     hand on this particular morning?
>
> A.  Yes.
>
> Q.  Okay. And your testimony is there's ***no truth*** to that?
>
> A.  ***None at all***.

*Wallace Peterson Dep.* [D.E. 35-4] at 45:15-25; 46:1-5 (emphasis our own).

After needlessly slamming Mr. Peterson to the ground and striking him in the face,

Edgar then recklessly, maliciously, and without reason, handcuffed Mr. Peterson and

forced him outside. Notably, despite the absence of an arrest warrant, Edgar testified as

follows:

Q.     Now, when you say – Mr. Peterson was *placed in custody*; is that right?

A.     *Correct*.

Q.     Was he under arrest?

A.     At that point, *yes*.

Q.     And what was he under arrest for?

A.     For my aspect of it, it would have been – at the very minimum, I *would have charged him with resisting arrest*; but he was handed over to Ryan Stachura at that point.

Q.     But what would he be resisting arrest for? This was a search warrant, right?

A.     *Uh-huh*.

*Shane Edgar Dep.* [D.E. 35-1] at 26:24-25; 27:1-11 (emphasis our own). And Edgar's decision to arrest Mr. Peterson occurred prior to any alleged resistance, as he testified that he was "beginning to holster my firearm *as I was going to take him into custody*, at which point he grabbed a wine bottle." *Id.* at p. 20. Thus, per Edgar's admission, the decision to arrest Mr. Peterson had been made prior to any alleged actions of Mr. Peterson.

Further, Mr. Peterson was traumatized by being forced to remain outside and inside the K9 compartment (not a passenger seat) of a patrol vehicle for two to three (2-3) hours - wearing only his underwear and handcuffs - while Edgar and the other officers tore apart his residence. Specifically, Mr. Peterson claims:

Q.     And so was this – let me back up on that. When did they put you in the back of the patrol car?

A.     After I complained about – I was trying to sit down. They wouldn't let me ever sit there. Then they put me in the cop car, and I was

8

> *bleeding*. And **he didn't want blood in there, so he put me in the dog part of the SUV, the dog compartment of the SUV**.

Q.     Was this a K9 unit?

A.     Yeah, the car was not. Blood was in the car, and he didn't want me in there. **So he put me in the K9 unit, in the dog compartment**.

Q.     Did you ever see a K9 there?

A.     Yeah, it was throwing a fit, barking.

Q.     Was it a German Shepherd?

A.     I was on the other side, I don't know.

Q.     So you never saw the actual dog in the K9 unit?

A.     No.

Q.     From the best of your recollection, how long was it from the first time you were thrown in any law enforcement vehicle until the time y'all left your property to go to jail?

A.     It **seemed like three hours**. I don't know.

*Wallace Peterson Dep.* [D.E. 35-4] at 41:4-25; 42:1-5 (emphasis our own). Throughout the entire two to three (2-3) hour period, Mr. Peterson never received any medical treatment and was never informed as to the reason for the raid at his home:

Q.     Did the sheriff allow you to **remain handcuffed**?

A.     **Yes**.

Q.     Allowed you to **remain bleeding outside**; too?

A.     Huh?

Q.     He allowed you to **remain bleeding outside**, too?

A.     **Yes**.

Q.     And he ***didn't offer you any aid*** at all?

A.     ***Nothing***.

Q.     Did anybody ever ***tell you you were under arrest***?

A.     ***No***.

Q.     Did you ask for a copy of the purported search warrant?

A.     ***Yes***.

Q.     And did you get a copy?

A.     ***No***.

Q.     Who did you ask?

A.     I asked Allison and Chris, whatever his last name is, Stachura, whatever.

Q.     Stachura?

A.     Yeah.

Q.     And what did they tell you?

A.     Allison told me he ***didn't have to have a warrant***, and Chris Stachura just never answered me – or Ryan Stachura, whatever his name is.

Q.     So the sheriff said he didn't need a warrant?

A.     Yes. He said he ***didn't have to have a warrant to be at my house***, is what he said.

*Wallace Peterson Dep.* [D.E. 35-4] at 42:24-25; 43:1-25; 44:1-5 (emphasis our own).

As a result of the actions and omissions of Edgar, this incident ended in Mr. Peterson suffering physical injuries to his face, head, mouth, and wrists, as well as mental and emotional suffering. After the senseless assault, Mr. Peterson was treated at Pearl

River County Hospital in Poplarville, Mississippi, where he was diagnosed and treated for a concussion, head and wrist contusions, and abrasions, said injuries being severe enough to cause permanent nerve damage to his face and mouth.

The operative pleading in this case is Plaintiff's First Amended Complaint asserting three (3) claims against Edgar individually:  (1) Fourth Amendment excessive force claim pursuant to the Civil Rights Act, 42 U.S.C. § 1983; (2) Fourth Amendment unreasonable seizure (false arrest/imprisonment) claim pursuant to the Civil Rights Act, 42 U.S.C. § 1983; and (3) Mississippi state law reckless disregard claim under the Mississippi Tort Claims Act ("MTCA"),[10] which is imputed to Defendant Pearl River County, Mississippi under the doctrine of *respondeat superior*. [D.E. 43]. Edgar now suggests that the facts demonstrate the Amended Complaint fails to state a claim against him as a matter of law, and further, fails to demonstrate the inapplicability of Edgar's qualified immunity. [D.E. 47-48]. As illustrated throughout this Memorandum, Mr. Peterson begs to differ.

## ARGUMENT AND AUTHORITIES

### I.    STANDARD OF REVIEW

#### A.    Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  "In making that determination, a court must view the evidence 'in the

---

[10]    Miss. Code Ann. § 11-46-1 *et seq.*

light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  In *Tolan*, where the Fifth Circuit affirmed the trial court's grant of summary judgment to a police officer on qualified immunity, the Supreme Court reversed, holding the lower courts "failed to adhere to the axiom that in ruling on a motion for summary judgment '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Id*. at 1863 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   All doubts must be resolved against the moving party.  *Erco Industries Ltd. v. Seaboard Coast Line Railroad Co.*, 644 F.2d 424, 428 (5th Cir. 1981).   "[T]he district court cannot draw conclusions of law from disputed facts at the summary judgment phase."  *Goodson v. City of Corpus Christi*, 202 F.3d 730, 739 (5th Cir. 2000).

A "material fact" is one that might affect the outcome of the suit under the governing law.  *Anderson*, 477 U.S. at 248.  A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id*.  A "genuine issue" is created when a reasonable jury could resolve the disputed facts in favor of, or in the manner described by, the non-movant.  *Meadowbrier Home v. Gunn*, 81 F.3d 521, 533 (5th Cir. 1996).

Even when there is no factual dispute, summary judgment is not appropriate "if the parties disagree regarding the material factual inferences that properly may be drawn from these facts."  *Winters v. Highlands Insurance Company*, 569 F.2d 297, 299 (5th Cir. 1978).  "Juries must consider not only 'questions of fact in dispute, [but] questions of conflicting inferences from undisputed facts.'"  *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.

1978) (quoting *Buffalo Insurance Co. v. Spach*, 277 F.2d 529, 530 (5th Cir. 1960)). "When the ultimate fact is to be inferred from evidentiary facts, the choice between permissible inferences is for the trier of fact." *Id.*

### B.   Qualified Immunity

The doctrine of qualified immunity "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam). "[Q]ualified immunity is an immunity from suit rather than a mere defense to liability." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). "A qualified immunity defense alters the usual summary judgment burden of proof." *Hanks v. Rogers*, 853 F.3d 738, 744 (2017) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, 134 S.Ct. at 1865. "The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right [.]'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The second prong of the qualified immunity analysis asks whether the right in question was 'clearly established' at the time of the violation. *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Thus, to avoid summary judgment, Mr. Peterson must show that—viewing the evidence in the light most favorable to his claims and resolving

factual disputes in his favor—he has put forth enough evidence that a jury could rationally find that he was unreasonably seized or arrested and that he was subjected to unreasonably excessive force in the process.

## II.  MR. PETERSON'S ARREST VIOLATED HIS FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEIZURE

To make out a claim for unreasonable seizure, false arrest, or false imprisonment under the Fourth Amendment, Mr. Peterson must show that he was unreasonably seized. *Angulo v. Brown,* 978 F.3d 942, 949 (5th Cir. 2020). There can be no doubt that the right not to be arrested absent probable cause was clearly established at the time of Mr. Peterson's arrest. *Alexander v. City of Round Rock*, 854 F.3d 298, 306-07 (5th Cir. 2017) (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009 - "The Fourth Amendment right to be free from false arrest—arrest without probable cause—[is] clearly established...."); *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994) ("The right to be free from arrest without probable cause is a clearly established constitutional right."). "[E]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to" qualified immunity, however. *Club Retro*, 568 F.3d at 206 (internal quotation marks omitted) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)). We must therefore determine whether it was objectively reasonable for Edgar and the officers to conclude that probable cause existed to arrest Mr. Peterson. "Objective reasonableness is assessed in light of legal rules clearly established at the time of the incident." *Mangieri*, 29 F.3d at 1016.

There is no dispute that an arrest warrant was never issued for Mr. Peterson prior to the unlawful search and seizure of his residence. Warrantless seizures are "*per se* unreasonable unless they fall within a few narrowly defined exceptions," such as arrest with probable cause or a temporary seizure based on reasonable suspicion. *Angulo,* 978 F.3d at 949 (5th Cir. 2020) (quoting *United States v. Ho*, 94 F.3d 935, 935 (5th Cir. 1996)). "To remain within the bounds of the Fourth Amendment, a warrantless arrest must be supported by probable cause." *Danna v. Purgerson*, 760 Fed.Appx. 275, 277-78 (5th Cir. 2019) (quoting *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018)). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense." *Id.* (qoting *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc) (per curiam)).

Viewing the evidence in the light most favorable to Mr. Peterson, Edgar entered the residence while Mr. Peterson was asleep on the couch. Despite Mr. Peterson complying with all commands and with no arrest warrant, Edgar approached Mr. Peterson to arrest him within a few seconds of entering the residence. Then, he slammed Mr. Peterson to the ground, struck him in the face, handcuffed him, and had him escorted from the residence. Further, Edgar never informed Mr. Peterson of the object and cause of his arrest. *See* Miss. Code Ann. 99-3-7 ("And in all cases of arrests **without warrant**, the person making such arrest must inform the accused of the object and cause of the arrest, except when he is in the actual commission of the offense or is arrested on pursuit"). However, Edgar admits that he would have been arresting him for resisting

arrest.[11] Not only does Mr. Peterson deny resisting, and thus, the analysis must be viewed from the lens of Mr. Peterson, but Edgar freely admitted that he had decided to arrest him prior to any alleged resistance. He testified that he was "beginning to holster my firearm *as I was going to take him into custody*, at which point he grabbed a wine bottle."[12] Therefore, any alleged resistance occurred after Edgar attempted to effectuate an unlawful arrest. And although he always complied and never offered any resistance, Mr. Peterson has a right to resist an unlawful arrest. *Smith v. State*, 208 So.2d 746 (Miss. 1968).

Candidly, the inquiry for both the unreasonable seizure and excessive force claims boils down to whether Mr. Peterson grabbed the wine bottle and threatened Edgar. In fact, defense counsel has freely admitted this in the *Memorandum in Support of Motion for Summary Judgment* [D.E. 48 at p. 14] and during Mr. Peterson's deposition:

> Q.    And, Mr. Peterson, as I am sure you can appreciate, in a lot of respects, that **comes down to a he said, she said**. You're going to say I **didn't have a wine bottle**, *and* **the officers will likely say that you did**. That's one of our sticking points. But again, your testimony is you did not have a wine bottle?
>
> A.    No, sir.
>
> Q.    And your counsel just clarified with you – and this is also in your complaint – that your testimony is you didn't do anything threatening to the officer; correct?
>
> A.    Correct.

*Wallace Peterson Dep.* [D.E. 35-4] at 46:6-19 (emphasis our own).

---

[11]    *Shane Edgar Dep.* [D.E. 35-1] at 26:24-25; 27:1-8.
[12]    *Id.* at 20:14-17.

A "material fact" is one that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.  A genuine dispute about a material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Id*.  Whether Mr. Peterson grabbed a wine bottle or otherwise threatened Edgar is the most material of all facts in this case. And as Judge Starrett has held, "[the defendant officer] did not communicate to [the plaintiff] that he was under arrest, ***making the idea of [the plaintiff] resisting or evading arrest impossible***." *Saucier v. Lamar County Board of Supervisors*, No. 2:15-CV-7-KS-MTP, 2015 WL 9244397, at *5 (S. D. Miss. Dec. 17, 2015) (Judge Starrett) (emphasis our own.).

Given that Edgar claims the wine bottle was sitting on a table that does not exist, no body cameras were turned on during the raid, and the alleged wine bottle could not be identified in the dozens of photographs taken inside Mr. Peterson's residence, Mr. Peterson's version of events seems much more plausible.[13] Summary judgment is not appropriate when "questions about the credibility of key witnesses loom ... large" and the evidence could permit the trier-of-fact to treat their testimony with "skeptical scrutiny." *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (quoting *Thomas v. Great Atl. & Pac. Tea Co.*, 233 F.3d 326, 331 (5th Cir.2000) (footnote omitted)). Given the foregoing, Edgar's version of events surrounding the wine bottle call into question his credibility. Nevertheless, when simply accepting Mr. Peterson's version of events and all reasonable inferences therefrom, genuine disputes exist which would allow a reasonable

---

[13]     *Shane Edgar Dep.* [D.E. 35-1] at 20:19-25; 21:1-3; 29:9-25; 30:1-2.

jury to return a verdict for Mr. Peterson. Accordingly, summary judgment must be denied.

### III.    EDGAR USED EXCESSIVE FORCE IN ARRESTING MR. PETERSON

The Fourth Amendment of the United States Constitution protects individuals from excessive force during an arrest or other seizure. *See Graham v. Conner*, 490 U.S. 386, 395 (1989). "To prevail on an excessive force claim, [a plaintiff] must show '(1) [an] injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) (citation omitted)). "Our precedents recognize that inquiries regarding whether a use of force was 'clearly excessive' or 'clearly unreasonable' . . . are often intertwined . . . ." *Hanks*, 853 F.3d at 744 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

"Although we no longer require 'significant injury' for excessive force claims, the injury must be more than *de minimis*." *Westfall v. Luna*, 903 F.3d 534, 550 (5th Cir. 2018) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) (internal citation omitted)). The Fifth Circuit has held the following types of injuries to be *de minimis*: abrasions, back and neck pain, and contusions. *See Brooks v. City of W. Point, Miss.*, 639 F. App'x 986, 990 (5th Cir. 2016) (internal citations omitted). Mr. Peterson's injuries include abrasions on his lip and nose, nerve damage, a concussion, and contusions to other areas of his body. Thus, his injuries are certainly consistent with or more serious than injuries previously established as *de minimis*.

Edgar is entitled to qualified immunity only if, viewing the evidence in the light most favorable to Mr. Peterson and drawing the reasonable inferences therefrom in his favor, Mr. Peterson has failed to demonstrate that (1) Edgar's conduct violated one of Mr. Peterson's constitutional rights and (2) that right was clearly established at the time of the violation. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1868 (2014); *Saucier v. Katz*, 533 U.S. 194, 201, (2001). With respect to the first prong, Edgar is entitled to qualified immunity at the summary judgment stage only if, viewing the summary judgment facts in the light most favorable to Mr. Peterson, his use of force was not "clearly excessive to the need" or the excessiveness was not "objectively unreasonable." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011) (internal quotation marks omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Clark v. Massengill*, 641 Fed.Appx. 418, 420 (5th Cir. 2016) (quoting *Deville*, 567 F.3d at 167)).

During Edgar's unlawful arrest of Mr. Peterson, he clearly used force which was excessive to the need and objectively unreasonable. Again, much of the analysis hinges on a "he said, he said" scenario surrounding Mr. Peterson's actions, or lack thereof, upon Edgar's entry into his residence. Much akin to Edgar's assertions related to the unreasonable seizure claim, he again concedes that the inquiry involves "competing testimonies" which "create a 'he-said/he-said situation.'"[14] Edgar claims that Mr. Peterson reached for and grabbed a wine bottle, then held it in an aggressive manner as

---

[14] D.E. 48, p. 16.

if he was going to utilize it as a weapon.[15] To the contrary, Mr. Peterson is adamant he never resisted or failed to comply with any commands, never reached for and/or grabbed anything, that the alleged end table where the alleged wine bottle sat does not even exist, and that Edgar simply barged into his home, slammed him face down onto the floor, and struck him in the face with his firearm.[16]

As the Supreme Court has made clear, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Accepting Mr. Peterson's version, as this Court must do, a jury could conclude that all reasonable officers on the scene would have known that Mr. Peterson was complying in all respects, and thus, any force utilized was unnecessary and unlawful. Certainly, slamming Mr. Peterson to the ground face-first, holding him down, and striking him in the face with a firearm is grossly excessive to the need and objectively unreasonable, as Mr. Peterson was not resisting, complied with all commands, and was not fleeing.

In *Flores v. City of Palacios,* 381 F.3d 391, 398 (5th Cir. 2004), the Fifth Circuit affirmed the trial court's denial of summary judgment based on qualified immunity. The officer in *Flores* argued that the court had to accept, as a matter of law, that he reasonably believed that Flores posed a significant threat to him or another person. *Id*. at 399. The trial court and Fifth Circuit disagreed. *Id*. "The district court correctly held that genuine

---

[15]     *Shane Edgar Dep*. [D.E. 35-1] at 52:8-23.
[16]     *Wallace Peterson Dep*. [D.E. 35-4] at 13:21-25; 14:1-15; 16:12-17; 17:4-17; 25:4-19; 26:10-17.

issues of fact exist as to whether [the officer] . . . reasonably believed Flores was a threat." *Id*. "[A]n individual defendant's subjective state of mind is irrelevant to the qualified immunity inquiry." *Cozzo v. Tangipahoa Parish Council-President Government*, 279 F.3d 273, 284 (5th Cir. 2002); *see also Johnson v. Waters*, 317 F.Supp.2d 726, 737 (S.D. Tex. 2004) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "Even if a police officer who uses deadly force believed he is at risk of death or serious injury, he is not entitled to qualified immunity if that belief was objectively unreasonable." *Hobart v. City of Stafford*, 784 F.Supp.2d 732, 748 (S.D. Tex 2011).

Accepting Mr. Peterson's allegations as true, he was sleeping at his own residence when Edgar forced entry several feet away. Mr. Peterson immediately raised his hands as commanded, but Edgar violently slammed him to the floor, held him down, struck him in the face with his firearm, and handcuffed him. Mr. Peterson never attempted to flee and, notably, was not charged with resisting arrest, failure to comply, or any other charge related to the allegations made by Edgar. Viewing the summary judgment facts in the light most favorable to Mr. Peterson, a genuine dispute of material fact exists as to whether this use of force was clearly excessive and objectively unreasonable.

Edgar's conduct also violates clearly established law. In *Darden v. City of Fort Worth*, 880 F.3d 722, 731 (5th Cir. 2018), the Court was tasked with describing clearly established law as of May 16, 2013, over six (6) years prior to the events giving rise to Mr. Peterson's claims. There, while executing a search warrant, one officer threw to the ground and twice tased a suspect who was ***not resisting arrest***. *Id*. (emphasis our own). And another officer kicked, punched, and choked the suspect, and then forced him into

a prone position. *Id.* at 732. The Fifth Circuit held that, viewing the facts in Darden's favor, both officers violated clearly established law because any reasonable officer would know that "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." *Id.* at 731 (citing *Ramirez v. Martinez,* 716 F.3d 369, 377-78 (5th Cir. 2013); *Newman v. Guedry,* 703 F.3d 757, 762-63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). We observed in *Darden* that a jury could ultimately determine that the suspect was in fact resisting arrest or disobeying commands. *Id.* at 732. And under those alternative facts, the officers' force may have been reasonable under the Fourth Amendment and reasonable under the clearly established law. *Id.* at 731. Yet, a genuine dispute of material fact existed in *Darden*, meaning that a jury could also find facts demonstrating the opposite. Therefore, the officers were not entitled to qualified immunity at the summary-judgment stage. *Id.* at 731-32.

 *Darden* announced no new rule; ***it reaffirmed an already-existing one***. "*Darden* repeated what had long been established in our circuit: Officers engage in excessive force when they ***physically strike a suspect who is not resisting arrest***." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020) (emphasis our own). "For us to say that the unlawfulness of such conduct wasn't clearly established in 2017, despite the fact that *Darden* said it was clearly established in 2013, would flout precedent and our rule of orderliness." *Id.* (citing *Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our en banc court.").

Finally, Edgar contends the excessive force claim fails because Mr. Peterson's injuries are inconsistent with the injuries alleged. As "evidence" in support of this claim, he cites to a photograph showing Mr. Peterson bleeding from the right side of his nose and his mouth, as opposed to the left side as alleged. It is true that Mr. Peterson claims he was struck in the face while his face was turned to the left; however, what Edgar conveniently ignores is that the blow to the left side of Mr. Peterson's face would also cause the right side of his face to be slammed against the floor, and thus, causing further injury to that portion of his face. More, while testifying about the very photograph attached to Edgar's motion, Mr. Peterson stated that the blood depicted therein was not coming from his nose and mouth, but rather, inside his mouth.[17] He was drinking most of the blood, and it is certainly conceivable that any blood exiting his mouth simply dried up on the right side. More, contrary to Edgar's allegations in the motion, Mr. Peterson was clear that he was struck by the butt of Edgar's firearm in the left side of his face.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Shane Edgar's *Motion for Summary Judgment Based upon Qualified Immunity* should be denied, *in toto*.

RESPECTFULLY SUBMITTED, this the 10th day of January, 2023.

**WALLACE DWAYNE PETERSON, JR.**

By:  /s/ *G. MORGAN HOLDER, MSB# 104131*

---

[17]     *Wallace Peterson Dep.* [D.E. 35-4] at 27:10-13.

## <u>CERTIFICATE OF SERVICE</u>

I, G. Morgan Holder, of the law firm of Smith & Holder, PLLC, hereby certify that I have this date filed the foregoing with the Clerk of Court using the ECF system which served a copy on all participating counsel of record.

SO CERTIFIED, this the 10th day of January, 2023.

/s/ <u>*G. MORGAN HOLDER, MSB# 104131*</u>

G. MORGAN HOLDER, MSB# 104131
CHRISTOPHER SMITH, MSB# 104366
**SMITH & HOLDER, PLLC**
POST OFFICE BOX 1149
GULFPORT, MS 309502
228-206-7076 (Telephone)
228-284-1870 (Facsimile)
morgan@smithholder.com
chris@smithholder.com